## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| PES HOLDINGS, LLC, *et al.*, | Case No. 19-11626 (KG) |
| Debtors. | (Jointly Administered) |

| | |
|---|---|
| PES HOLDINGS, LLC, NORTH YARD GP, LLC, NORTH YARD LOGISTICS, L.P., PES ADMINISTRATIVE SERVICES, LLC, PES ENERGY INC., PES INTERMEDIATE, LLC, PES ULTIMATE HOLDINGS, LLC, PHILADELPHIA ENERGY SOLUTIONS REFINING AND MARKETING LLC | |
| Plaintiffs, | Adversary Proceeding |
| v. | Case No. 20-_____ (KG) |
| ALLIANZ GLOBAL RISKS US INSURANCE CO., AXA CORPORATE SOLUTIONS ASSURANCE, CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO POLICY NO. 18NSRO1797-01, CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO POLICY NO. AJK148822G18, CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO POLICY NO. EN100070-18, CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO POLICY NO. (UMR) B1526ENNMG1800181, CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO POLICY NO. (UMR) B1526ENNMG1800261, CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO POLICY NO. (UMR) B1526ENNMG1900279, CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO POLICY NO. (UMR) B1526ENNMG1800280, CERTAIN | |

UNDERWRITERS AT LLOYD'S, LONDON          )
SUBSCRIBING TO POLICY NO. (UMR)          )
B1526ENNMG1800281, CERTAIN               )
UNDERWRITERS AT LLOYD'S, LONDON          )
SUBSCRIBING TO POLICY NO. (UMR)          )
B1526ENNMG1800282, CERTAIN               )
UNDERWRITERS AT LLOYD'S, LONDON          )
SUBSCRIBING TO POLICY NO. (UMR)          )
B1526ENNMG1800283, CERTAIN               )
UNDERWRITERS AT LLOYD'S, LONDON          )
SUBSCRIBING TO POLICY NO. (UMR)          )
B1526ENNMG1800285, GENERAL               )
SECURITY INDEMNITY COMPANY OF            )
ARIZONA, GREAT LAKES INSURANCE SE,       )
HDI GLOBAL INSURANCE CO., HDI            )
GLOBAL SPECIALTY SE, HELVETIA            )
SWISS INSURANCE COMPANY IN               )
LIECHTENSTEIN LTD., LANCASHIRE           )
INSURANCE COMPANY (UK) LTD.,             )
LIBERTY MUTUAL INSURANCE CO.,            )
MAPFRE RE COMPAÑIA DE                    )
REASEGUROS, S.A., PARTNERRE              )
IRELAND INSURANCE DAC, STARR             )
TECHNICAL RISKS AGENCY, INC.,            )
WESTPORT INSURANCE CORP., XL             )
INSURANCE AMERICA, INC., and ZURICH      )
AMERICAN INSURANCE CO.                   )
                                         )
                                         )
                                         )
                                         )
                     Defendants.         )

## **COMPLAINT**

Plaintiffs PES Ultimate Holdings, LLC ("PES Ultimate Holdings," together with the above-captioned debtors and debtors-in-possession, the "Company," the "Debtors," or "PES"), by and through its undersigned counsel, for its Complaint against Defendants Allianz Global Risks US Insurance Company, AXA Corporate Solutions Assurance, Certain Underwriters at Lloyd's, London subscribing to Policy No. 18NSRO1797-01, Certain Underwriters at Lloyd's, London subscribing to Policy No. AJK148822G18, Certain Underwriters at Lloyd's, London

subscribing to Binder No. EN100070-18, Certain Underwriters at Lloyd's, London subscribing to Policy No. (UMR) B1526ENNMG1800181, Certain Underwriters at Lloyd's, London subscribing to Policy No. (UMR) B1526ENNMG1800261, Certain Underwriters at Lloyd's, London subscribing to Policy No. (UMR) B1526ENNMG1900279, Certain Underwriters at Lloyd's, London subscribing to Policy No. (UMR) B1526ENNMG1800280, Certain Underwriters at Lloyd's, London subscribing to Policy No. (UMR) B1526ENNMG1800281, Certain Underwriters at Lloyd's, London subscribing to Policy No. (UMR) B1526ENNMG1800282, Certain Underwriters at Lloyd's, London subscribing to Policy No. (UMR) B1526ENNMG1800283, Certain Underwriters at Lloyd's, London subscribing to Policy No. (UMR) B1526ENNMG1800285, General Security Indemnity Company of Arizona, Great Lakes Insurance SE, HDI Global Insurance Company, HDI Global Specialty SE, Helvetia Swiss Insurance Company in Liechtenstein Ltd., Lancashire Insurance Company (UK) Limited, Liberty Mutual Insurance Company, Mapfre Re Compañia de Reaseguros, S.A., PartnerRe Ireland Insurance DAC, Starr Technical Risks Agency, Inc., Westport Insurance Corporation, XL Insurance America, Inc., and Zurich American Insurance Company (individually, each an "Insurer," and, collectively, the "Insurers"), alleges as follows:

## NATURE OF THE ACTION

1.     This is an action to recover insurance proceeds that the Insurers owe the Debtors arising out of a catastrophic incident involving an explosion at the alkylation unit in the Company's Girard Point refining facility on June 21, 2019 (the "Explosion"). Each Insurer sold the Company an insurance policy promising to underwrite a portion of the Company's 2018–2019 property insurance program (the "Insurance Program," or the "Program"), which provides a combined $1.25 billion in coverage for property damage and business interruption losses sustained by the Company. The Explosion caused massive property damage to the Company's

refining complex and caused a complete shutdown of the Company's refinery, leading to the filing of these chapter 11 cases shortly thereafter. But when the time came to honor their contractual obligations and provide coverage for the massive property damage and business interruption loss the Company suffered—and help the Company get back on its feet—the Insurers refused to answer the call.

2.      From day one, PES has made clear to the Insurers that its losses approach, and when all is said and done will likely exceed, the entire $1.25 billion in protection the Company bargained and paid for annually since its founding in 2012. This could hardly have come as a surprise to the Insurers given the widespread physical damage caused by the Explosion, the extensive and ongoing work conducted by the Debtors after the Explosion to make the site safe for access before any rebuild could begin, and the total shutdown of refining operations the Explosion caused. In the Company's hour of need, the Insurers' response has been to feign cooperation while preparing to avoid their clear coverage commitments under the Policy. The Insurers have needlessly delayed payment of PES's losses, imposing repeated, onerous requests on the Company as part of a deliberately delayed "adjustment" process in which the Insurers have paid just $65 million—a fraction of the more than $1 billion in coverage they clearly owe. After seven months and counting of "adjustment," the Insurers claim that they are still not "in a position to fully evaluate PES's claim."

3.      The Insurers recently informed PES that they do not anticipate making any additional payments for physical damage to the refinery over and above the $65 million they have already paid on account of estimated rebuild costs—a position that ignores the catastrophic scope of damage caused by the Explosion and directly contravenes the express terms of the Policy. The Insurers also have failed to fully reimburse the Company for the ancillary expenses

4

it has incurred as a result of the Explosion, such as fire brigade, demolition, and demurrage costs, which are separately covered under the Policy.

4.    The Insurers' response to the Company's business interruption loss has been even more miserly.  For months, the Company has engaged in good faith with the Insurers' requests for information regarding the business interruption loss; the Insurers responded by self-interestedly selecting inputs into a model so absurd it suggested the Company *made* money as a result of the Explosion that forced it into bankruptcy.

5.    The Insurers then told the Company that they contend PES was on course to permanently shut down the refinery *even if the Explosion had never happened*, in effect arguing that this massive explosion provided a benefit to the Company.  Then, after months of so-called "adjustment" of the claim, the Insurers announced that they were hiring a team of experts to prepare for litigation.

6.    As of today, the Insurers have not paid PES a single dollar for the business interruption loss that has been ongoing since June of 2019.  In the days leading up to the filing of this Complaint, the Insurers' adjuster suggested for the first time that the Insurers might make a "provisional" payment on account of the Company's business interruption loss at some point in the future—a transparent attempt to paper over the Insurers' egregious handling of this claim by making a token payout of pennies on the dollar of the Company's actual loss.  And the Insurers still have not actually *made* that payment, or even informed the Company of any conditions they may purport to attach to it.

7.    Making matters worse, the Insurers have also taken the position that their own obligations to PES require a final determination of the priority of PES's various creditor constituencies over the sums the Insurers owe.  The Insurers' conduct and their positions

5

demonstrate that they are not acting in good faith by refusing to honor the Policy terms. The Insurers' conduct has left PES with no choice but to bring this action to recover more than one billion dollars in coverage that Insurers clearly owe and plainly do not intend to provide until they are ordered to do so.

8.    The proceeds of the Company's insurance are at the very heart of these chapter 11 cases, and resolution of this coverage dispute is critical to the efficient administration of the estate. Despite the Company's best efforts, it has been unable to recover under the Policies the coverage it is owed by working amicably with the Insurers. The Debtors therefore bring this adversary proceeding seeking coverage under the Policies for the Company's property damage and business interruption losses resulting from the Explosion. The Company also seeks damages based on the Insurers' bad faith failure to provide coverage and their deliberate delay and bad faith in the prolonged "adjustment" of PES's insurance claims.

## JURISDICTION AND VENUE

9.    On July 21, 2019 (the "Petition Date"), the Company filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "Court").

10.    The Court has non-core concurrent jurisdiction over this proceeding under 28 U.S.C. § 157(c)(1). The Company's claims are directly related to its bankruptcy cases and will have a significant impact on its estate.

11.    This Court has personal jurisdiction over each of the Defendants under Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7004(f).

12.    General Condition 28 of the Policies provides that "in the event of the failure of the Insurers hereon to pay any amount claimed to be due hereunder, the Insurers hereon, at the

request of the Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States."

13.    Pursuant to Bankruptcy Rule 7008(a), the Company consents to the entry of final orders or judgment by this Court.  The Company also consents to the entry of final orders or judgments by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United Sates Constitution.

14.    Venue properly lies in this District pursuant to 28 U.S.C. §§ 1408 and 1409(a).

15.    This adversary proceeding is initiated under Bankruptcy Rule 7001(2) and (9), and 28 U.S.C. § 2201.

## THE PARTIES

16.    PES Ultimate Holdings is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in the Commonwealth of Pennsylvania.  All other debtors, other than PES Energy Inc., are privately held limited liability companies and limited partnerships that are parents and subsidiaries of PES Ultimate Holdings. Each debtor is organized under the laws of the State of Delaware, with a principal place of business in the Commonwealth of Pennsylvania.  PES Energy Inc. is a privately held corporation and is the managing member of PES Ultimate Holdings.

17.    Allianz Global Risks US Insurance Company is an insurance company organized under the laws of the State of Illinois, with a principal place of business in Chicago, Illinois.

18.    AXA Corporate Solutions Assurance is an insurance company organized under the laws of France, with a principal place of business in Paris, France.

19.    A number of the Policies in the Program were issued by Lloyd's underwriting syndicates or consortiums that are organized and registered under the laws of the United

7

Kingdom. The specific Lloyd's syndicates or consortiums that participate in the Program are set forth below:

a. Upon information and belief, Defendant Navigators Syndicate at Lloyd's 1221 is an underwriting syndicate subscribing to Policy No. 18NSRO 1797-01 that is organized and registered under the laws of the United Kingdom.

b. Upon information and belief, Defendant Lloyd's Syndicates TAL 1183 is an underwriting syndicate subscribing to Policy No. AJK148822G18 that is organized and registered under the laws of the United Kingdom.

c. Upon information and belief, Defendant Lloyd's Syndicate 1458 is an underwriting syndicate subscribing to Binder No. EN100070-18 that is organized and registered under the laws of the United Kingdom.

d. Upon information and belief, Defendant Lloyd's Syndicate 1884 is an underwriting syndicate subscribing to Binder No. EN100070-18 that is organized and registered under the laws of the United Kingdom.

e. Upon information and belief, Defendant Lloyd's Consortium 9094 (a/k/a Pioneer Natural Resources - Onshore - PNR 9094) is an underwriting consortium subscribing to Policy No. (UMR) B1526ENNMG1800181 that is organized and registered under the laws of the United Kingdom.

f. Upon information and belief, Defendant Lloyd's Consortium 9551 is an underwriting consortium subscribing to Policy Nos. (UMR) B1526ENNMG1800261, (UMR) B1526ENNMG1900279, (UMR)

DOCS_DE:227492.1 70753/001

B1526ENNMG1800280, and (UMR) B1526ENNMG1800282 that is organized and registered under the laws of the United Kingdom.

g.     Upon information and belief, Defendant Lloyd's Underwriter Syndicate No. 1084 CSL is an underwriting syndicate subscribing to Policy No. (UMR) B1526ENNMG1900279 that is organized and registered under the laws of the United Kingdom.

h.     Upon information and belief, Defendant Lloyd's Underwriter Syndicate 1200 AMA is an underwriting syndicate subscribing to Policy No. (UMR) B1526ENNMG1900279 that is organized and registered under the laws of the United Kingdom.

i.     Upon information and belief, Defendant Lloyd's Syndicate 2003 XLC is an underwriting syndicate subscribing to Policy No. (UMR) B1526ENNMG1800280 that is organized and registered under the laws of the United Kingdom.

j.     Upon information and belief, Defendant Lloyd's Underwriter Syndicates 1955 BAR is an underwriting syndicate subscribing to Policy No. (UMR) B1526ENNMG1800281 that is organized and registered under the laws of the United Kingdom.

k.     Upon information and belief, Defendant Lloyd's Underwriter Syndicate No. 1036 COF is an underwriting syndicate subscribing to Policy No. (UMR) B1526ENNMG1800283 that is organized and registered under the laws of the United Kingdom.

DOCS_DE:227492.1 70753/001

1.    Upon information and belief, Defendant Lloyd's Underwriter Syndicate 3902 NOA is an underwriting syndicate subscribing to Policy No. (UMR) B1526ENNMG1800285 that is organized and registered under the laws of the United Kingdom.

20.    General Security Indemnity Company of Arizona is an insurance company organized under the laws of the State of Arizona, with a principal place of business in Scottsdale, Arizona.

21.    Great Lakes Insurance SE is a member company of Munich RE.   Great Lakes Insurance SE is an insurance company organized under the laws of the European Union, with a principal place of business in Munich, Germany.

22.    HDI Global Insurance Company is an insurance company organized under the laws of the State of Illinois, with a principal place of business in Chicago, Illinois.

23.    HDI Global Specialty SE is the successor in interest to International Insurance Company of Hannover SE.  HDI Global Specialty SE is an insurance company organized under the laws of the European Union, with a principal place of business in Hannover, Germany.

24.    Helvetia Swiss Insurance Company in Liechtenstein Ltd. is an insurance company organized under the laws of the Principality of Liechtenstein, with a principal place of business in Vaduz, Principality of Liechtenstein.

25.    Lancashire Insurance Company (UK) Limited is an insurance company organized under the laws of England and Wales, with a principal place of business in London, United Kingdom.

26.    Liberty Mutual Insurance Company is an insurance company organized under the laws of the State of Massachusetts, with a principal place of business in Boston, Massachusetts.

27.     Mapfre Re Compañía de Reaseguros, S.A. (Mapfre Re) is the successor in interest to Mapfre Global Risks Companie Internacional De Seguros Y Reaseguros S.A. Mapfre Re is an insurance company organized under the laws of Spain, with a principal place of business in Madrid, Spain.

28.     PartnerRe Ireland Insurance DAC is an insurance company organized under the laws of Ireland, with a principal place of business in Dublin, Ireland.

29.     Starr Technical Risks Agency, Inc. is an insurance company organized under the laws of the State of New York, with a principal place of business in New York, New York.

30.     Westport Insurance Corporation is a member company of Swiss Re.  Westport Insurance Corporation is an insurance company organized under the laws of the State of Missouri, with a principal place of business in Kansas City, Missouri.

31.     XL Insurance America, Inc. is an insurance company organized under the laws of the State of Delaware, with a principal place of business in Stamford, Connecticut.

32.     Zurich American Insurance Company is an insurance company organized under the laws of the State of New York, with a principal place of business in Schaumburg, Illinois.

## FACTUAL BACKGROUND

### I.     PES'S CORPORATE HISTORY

#### A.     The Refining Complex's Longstanding Operation And PES's Corporate Origin.

33.     The Debtors' principal asset is a refining complex (the "Refining Complex"). The Refining Complex sits on an industrial site spanning roughly 1,300 acres.  The site is two-and-a-half miles from downtown Philadelphia and includes two interconnected refineries: Girard Point and Point Breeze.  The Refining Complex has a proud history in Philadelphia, and has been continuously operating in some form—through good markets and bad—since the 1800s.

11

34.    The Company's corporate origin is much more recent.  The Company was formed in 2012, in connection with the Company's acquisition of the Refining Complex from Sunoco Inc., a subsidiary of Energy Transfer Partners, L.P.

35.    The Company is a collection of privately held corporations, limited liability companies, and limited partnerships.  Before the Explosion on June 21, 2019, the Company employed approximately 1,100 people.  As of the Company's mid-July Petition Date, that number had dropped to approximately 950 employees, roughly 620 of whom were unionized members of the United Steelworkers.  Further layoffs since the Petition Date now leave the Company with approximately 175 employees and limited financial resources.

**B.    PES's Significant, Recent Investments In The Refining Complex.**

36.    Over the past several years, the Company has invested significantly in the Refining Complex.  One of the Company's aims has been to seize an opportunity to secure domestic crude oil at advantageous prices relative to other sources of crude oil.

37.    In 2013, the Company invested approximately $100 million to construct the North Yard Terminal in order to capitalize on this opportunity.  In 2014, an additional investment of approximately $30 million doubled the North Yard Terminal's capacity, allowing it to unload four crude unit trains—or 280,000 barrels of crude—per day and making the North Yard Terminal the largest crude oil unloading terminal on the United States' East Coast.

38.    In addition to its investments in the North Yard Terminal, the Company has invested approximately $850 million in the Refining Complex's infrastructure over the past five years.  These investments enabled the Company to operate safely and efficiently, and to position itself for success in the highly competitive transportation-and-fuel market.

39.    In a flash, the Explosion wiped out the Company's many steps forward.

**C.    PES's Prior Chapter 11 Cases.**

12

40.    On January 21, 2018, the Company filed petitions in this Court for relief under the Bankruptcy Code (the "2018 Chapter 11 Cases"), primarily due to regulatory-compliance costs that penalize independent merchant refiners like PES and challenging macroeconomic trends in the energy sector.  Through this process, the Company restructured and ultimately changed ownership.

41.    On August 7, 2018, the Company successfully emerged from the 2018 Chapter 11 Cases. The Company's plan of reorganization (the "2018 Plan") achieved, among other things:

   a.  a capital infusion of approximately $260 million;

   b.  extension of the Company's debt maturities through 2022;

   c.  reduction in the Company's anticipated debt-service obligations by approximately $35 million per year;

   d.  access for the Company to what is essentially a working capital facility (the "SOA") to facilitate the purchase and sale of hydrocarbons provided by ICBC Standard Bank PLC ("ICBCS"); and

   e.  relief for the Company from certain regulatory obligations.

42.    Following conclusion of the 2018 Chapter 11 Cases, the Company conducted a complex, multistage operational and legal implementation of the SOA.  Once fully implemented, the SOA created an intermediation arrangement under which ICBCS would procure and sell crude oil to PES, which PES would then refine and resell to ICBCS at specified prices.  Among other things, the SOA provided PES with reliable inputs for its crude-refining process and ensured access to essential working capital for its supply chain and refining operations.  The SOA allowed PES to capture the daily crack spread through crude and refined product

13

intermediation. The Company completed the SOA-implementation process on June 18, 2019, just days before the Explosion.

43.    Implementation of the new SOA was a major step forward and was the final step in the Company's year-long process to obtain a long-term SOA following the prior bankruptcy proceeding. Sadly, this momentum was lost just days later when, in the early morning hours of June 21, 2019, the Company suffered the historic and catastrophic Explosion at its Refining Complex.

**D.    The Refining Complex's Pre-Explosion Operations.**

44.    The Refining Complex produced a full range of transportation fuels, including gasoline and ultra-low sulfur diesel, as well as other refined products, such as home heating oil, jet fuel, kerosene, residual fuel oil, propane, refinery-grade propylene, butane, cumene, and sulfur.

45.    The Refining Complex's products were marketed and distributed by truck, rail, pipeline, and waterborne vessels throughout the northeastern United States, and by waterborne vessels to international markets.

46.    The Refining Complex consisted of two interconnected refineries with a combined distillation and refining capacity of approximately 335,000 barrels of crude oil per day. Before the Refining Complex shut down as a result of the Explosion, its output represented approximately 28% of the crude oil refining capacity of the United States' East Coast.

**1.    PES Used Cutting-Edge Technology To Optimize Its Business.**

47.    Since its inception, PES has used a linear programming model (the "LP Model") to optimize its business operations. Using the LP Model, specialists determined optimal

14

operational strategy by analyzing current economic trends, proposed crude slates and outputs and relevant constraints on the Refining Complex.

48.    Teams of specialists would analyze the LP Model and determine which crudes the Company would purchase.    These LP Model analysts communicated with traders weekly to calculate refining value of each crude and establish purchase plans.

49.    With the aid of the LP Model and derivative analysis, the Company engaged in weekly strategy meetings to determine actionable, near-term goals.    The Company's LP Model specialists then developed rolling, three-month plans for purchasing crude.

50.    To optimize its business operations even further, and to make its forecasting more precise, the Company implemented a monthly "lookback process" in 2013.    The lookback process allowed the Company to run a match case comparing the actual-yield accounting figures to earlier LP Model projections, allowing the Company to assess the LP Model's accuracy.

51.    The LP Model has proven extremely accurate, with match-case accuracy averaging roughly $0.30/bbl.    In other words, the predicted yield value matched the actual yield value by a tolerance of approximately 0.5%.    Always seeking to improve its performance, the Company would periodically require its LP Model specialists to review the match-case tests and to recalibrate the model, if necessary.

52.    The LP Model's track record of accuracy and reliability in the Company's ordinary course operations makes it the most appropriate tool to calculate the business interruption loss stemming from the Explosion.

### 2.    PES's Pre-Explosion Operations And Finances.

53.    The Company's operational gross earnings are primarily a function of the difference between the market prices for the refined products that the Company produces and the prices of refining inputs—most significantly, crude oil.    The Company expresses the difference

15

between refined-product prices and input prices in a financial metric known as Gross Refining Margin. The Gross Refining Margin is the source of the Company's operational cash flow.

54. Before the Explosion, the Company had developed a strong record of strategic investments designed to improve Gross Refining Margin, increase logistical flexibility, and diversify product offerings.

55. The Company's financial metrics further illustrate its viability. In the three years prior to the Explosion, the Company produced a Gross Refining Margin of between $500 million and $600 million per year. In addition, the Company had already realized a Gross Refining Margin of almost $200 million in 2019 before the June Explosion, in spite of having taken down both the Girard Point Crude and FCC units for extensive maintenance outages during the first quarter.

56. The Explosion radically disrupted the Company's business. Mere days after completing the transition to its new intermediation agreement, it was forced to shutter the Refining Complex in order to preserve liquidity pending receipt of insurance proceeds. The Company had no choice but to reduce expenses, including reducing its workforce to only those levels necessary to maintain safe and environmentally compliant operations.

57. The Explosion caused the shutdown of the entire Refining Complex; Girard Point immediately, and Point Breeze shortly thereafter. The shutdown has caused the Company to realize *zero* Gross Refining Margin where it had previously realized a Gross Refining Margin of between $500 million and $600 million per year in the three years before the Explosion, and a Gross Refining Margin of almost $200 million in five-plus months in 2019 preceding the Explosion, in spite of having taken down both the Girard Point Crude and FCC units for extensive maintenance outages during the first quarter. The Explosion caused a massive

16

business interruption and loss of value that the Insurers have refused to recognize as a covered business interruption loss under the Policies.

58.    The Explosion has not only led to the shuttering of the Refining Complex, which had operated through thick and thin since the mid-nineteenth century, it has devastated PES's stakeholders—particularly its workforce.

## II.    PES'S INSURANCE PROGRAM

59.    The Company's Insurance Program in place on the date of the Explosion provides a total of $1.25 billion in coverage for property damage and/or business interruption losses. The Insurance Program comprises more than 30 insurance policies issued by different insurers, each of which insures a portion—be it primary, excess, or a quota share—of the $1.25 billion aggregate coverage limit provided in the Policy. The Insurance Program was designed to protect the Company and its stakeholders in the event of catastrophic physical damage and business interruption like the Explosion.

60.    Each Insurer's policy follows a base insurance contract form with minor deviations in some instances, none of which is material to this litigation. *See, e.g.*, General Security Indemnity Company of Arizona ("GSICA Policy"), attached as Exhibit 1 hereto; a complete set of Policies relevant to this lawsuit is attached as Exhibits 2–28. PES refers herein to the common policy terms throughout the program as the "Policy." The Policy lists PES Energy Inc., PES Ultimate Holdings, LLC, and the other Plaintiffs in this lawsuit, among others, as "Named Insureds." Ex. 1, Declarations ¶ 1.

### A.    The Policy's Property Damage Coverage.

61.    Section I of the Policy details the terms and conditions of the property damage coverage for physical damage. The Policy insures "Real and Personal Property of the Insured of

every kind and description," subject to limited exclusions that do not apply to the property damage caused by the Explosion. That property is insured against "all risks of direct physical loss or damage occurring during the Term of Insurance," subject to a narrow list of excluded perils that, again, is not relevant here. The Policy's property damage coverage is subject to its $1.25 billion aggregate limit.

62.    The Policy's "Valuation" subsection, in Section I at paragraph 5, provides that, "[a]t the time of loss, the basis of valuation" for "Real and Personal Property" is "[t]he Replacement Cost, except Actual Cash Value if not repaired or replaced." Ex. 1, Policy § I.5(a).

63.    The Policy defines "Replacement Cost" as "[t]he amount it would take to repair or replace the damaged or destroyed property with materials of like kinds and quality, without deduction for depreciation or obsolescence and including the Insured's overhead . . . ." *Id.* § I.6(f).

64.    "Actual Cash Value" is defined as "Replacement Cost less deduction for physical depreciation." *Id.* § I.6(a).

65.    The Policy's "Valuation" subsection, in Section I at paragraph 5(e), also includes a provision titled "Stipulated Loss Value" (the "Stipulated Loss Value Clause"). The Stipulated Loss Value Clause applies where the insured has a contractual obligation to insure property that is the subject of a covered loss. It creates an exception to the general rule that the valuation is either Replacement Cost or Actual Cash Value.

66.    More specifically, the Stipulated Loss Value Clause provides that "where the Insured is contractually obligated to insure specific property for a stipulated loss amount, then in the event of a loss, this Policy will provide for the stipulated loss value *regardless of whether such property is replaced.* However, in no event shall this amount exceed the Replacement Cost

18

Value of such property (plus in addition the covered cleanup costs)." Ex. 1, Policy § I.5(e) (emphasis added). The Stipulated Loss Value Clause goes on to state that, "[i]n the event of a loss up to USD 250,000,000 regardless whether the affected property is replaced, the loss settlement will be on a replacement cost basis." *Id.* With respect to property damage losses exceeding $250 million, the Policy states, "[i]n the event of a property damage loss in excess of USD 250,000,000 and the insured does not replace the affected property, the loss settlement will be on the basis of Actual Cash Value with a minimum of USD 250,000,000." *Id.*

67.     In other words, for property subject to the Stipulated Loss Value Clause, if the Replacement Cost is $250 million or more the policyholder is entitled to recover a *minimum* of $250 million even if it "does not replace the affected property." This provision thus mandates that once the Replacement Cost value of the property damage exceeds $250 million, the Insurers must pay at least that amount. As noted above, to date, the Insurers have paid only $65 million of property damage coverage.

**B.     The Policy's Business Interruption Coverage.**

68.     Section II of the Policy details the terms and conditions of the Policy's business interruption insurance coverage. The "Business Interruption" provision, which appears in the "Time Element" section of the Policy, covers "actual loss sustained by the Insured resulting from the necessary interruption of business caused by direct physical loss or damage, by a peril insured against, to property insured herein . . . ." Ex. 1, Policy § II.1. The Policy's business interruption coverage is subject to the $1.25 billion aggregate limit of the Policy, and the retention consists of a 60-day "waiting period." *See id.*, Declarations ¶ 6.

69.     The "Basis of Recovery" Section describes how business interruption losses are measured under the Policy, and focuses on the Insured's "actual loss sustained." The "Basis of Recovery" provision states that "[r]ecovery in the event of loss hereunder shall be the actual loss

sustained by the Insured directly resulting from such interruption of business, but not exceeding the reduction in gross earnings less charges and expenses which do not necessarily continue during the interruption of business, not exceeding the Period of Indemnity as defined herein." *Id.* § II.8.

70.    The Company is entitled to business interruption insurance proceeds for covered losses sustained over a defined "Period of Indemnity." *Id.* § II.10(c). The Period of Indemnity is, in substance, the time that would be required to rebuild, repair, or replace the damaged property, but not to exceed "twenty-four (24) months after application of the Retentions." *Id.*

**C.    Coverage Extensions For Other Discrete Costs And Losses.**

71.    The Policy also has several ancillary coverage extensions that apply to the Explosion. As examples, the Policy provides up to $2.5 million in coverage for the Company's costs in preparing its claim for coverage, *see* Ex. 1, Policy, Declarations ¶ 5; up to $10 million in demurrage charges incurred as a result of a covered event, *id.*; up to $10 million in "Expediting Expense," *id.*; up to $25 million in "Extra Expense," *id.*; and up to $5 million in coverage for fire brigade and other extinguishing expenses, *id.*

72.    PES has incurred and submitted to the Insurers over $20 million in charges and expenses covered under these and other related coverage sections of the Policy, and expects to incur another $20 million before all is said and done. The Insurers have not reimbursed the Company for any of these losses. To take just one example, PES was required to pay the Philadelphia Fire Department approximately $1.8 million to cover the expense of extinguishing the fire that followed the Explosion. When PES submitted those expenses under the express grant of coverage for "fire brigade charges and extinguishing expenses," the Insurers denied coverage for more than 90% of those expenses, apparently taking the position that PES should not have paid the City of Philadelphia and the Fire Department for the expenses.

20

## III. THE EXPLOSION CAUSED SIGNIFICANT PROPERTY DAMAGE AND CRIPPLED PES'S BUSINESS

### A. The Explosion.

73. At approximately 4:00 AM on June 21, 2019, Unit 433 (the HF Alkylation Unit at Girard Point) suffered a light ends leak near the depropanizer tower. The incident occurred in the Modified HF Alkylation Unit's Depropanizer Reflux System. A vapor cloud formed and ignited in approximately two minutes, resulting in a massive explosion and fire. This activated the safety system, which included rapid acid de-inventory and water-mitigation systems.

74. At approximately 4:20 AM, a second, larger explosion occurred. The second explosion erupted with such force that it launched a 38,000-pound treating vessel out of the unit battery limits and across the Schuylkill River. By 7:00 AM, the fire was burning in a controlled manner. The fire continued to burn through approximately 8:00 AM on June 22, 2019.

75. Significant portions of the Unit 433 processing equipment and at least eight discrete structures within the Refinery Complex sustained severe damage, with property losses alone exceeding $350 million.

76. Fortunately, despite the catastrophic property damage, no major injuries were reported.

77. The Explosion appears to have been the result of a failure in an 8-inch, 90-degree carbon steel elbow. The failed component was on the discharge line of one of two reflux pumps. The failure occurred on the discharge line of the pump that was not operating at the time.

### B. The Explosion Led To A Shutdown Of The Refining Complex And To PES's Bankruptcy Filing.

#### 1. The Girard Point And Point Breeze Refining Facilities Operate Interdependently.

78.    As a result of the Explosion, the Girard Point refinery is inoperable and will require an extensive rebuild. The Explosion left the Company significantly impaired, with only a temporary ability to use the Point Breeze refinery to run off remaining inventories.

79.    While the Girard Point and Point Breeze refineries have independent crude and downstream processing units, they comprise a single refining complex and operate interdependently. In practical terms, the Refining Complex's interconnectedness means that breakdown of one of its various units can—and, in this case, did—produce severely negative downstream effects, ultimately impacting the Company's Gross Refining Margin.

80.    As a result of the Explosion, the Company announced that it would cease operating the Refining Complex—after the run-off through the Point Breeze refinery of remaining inventories, subject to available liquidity—until satisfactory arrangements can be made with the Insurers to rebuild the damaged infrastructure and restart operations. Some remaining hydrocarbons are still being removed from the Refinery Complex.

### 2.    The Explosion Left PES With No Choice But To Reenter Chapter 11.

81.    The reduced capacity had a significant financial impact due to the high fixed cost nature of the refining industry, and the obligations to operate the Refining Complex in a safe and responsible manner would have cost the Company over $100 million within a few weeks. The Company was thus left with little choice but to file another set of voluntary petitions with this Court for relief under chapter 11 of the Bankruptcy Code, which it did on July 21, 2019.

82.    On June 26, 2019, the Company informed approximately 1,025 employees of upcoming reductions in the workforce via written notices issued pursuant to the Worker Adjustment and Retraining Notification Act (the "WARN Act"). The Company's decision to reduce its workforce was another unfortunate result of the unforeseeable Explosion, and was driven by the necessity to preserve liquidity until the Company recovers the insurance proceeds

22

to which it is entitled and completes its reorganization or sale under the chapter 11 proceedings. The Refinery Complex remains shut down as of the date of this filing, except for the removal of remaining hydrocarbons.

**C.    PES's Covered Losses Will Likely Exceed A Billion Dollars And May Exceed The $1.25 Billion Limit.**

**1.    The Explosion Caused Over $360 Million In Property Damage.**

83.    PES has retained industry-leading consultants to assist in the assessment of physical damage and business interruption loss.

84.    With respect to the property damage claim, the Company engaged Fluor Corporation, one of the world's largest engineering and construction firms, to develop a "Class 4" Fire Damage Estimate (the "Fluor Report") for the costs associated with the repair and replacement of the property and facilities damaged in the Explosion.

85.    The Fluor Report was finalized on September 18, 2019. On September 20, 2019, the Company sent a copy of the Fluor Report to Integra, the Insurers' claims adjuster. Fluor revised its report on January 29, 2020 to account for additional information from the PES inspection team regarding the scope of damage. With that additional detail, Fluor revised its estimate of the total replacement cost associated with fire damage from the Explosion from approximately $365 million to approximately $361 million. The Company provided a copy of the revised Fluor Report to Integra on February 5, 2020.

86.    Fluor's engineering and project-management teams reviewed data collected by PES's site team in concert with data that Fluor had previously collected for engineering work at the Refining Complex. Fluor analyzed key components such as quantity development, labor costs, material costs, equipment costs, indirect costs, wage rates, taxes, escalation, and contingencies.

87.    Fluor anchored its analysis in a conservative "Replace in Kind" philosophy, under which Fluor modeled the cost of replacing precisely what was lost; put differently, the Fluor Report includes no upgrades or debottlenecking.  Nor does the Fluor Report include costs for acceleration of engineering, procurement, fabrication, or construction.

88.    In addition to the over $360 million in rebuilding costs, PES estimates that it will incur many millions in losses covered under other Policy provisions.  Fluor also concluded that the rebuilding period would exceed the Policy's 24-month period of indemnity given the extensive work required and the delay in the start of that work necessitated by the time required to remove and neutralize the hydrofluoric acid from the damaged unit (during which period site access was restricted by federal investigations).

### 2.    The Explosion Has Also Caused Massive Business Interruption Losses.

89.    PES is using the same LP Model it has historically used to optimize its business and accurately forecast which crude to purchase to calculate its business interruption losses.  PES retained BDO USA, LLP ("BDO"), a leading forensic accounting firm, to quantify the loss from the interruption to PES's operations and to present those figures to the Insurers.

90.    The Company has suffered hundreds of millions of dollars in business interruption losses already, up to the time of this filing, and its business interruption losses will likely exceed the Policy's aggregate limit by the end of the Policy's period of interruption.

91.    The magnitude of the Company's business interruption loss is not news to the Insurers.  In 2018, the Company's insurance broker, Aon, provided the Insurers with a "Risk Engineering Review For Insurance Purposes Of: Philadelphia Energy Solutions (PES) Philadelphia Refinery," (the "Risk Review") attached as Exhibit 29.  In the Risk Review, Aon analyzed, among other things, the Company's business operations and risk exposures from an

24

insurance coverage perspective, and explicitly addressed the prospect of business interruption losses. *See* Ex. 29 at 72–90. The Company was in the midst of the 2018 Chapter 11 Cases when Aon conducted the diligence that would ultimately produce the Risk Review. Despite the Company's headwinds, Aon nevertheless estimated plausible business interruption losses of more than $600 million for the Girard Point refinery alone in the event that a catastrophe led to a shutdown of the facility. *Id.* at 80–86.

92.     The Risk Review provided the Insurers with a basis for their own analysis of the risks associated with insuring PES for an aggregate limit of $1.25 billion, which in turn determined the premiums the Insurers charged PES as compensation for assuming those risks. The Insurers were thus well aware that PES could face significant business interruption losses in the event of a catastrophic event, even as the Company worked through its prior reorganization in bankruptcy, and they extracted the price they saw fit for the Policies. The Insurers must now fulfill their end of the bargain.

## IV.    PES'S COVERAGE CLAIM AND THE INSURERS' RESPONSE

93.     PES has diligently pursued the insurance recovery it is owed in the seven-plus months following the Explosion. In that time, the Insurers have repeatedly delayed resolution of the claim and advanced increasingly aggressive and indefensible coverage positions in an attempt to avoid their clear coverage obligations.

94.     PES notified the Insurers of the Explosion on June 21, 2019—the same day the Explosion occurred. Shortly after receiving notice, the Insurers retained Integra as their claims adjuster, along with a team of forensic accountants and other consultants.

95.     PES has gone to great lengths to cooperate in the Insurers' adjustment of the Company's property damage and business interruption losses. The Company has made its

25

employees and consultants continuously available to the Insurers in the months following the Explosion.

96.    In addition to extensive day-to-day contact with the Insurers' retained professionals, PES has hosted a series of meetings with the Insurers themselves. On August 13, 2019, PES and its consultants hosted the Insurers to provide an update on the status of its investigation of the Explosion and a preliminary calculation of its losses, in hopes of paving the way to a prompt resolution of the insurance claim.

97.    Given the extensive physical damage that had already occurred and the fact that the waiting period for business interruption loss was about to expire (making that loss recoverable as well), at the August 13 meeting PES asked the Insurers for an advance payment based on its losses to date—something that would have made a meaningful difference to PES's immediate liquidity and ability to start on the path to recovery.

98.    The Insurers agreed to pay only a fraction of PES's losses at the time, and only after the entry of a stipulation binding PES's creditors. PES did not see a penny of that coverage until September 19, 2019, and it took until October 24 to receive the entire amount. Adding insult to injury, one of the Insurers' checks bounced, delaying PES's receipt of the full payment for six days.

99.    PES continued to cooperate. On August 29, 2019, PES and BDO met with the Insurers' consultants again, to continue discussing the Company's LP Model and PES's business interruption loss calculation. From September 10 to 12, 2019, the Company arranged for one of the Insurers' consultants to witness metallurgical testing of the section of pipe that was suspected of failure. During the same period, PES arranged meetings between the Insurers' consultants and modeling specialists at Stancil & Co. ("Stancil") to provide the Insurers additional information

on the Company's LP Model and business interruption analysis. PES and BDO then met with Integra and other Insurer consultants on September 13, 2019, to continue discussions about the business interruption caused by the Explosion.

100.    The Company set up a data room to share information and documents with the Insurers and their consultants, giving access to dozens of individuals at the Insurers' request. To date, the Company has responded to over two hundred separate requests from the Insurers and uploaded more than 3,000 documents to the data room for the Insurers' review. The Company continued to accommodate the Insurers' requests for information and access throughout 2019 with in-person meetings held on September 25, September 30, October 1, October 2, October 3, November 20, December 3, December 4, and December 13, on top of nearly daily telephone conferences.

101.    On January 9, 2020, the Company held yet another onsite visit for the benefit of the Insurers' consultants. There, Stancil provided detailed explanations of its inputs and edits to the structure of the LP Model, and further discussed the Company's lookback process.

102.    Unfortunately, PES's cooperation has not led to a prompt and efficient adjustment of its insurance claim—and, more to the point, it has not led to prompt payment of the proceeds the Insurers owe.

103.    One of the new reasons that the Insurers have asserted for delaying payment of the amounts that they owe is the pending Adversary Proceeding in this Court concerning priority over any insurance proceeds recovered (the "Pending Priority Dispute"). On November 11, 2019, more than four-and-a-half months into the "adjustment," the Insurers told PES that they "cannot make any future payments without confirmation of how the payment can be made in

consideration of the pending claims in the bankruptcy action." Exhibit 30, 11/11/19 F. Popko Ltr. at 17.

104.    The Insurers have failed to pay PES the property damage proceeds to which it is entitled.  The Insurers have paid just $65 million for the physical damage wrought by the Explosion, and have not committed to paying anything more on account of estimated rebuild costs.  That amount falls woefully short of PES's entitlement to either the Actual Cash Value of the damaged property or the floor set by the Policy's Stipulated Loss Value Clause.  The Insurers also have failed to reimburse the Company for any of the ancillary expenses it has incurred as a result of the Explosion, such as fire brigade, demolition, and demurrage costs, which are separately covered under the Policy.

105.    The Insurers have similarly failed to honor their obligation to pay PES's "actual loss sustained" under the Policy's business interruption coverage.  PES has spent months educating the Insurers and their consultants on its calculations, and has made every effort to advance the process.  PES has answered every question, but even now—five months and counting *after* the expiration of the retention waiting period, with the refinery still completely shut down—the Insurers have not paid a single dollar of business interruption loss.

106.    The Insurers recently told the Company that they hired a team of testifying experts from Grant Thornton to "[a]dvise Insurers regarding the solvency of PES through the claimed 24 month Period of Liability." Exhibit 31, 11/1/19 F. Popko Email.  When PES expressed concern that this was an irrelevant (and unfounded) detour that would do nothing to advance the prompt payment of PES's losses, the Insurers replied that they would be relieved of their coverage obligations if PES would have stopped operating the refinery *even if the Explosion never happened.* Ex. 30, 11/11/19 F. Popko Ltr. at 16.

107.    The Insurers are grasping at straws to avoid their obligation to pay PES's "actual loss sustained." PES was a going concern on June 21, 2019, and it would have continued operations had it not been for the Explosion and fire—just as refinery operations have existed at the site since the 1800s despite ebbs and flows in the oil and gas markets. Indeed, even during the 2018 Chapter 11 Cases, PES continued operating while it was in bankruptcy.

108.    The Insurers' obligations under the business interruption coverage section of the Policy have been triggered for months. The Insurers are required under the Policy to reimburse PES's actual business interruption loss beginning on the day following the contractual waiting period. Based on the LP Model, the Company has suffered hundreds of millions of dollars in business interruption losses up to the time of this filing, and those losses will likely exceed the Policy's aggregate limit by the end of the Policy's Period of Indemnity. Nevertheless, the Insurers have yet to pay the Company one cent of coverage for its business interruption losses following the Explosion.

109.    At the meeting between the Company and the Insurers on October 3, 2019, the Company made a request for a second payment of $334 million. The Insurers responded that, at most, they would be willing to pay another $15 million in property damage coverage—but not a penny of business interruption loss—*after* entry of a second stipulation with the Debtors' stakeholders—again, just a fraction of the coverage they owe. Although the Insurers more recently suggested a willingness to "provisionally" make a small "partial payment" on account of the Company's business interruption losses, PES has received no such payment as of the date of this Complaint and the Insurers have not committed to any timeline for making it, nor have they informed the Company if any "strings" will be attached. The Company is doing all it can to remain viable and to maximize value for its stakeholders through these chapter 11 cases, but,

when the party that holds the key to the Company's successful reorganization refuses even to acknowledge its contractual obligations, the Company can do little but seek relief from this Court.

110.    Despite its best efforts over the past six months, PES has been unable to resolve these coverage disputes.  Its cooperation with the Insurers has not been reciprocated.  The Insurers have paid only a mere fraction of the $1 billion-plus in property damage and business interruption losses covered under the Policy.  The Company and its constituents deserve better and deserve more, which has necessitated the filing of this Complaint.

<u>**COUNT I — DECLARATORY JUDGMENT**</u>

(Pertaining To The Pending Priority Dispute)

111.    The Company incorporates by reference paragraphs 1 through 110 of its Complaint as if fully set forth herein.

112.    All conditions precedent to the Insurers' obligation to pay the property damage and business interruption losses incurred by the Company as a result of the Explosion have been met.

113.    The Company paid all premiums owed under the Policy.

114.    The Company performed any and all obligations that it has under the Policy, including the extensive cooperation with the Insurers' adjustment process since the Explosion.

115.    The Insurers have an obligation and/or duty to pay for the property damage and business interruption losses incurred by the Company as a result of the Explosion.

116.    As a direct and proximate result of the Insurers' breaches of their obligations under the Policy, the Company has suffered, will suffer, or is continuing to suffer, damages, costs, and other losses and have been or will be incurring damages in an amount to be proven.

30

117.    The Pending Priority Dispute does not excuse the Insurers' obligation to provide the Company with the coverage it is owed, and does not constitute a reason to delay provision of this coverage.

118.    The facts set forth above demonstrate the existence of an actual, justiciable controversy involving specific, adverse claims regarding the interpretation and effect of the Policies and the rights and obligations of the parties under the Policies, which claims are ripe for adjudication. All facts necessary for an adjudication of this dispute have occurred.

119.    The prompt resolution of the Insurers' erroneous claim that the Pending Priority Dispute allows them to withhold payment of the Company's losses will assist the parties in determining the Insurers' obligations to the Company, particularly where, as here, the ability of the Company to maximize value for all stakeholders in its chapter 11 restructuring depends on resolution of this dispute.

## COUNT II — DECLARATORY JUDGMENT

(Incurred And Expected Property Damage And Ancillary Expense Losses)

120.    The Company incorporates by reference paragraphs 1 through 119 of its Complaint as if fully set forth herein.

121.    Under the terms of the Policy, the Company is entitled to coverage for property damage resulting from the Explosion. The Company has incurred and will continue to incur property damage losses as a result of the Explosion.

122.    Under the terms of the Policy, the Company is also entitled to coverage for certain ancillary expenses resulting from the Explosion, such as fire brigade costs, demurrage, and claim preparation expenses. The Company has incurred and will continue to incur such ancillary expenses as a result of the Explosion.

31

123.    All conditions precedent to the Insurers' obligation to pay the Company's property damage and ancillary expense losses have been met.

124.    The Company paid all premiums owed under the Policy.

125.    The Company performed any and all obligations it has under the Policy.

126.    Despite due and repeated demands, the Insurers have failed to pay what is owed under the Policy for property damage losses suffered and ancillary expenses incurred as a direct result of the Explosion.

127.    As a direct and proximate result of the Insurers' breaches of their duties under the Policy, the Company has suffered, will suffer, or is continuing to suffer, damages, costs, and other losses and have been or will be incurring damages in an amount to be proven.

128.    The facts set forth above demonstrate the existence of an actual, justiciable controversy involving specific, adverse claims regarding the interpretation and effect of the Policies and the rights and obligations of the parties under the Policies, which claims are ripe for adjudication. All facts necessary for an adjudication of this dispute have occurred.

129.    The prompt resolution of the competing claims regarding coverage for the Company's property damage losses will assist the parties in determining their respective rights and obligations, particularly where, as here, the ability of the Company to maximize value for all stakeholders in its chapter 11 restructuring depends on resolution of this dispute.

## COUNT III — BREACH OF CONTRACT

(Incurred Property Damage And Ancillary Expense Losses)

130.    The Company incorporates by reference paragraphs 1 through 129 of its Complaint as if fully set forth herein.

32

131.    All conditions precedent to the Insurers' obligation to pay the property damage losses and ancillary expenses incurred by the Company as a result of the Explosion have been met.

132.    The Company paid all premiums owed under the Policy.

133.    The Company performed any and all obligations that it has under the Policy.

134.    The Insurers have an obligation and/or duty to pay for the property damage losses and ancillary expenses incurred by the Company as a result of the Explosion.

135.    The Insurers breached their obligation and/or duty to pay for the property damage losses and ancillary expenses incurred by the Company as a result of the Explosion by refusing to pay the full extent of the Company's losses.

136.    As a result of the Insurers' breach of their obligation and/or duty to pay for property damage and ancillary expenses incurred by the Company as a result of the Explosion, the Company has incurred damages in the form of legal fees and expenses, both present and future.

137.    The Insurers have failed to honor their contractual obligation to pay for property damage losses and ancillary expenses incurred by the Company as a result of the Explosion.

## COUNT IV — DECLARATORY JUDGMENT

### (Incurred And Expected Business Interruption Losses)

138.    The Company incorporates by reference paragraphs 1 through 137 of its Complaint as if fully set forth herein.

139.    Under the terms of the Policy, the Company is entitled to coverage for business interruption caused by the Explosion.  The Company has suffered and will continued to suffer business interruption losses as a result of the Explosion.

DOCS_DE:227492.1 70753/001

140.    All conditions precedent to the Insurers' obligation to pay the Company's business interruption losses have been met.

141.    The Company paid all premiums owed under the Policy.

142.    The Company performed any and all obligations it has under the Policy.

143.    Despite due and repeated demands, the Insurers have failed to pay what is owed under the Policy for Business Interruption losses.

144.    As a direct and proximate result of the Insurers' breaches of their duties under the Policy, the Company has suffered, will suffer, or is continuing to suffer, damages, costs, and other losses and have been or will be incurring damages in an amount to be proven.

145.    The facts set forth above demonstrate the existence of an actual, justiciable controversy involving specific, adverse claims regarding the interpretation and effect of the Policies and the rights and obligations of the parties under the Policies, which claims are ripe for adjudication.  All facts necessary for an adjudication of this dispute have occurred.

146.    The prompt resolution of the competing claims regarding coverage for the Company's business interruption losses will assist the parties in determining their respective rights and obligations, particularly where, as here, the ability of the Company to maximize value for all stakeholders in its chapter 11 restructuring depends on resolution of this dispute.

## COUNT V — BREACH OF CONTRACT

(Incurred Business Interruption Losses)

147.    The Company incorporates by reference paragraphs 1 through 146 of its Complaint as if fully set forth herein.

148.    All conditions precedent to the Insurers' obligation to pay the business interruption losses incurred by the Company as a result of the Explosion have been met.

149.    The Company paid all premiums owed under the Policy.

34

150.    The Company performed any and all obligations it has under the Policy.

151.    Insurers have an obligation and/or duty to pay for the business interruption losses incurred by the Company as a result of the Explosion.

152.    The Insurers breached their obligation and/or duty to pay for the business interruption losses incurred by the Company as a result of the Explosion by failing to provide any coverage.

153.    As a result of the Insurers' breach of their obligation and/or duty to pay for business interruption losses incurred by the Company as a result of the Explosion, the Company has incurred damages in the form of legal fees and expenses, both present and future.

154.    The Insurers have failed to honor their contractual obligation to pay for business interruption losses incurred by the Company as a result of the Explosion.

## COUNT VI — BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

(Property Damage Coverage)

155.    The Company incorporates by reference paragraphs 1 through 154 of its Complaint as if fully set forth herein.

156.    All conditions precedent to the Insurers' obligation to pay the property damage losses incurred by the Company as a result of the Explosion have been met.

157.    The Company paid all premiums owed under the Policy.

158.    The Company performed any and all obligations that it has under the Policy.

159.    The Insurers have an obligation and/or duty to pay for the property damage losses incurred by the Company as a result of the Explosion.

160.    New York law imposes on the Insurers an implied covenant of good faith and fair dealing in the Policy.  This covenant operates to prevent a party from taking any action that

35

would deprive the other of the benefits of the contract or to cause undue hardship or harm to the other party. In insurance contracts, this covenant requires Insurers to investigate in good faith and pay covered claims.

161.   By their actions, as set forth herein, the Insurers have breached the implied covenant of good faith and fair dealing in one or more of the following ways: (1) by arbitrarily, and with reckless disregard for the rights of the Company, conditioning any payment under the property damage policy on resolution of the Pending Priority Dispute; (2) by unreasonably, recklessly, knowingly, intentionally, or maliciously delaying payment of the Company's property damage losses; (3) by arbitrarily, and with reckless disregard for the rights of the Company, refusing to effectuate prompt, fair, and equitable payment of the Company's property damage losses; (4) by ignoring the voluminous documentation provided by the Company demonstrating the nature, extent, and cause of property damage; (5) by unreasonably, recklessly, knowingly, intentionally, or maliciously refusing advances on the Company's accrued property damage losses; (6) by intentionally exploiting the Company's lack of liquidity in order to impede the Company's pursuit of the coverage it was owed; and (7) by forcing the Company to sue for coverage.

162.   As a result of the Insurers' breach of the implied covenant of good faith and fair dealing, the Company has incurred damages in an amount to be determined at trial.

163.   The Company is entitled to consequential damages flowing from the Insurers' violation of the implied covenant of good faith and fair dealing including, without limitation, legal fees, engineering fees, contractor fees and costs, monitoring equipment, demolition and debris removal costs, fire-brigade fees, hydrofluoric acid inventory costs, claim-preparation expenses, increased fees and costs associated with the Company's bankruptcy proceedings, and

36

attorneys' fees, costs, and disbursements incurred by the Company in enforcing its rights as a consequence of the Insurers' bad faith conduct.

164.    The Insurers' breach of the implied covenant of good faith and fair dealing has proximately caused and is proximately causing the consequential damages sustained by the Company.

165.    Consequential damages for breach of the implied covenant of good faith and fair dealing in the Policy were reasonably contemplated by the Company and the Insurers at the time they entered into the Policy.

166.    The conduct by the Insurers that breached the covenant of good faith and fair dealing evinces such bad faith that no reasonable insurer would, in these circumstances, be expected to engage in such conduct.

167.    The Insurers have failed to honor their covenant of good faith and fair dealing with respect to investigating and paying the Company's property damage claim as a result of the Explosion.

## COUNT VII — BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

(Business Interruption Coverage)

168.    The Company incorporates by reference paragraphs 1 through 167 of its Complaint as if fully set forth herein.

169.    All conditions precedent to the Insurers' obligation to pay the business interruption losses incurred by the Company as a result of the Explosion have been met.

170.    The Company paid all premiums owed under the Policy.

171.    The Company performed any and all obligations that it has under the Policy.

172.    The Insurers have an obligation and/or duty to pay for the business interruption losses incurred by the Company as a result of the Explosion.

173.    New York law imposes on the Insurers an implied covenant of good faith and fair dealing in the Policy.  This covenant operates to prevent a party from taking any action that would deprive the other of the benefits of the contract or to cause undue hardship or harm to the other party.  In insurance contracts, this covenant requires Insurers to investigate in good faith and pay covered claims.

174.    By their actions, as set forth herein, the Insurers have breached the implied covenant of good faith and fair dealing in one or more of the following ways: (1) by arbitrarily, and with reckless disregard for the rights of the Company, conditioning any payment under the business interruption policy on resolution of the Pending Priority Dispute; (2) by unreasonably, recklessly, knowingly, intentionally, or maliciously taking the position that the Company has no business interruption losses at all based on the false claim that the Company would have stopped operating the refinery even if the Explosion never occurred; (3) by arbitrarily, and with reckless disregard for the rights of the Company, refusing to effectuate prompt, fair, and equitable payment of the Company's business interruption losses; (4) by ignoring the voluminous documentation provided by the Company demonstrating the nature, extent, and cause of business interruption; (5) by unreasonably, recklessly, knowingly, intentionally, or maliciously refusing partial payments on the Company's accrued business interruption losses; (6) by intentionally exploiting the Company's lack of liquidity in order to impede the Company's pursuit of the coverage it was owed; and (7) by forcing the Company to sue for coverage.

175.    As a result of the Insurers' breach of the implied covenant of good faith and fair dealing, the Company has incurred damages in an amount to be determined at trial.

176.    The Company is entitled to consequential damages flowing from the Insurers' violation of the implied covenant of good faith and fair dealing including, without limitation, additional business interruption the Company has suffered while awaiting payment of its claims, legal fees, contractor fees and costs, claim-preparation expenses, increased fees and costs associated with the Company's bankruptcy proceedings, and attorneys' fees, costs, and disbursements incurred by the Company in enforcing its rights as a consequence of the Insurers' bad faith conduct.

177.    The Insurers' breach of the implied covenant of good faith and fair dealing has proximately caused and is proximately causing the consequential damages sustained by the Company.

178.    Consequential damages for breach of the implied covenant of good faith and fair dealing in the Policy were reasonably contemplated by the Company and the Insurers at the time they entered into the Policy.

179.    The conduct by the Insurers that breached the covenant of good faith and fair dealing evinces such bad faith that no reasonable insurer would, in these circumstances, be expected to engage in such conduct.

180.    The Insurers have failed to honor their covenant of good faith and fair dealing with respect to investigating and paying the Company's business interruption claim as a result of the Explosion.

<u>**PRAYERS FOR RELIEF**</u>

**WHEREFORE**, the Company demands judgment in its favor and against Defendant Insurers as follows:

(1)    With respect to Count I:

(a) Declaring that the Pending Priority Dispute does not excuse the Defendants' coverage obligations or justify delaying payment of the Company's property and business interruption losses under the Policy;

(b) Awarding money damages, together with prejudgment and post-judgment interest;

(c) Awarding costs of suit;

(d) Awarding counsel fees; and

(e) Awarding such other and further relief as the Court may deem just and proper.

(2)    With respect to Count II:

(a) Declaring that Plaintiffs' property damage losses and ancillary expenses incurred as a result of the Explosion are covered under the Policy;

(b) Declaring and adjudging the rights and obligations of the parties under the Policy with respect to ancillary expenses and property damage losses, as such losses are described in Section I of the Policy, resulting from the Explosion;

(c) Awarding money damages, together with prejudgment and post-judgment interest;

(d) Awarding costs of suit;

(e) Awarding counsel fees; and

(f) Awarding such other and further relief as the Court may deem just and proper.

(3)    With respect to Count III:

(a) Awarding money damages against the Insurers in an amount to be determined at trial, plus any additional amounts that may become due and owing, together with prejudgment and post-judgment interest;

(b) Awarding costs of suit;

(c) Awarding counsel fees; and

(d) Awarding such other and further relief as the Court may deem just and proper.

(4)     With respect to Count IV:

(a) Declaring that Plaintiffs' business interruption losses as a result of the Explosion are covered under the Policy;

(b) Declaring and adjudging the rights and obligations of the parties under the Policy with respect to business interruption losses, as such losses are described in Section II of the Policy, resulting from the Explosion;

(c) Awarding money damages, together with prejudgment and post-judgment interest;

(d) Awarding costs of suit;

(e) Awarding counsel fees; and

(f) Awarding such other and further relief as the Court may deem just and proper.

(5)     With respect to Count V:

(a) Awarding money damages against the Insurers in an amount to be determined at trial, plus any additional amounts that may become due and owing, together with prejudgment and post-judgment interest;

(b) Awarding costs of suit;

(c) Awarding counsel fees; and

(d) Awarding such other and further relief as the Court may deem just and proper.

(6)     With respect to Count VI:

(a) Awarding consequential money damages against the Insurers in an amount to be determined at trial, plus any additional amounts that may become due and owing, together with prejudgment and post-judgment interest;

(b) Awarding costs of suit;

(c) Awarding counsel fees; and

(d) Awarding such other and further relief as the Court may deem just and proper.

(7)      With respect to Count VII:

(a) Awarding consequential money damages against the Insurers in an amount to be determined at trial, plus any additional amounts that may become due and owing, together with prejudgment and post-judgment interest;

(b) Awarding costs of suit;

(c) Awarding counsel fees; and

(d) Awarding such other and further relief as the Court may deem just and proper.

DOCS_DE:227492.1 70753/001

Dated:  February 12, 2020          /s/ Laura Davis Jones
Wilmington, Delaware          Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Peter J. Keane (DE Bar No. 5503)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:     (302) 652-4100
Facsimile:     (302) 652-4400
Email:          ljones@pszjlaw.com
                joneill@pszjlaw.com
                pkeane@pszjlaw.com

- and -

Edward O. Sassower, P.C.
Steven N. Serajeddini (admitted *pro hac vice*)
Matthew C. Fagen (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          edward.sassower@kirkland.com
                steven.serajeddini@kirkland.com
                matthew.fagen@kirkland.com

Andrew A. Kassof, P.C. (*pro hac vice* admission pending)
Nader R. Boulos, P.C. (*pro hac vice* admission pending)
Michael B. Slade (admitted *pro hac vice*)
William T. Pruitt (*pro hac vice* admission pending)
Whitney L. Becker (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 N. LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          andrew.kassof@kirkland.com
                nader.boulos@kirkland.com
                michael.slade@kirkland.com
                william.pruitt@kirkland.com
                whitney.becker@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*

Robin Cohen (*pro hac vice* forthcoming)
Kenneth H. Frenchman (*pro hac vice* forthcoming)
**MCKOOL SMITH**
One Manhattan West
395 9th Avenue, 50th Floor
New York, NY 10001
Telephone:    (212) 402-9400
Facsimile:    (212) 402-9444
Email:    rcohen@mckoolsmith.com
          kfrenchman@mckoolsmith.com

*Of Counsel to the Debtors and Debtors in Possession*

DOCS_DE:227492.1 70753/001