## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PES HOLDINGS, LLC, *et al.*,[1] | ) | Lead Case No. 19-11626 (LSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| PES HOLDINGS, LLC, NORTH YARD GP, | ) | |
| LLC, NORTH YARD LOGISTICS, L.P., PES | ) | |
| ADMINISTRATIVE SERVICES, LLC, PES | ) | |
| ENERGY INC., PES INTERMEDIATE, LLC, | ) | |
| PES ULTIMATE HOLDINGS, LLC, | ) | |
| PHILADELPHIA ENERGY SOLUTIONS | ) | |
| REFINING AND MARKETING LLC, | ) | |
| | ) | |
| *Plaintiffs*, | ) | Adversary Proceeding |
| | ) | |
| -and- | ) | Case No. 20-50454 (LSS) |
| | ) | |
| ICBC STANDARD BANK PLC, | ) | |
| | ) | |
| *Intervenor-Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ALLIANZ GLOBAL RISKS US INSURANCE | ) | |
| CO., AXA CORPORATE SOLUTIONS | ) | |
| ASSURANCE, CERTAIN UNDERWRITERS | ) | |
| AT LLOYD'S, LONDON SUBSCRIBING TO | ) | |
| POLICY NO. 18NSR01797-01, CERTAIN | ) | |
| UNDERWRITERS AT LLOYD'S, LONDON | ) | |
| SUBSCRIBING TO POLICY NO. | ) | |
| AJK148822G18, CERTAIN UNDERWRITERS | ) | |
| AT LLOYD'S, LONDON SUBSCRIBING TO | ) | |
| POLICY NO. EN100070-18, CERTAIN | ) | |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: PES Holdings, LLC (8157); North Yard GP, LLC (5458); North Yard Logistics, L.P. (5952); PES Administrative Services, LLC (3022); PES Energy Inc. (0661); PES Intermediate, LLC (0074); PES Ultimate Holdings, LLC (6061); and Philadelphia Energy Solutions Refining and Marketing LLC (9574) (collectively, the "**Debtors**"). The Debtors' service address is: 1735 Market Street, Philadelphia, Pennsylvania 19103.

UNDERWRITERS AT LLOYD'S, LONDON )
SUBSCRIBING TO POLICY NO. (UMR) )
B1526ENNMG1800181, CERTAIN )
UNDERWRITERS AT LLOYD'S, LONDON )
SUBSCRIBING TO POLICY NO. (UMR) )
B1526ENNMG1800261, CERTAIN )
UNDERWRITERS AT LLOYD'S, LONDON )
SUBSCRIBING TO POLICY NO. (UMR) )
B1526ENNMG1900279, CERTAIN )
UNDERWRITERS AT LLOYD'S, LONDON )
SUBSCRIBING TO POLICY NO. (UMR) )
B1526ENNMG1800280, CERTAIN )
UNDERWRITERS AT LLOYD'S, LONDON )
SUBSCRIBING TO POLICY NO. (UMR) )
B1526ENNMG1800281, CERTAIN )
UNDERWRITERS AT LLOYD'S, LONDON )
SUBSCRIBING TO POLICY NO. (UMR) )
B1526ENNMG1800282, CERTAIN )
UNDERWRITERS AT LLOYD'S, LONDON )
SUBSCRIBING TO POLICY NO. (UMR) )
B1526ENNMG1800283, CERTAIN )
UNDERWRITERS AT LLOYD'S, LONDON )
SUBSCRIBING TO POLICY NO. (UMR) )
B1526ENNMG1800285, GENERAL )
SECURITY INDEMNITY COMPANY OF )
ARIZONA, GREAT LAKES INSURANCE SE, )
HDI GLOBAL INSURANCE CO., HDI )
GLOBAL SPECIALTY SE, HELVETIA )
SWISS INSURANCE COMPANY IN )
LIECHTENSTEIN LTD., LANCASHIRE )
INSURANCE COMPANY (UK) LTD., )
LIBERTY MUTUAL INSURANCE CO., )
MAPFRE RE COMPAÑIA DE )
REASEGUROS, S.A., PARTNERRE )
IRELAND INSURANCE DAC, STARR )
TECHNICAL RISKS AGENCY, INC., )
WESTPORT INSURANCE CORP., XL )
INSURANCE AMERICA, INC., and ZURICH )
AMERICAN INSURANCE CO., )
                                         )
                    *Defendants.*        )
                                         )
                                         )

## INTERVENOR-COMPLAINT

Intervenor-Plaintiff ICBC Standard Bank Plc ("**ICBCS**"), by and through its undersigned counsel, hereby alleges the following as its Intervenor-Complaint:

## <u>NATURE OF THE ACTION</u>

1.     ICBCS is filing this Intervenor-Complaint in order to protect its rights as an additional insured, loss payee, and mortgagee under the Policies that are the subject of the Adversary Proceeding filed by the Debtors against Allianz Global Risks US Insurance Company, AXA Corporate Solutions Assurance, Certain Underwriters at Lloyd's, London subscribing to Policy No. 18NSR01797-01, Certain Underwriters at Lloyd's, London subscribing to Policy No. AJK148822G18, Certain Underwriters at Lloyd's, London subscribing to Binder No. EN100070-18, Certain Underwriters at Lloyd's, London subscribing to Policy No. (UMR) B1526ENNMG1800181, Certain Underwriters at Lloyd's, London subscribing to Policy No. (UMR) B1526ENNMG1800261, Certain Underwriters at Lloyd's, London subscribing to Policy No. (UMR) B1526ENNMG1900279, Certain Underwriters at Lloyd's, London subscribing to Policy No. (UMR) B1526ENNMG1800280, Certain Underwriters at Lloyd's, London subscribing to Policy No. (UMR) B1526ENNMG1800281, Certain Underwriters at Lloyd's, London subscribing to Policy No. (UMR) B1526ENNMG1800282, Certain Underwriters at Lloyd's, London subscribing to Policy No. (UMR) B1526ENNMG1800283, Certain Underwriters at Lloyd's, London subscribing to Policy No. (UMR) B1526ENNMG1800285, General Security Indemnity Company of Arizona, Great Lakes Insurance SE, HDI Global Insurance Company, HDI Global Specialty SE, Helvetia Swiss Insurance Company in Liechtenstein Ltd., Lancashire Insurance Company (UK) Limited, Liberty Mutual Insurance Company, Mapfre Re Compañía de Reaseguros, S.A., PartnerRe Ireland Insurance DAC, Starr Technical Risks Agency, Inc., Westport Insurance Corporation, XL Insurance America, Inc., and Zurich American Insurance Company (collectively, the "**Insurers**").  As an additional insured under the Policies, ICBCS has the right to

recover for its business interruption losses, and also possesses an interest, as a contractual counterparty to the Debtors, to certain insurance proceeds of the Debtors' insurance claim.

2.      The Debtors initiated this Adversary Proceeding to pursue payment by Insurers for their own property damage and business interruption losses.  Both ICBCS's Claim and the Debtors' claim stem from the Explosion (as defined below) that caused crippling damage to the Debtors' Girard Point refining facility on June 21, 2019.  As an additional insured, loss payee, and mortgagee under the Policies, ICBCS has the right to receive payment under the same Policies for its own losses resulting from the exact same occurrence, *i.e.*, the Explosion.

3.      The Debtors have alleged that their losses may exceed the Policies' aggregate limit. If the Debtors recover on their claim in this proceeding prior to an adjudication on ICBCS's claim, there may be limited, if any, funds left to compensate ICBCS for its losses that resulted from the Explosion.  Given that both ICBCS and the Debtors have rights to receive business interruption coverage under the Policies, ICBCS should not suffer the risk that the Insurers will drain the Policies' limits by paying the Debtors' claim first.  ICBCS therefore files this Intervenor-Complaint to preserve its rights under the Policies, and seeks a declaration that if the Debtors' claim is adjudicated in this proceeding prior to an adjudication of ICBCS's rights, then the Insurers shall place any insurance proceeds awarded to the Debtors in a constructive trust pending adjudication of ICBCS's rights under the Policies and proper allocation of the Policies' proceeds, except to the extent that the parties agree, in advance of a final adjudication, to a stipulation (or other agreement) for the payment of certain proceeds.

4.      Furthermore, the Insurers have already acknowledged certain obligations under the Policies by advancing proceeds for the Debtors' property damage losses, while also expressing a willingness to advance certain proceeds to cover the Debtors' business interruption losses.  In

contrast, however, Insurers have not yet expressed any willingness to advance any policy proceeds or payments to ICBCS and indeed have not even acknowledged their contractual obligations to ICBCS.  Insurers have instead chosen to prolong their claims review process and even invent grounds on which to disclaim coverage—all of which are meritless and certain of which have not even been presented in good faith.  ICBCS therefore also seeks to adjudicate its rights under the Policies.

### JURISDICTION AND VENUE

5.      On July 21, 2019 (the "**Petition Date**"), the Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**").  On July 23, 2019, the Court ordered that the Debtors' petitions be jointly administered (the "**Chapter 11 Cases**").  *See Order (I) Directing Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief*, (July 23, 2019), ECF No. 72.

6.      This Court has non-core concurrent jurisdiction over this proceeding under 28 U.S.C. §§ 157(c)(1) and 1334.  ICBCS's claims are directly related to these Chapter 11 Cases because they could conceivably affect the Debtors' estates.

7.      This Court has personal jurisdiction over each of the Insurers under Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7004(f).

8.      General Condition 28 of the Policies provides that "in the event of the failure of the Insurers hereon to pay any amount claimed to be due hereunder, the Insurers hereon, at the request of the Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States."

9.      Pursuant to Bankruptcy Rule 7008(a), ICBCS consents to the entry of final orders or judgment by this Court.  ICBCS also consents to the entry of final orders or judgments by the

Bankruptcy Court if it is determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

10. Venue properly lies in this District pursuant to 28 U.S.C. §§ 1408 and 1409(a).

## THE PARTIES

11. ICBCS is organized under the laws of England and Wales with its headquarters in London, United Kingdom.

12. Upon information and belief, at all relevant times herein, defendant Allianz Global Risks US Insurance Company is an insurance company organized under the laws of the State of Illinois with its principal place of business in Chicago, Illinois.

13. Upon information and belief, at all relevant times herein, defendant AXA Corporate Solutions Assurance is an insurance company organized under the laws of France, with its principal place of business in Paris, France.

14. Upon information and belief, at all relevant times herein, defendants Certain Underwriters at Lloyd's, London subscribing to Policy No. 18NSRO1797-01, are a collection of syndicates organized and registered under the laws of the United Kingdom.

15. Upon information and belief, at all relevant times herein, defendants Certain Underwriters at Lloyd's, London subscribing to Policy No. AJK148822G18, are a collection of syndicates organized and registered under the laws of the United Kingdom.

16. Upon information and belief, at all relevant times herein, defendants Certain Underwriters at Lloyd's, London subscribing to Binder No. EN100070-18, are a collection of syndicates organized and registered under the laws of the United Kingdom.

17. Upon information and belief, at all relevant times herein, defendants Certain Underwriters at Lloyd's, London subscribing to Policy No. (UMR) B1526ENNMG1800181, are a collection of syndicates organized and registered under the laws of the United Kingdom.

RLF1 23218569V.1

18.    Upon information and belief, at all relevant times herein, defendants Certain Underwriters at Lloyd's, London subscribing to Policy No. (UMR) B1526ENNMG1800261, are a collection of syndicates organized and registered under the laws of the United Kingdom.

19.    Upon information and belief, at all relevant times herein, defendants Certain Underwriters at Lloyd's, London subscribing to Policy No. (UMR) B1526ENNMG1900279, are a collection of syndicates organized and registered under the laws of the United Kingdom.

20.    Upon information and belief, at all relevant times herein, defendants Certain Underwriters at Lloyd's, London subscribing to Policy No. (UMR) B1526ENNMG1800280, are a collection of syndicates organized and registered under the laws of the United Kingdom.

21.    Upon information and belief, at all relevant times herein, defendants Certain Underwriters at Lloyd's, London subscribing to Policy No. (UMR) B1526ENNMG1800281, are a collection of syndicates organized and registered under the laws of the United Kingdom.

22.    Upon information and belief, at all relevant times herein, defendants Certain Underwriters at Lloyd's, London subscribing to Policy No. (UMR) B1526ENNMG1800282, are a collection of syndicates organized and registered under the laws of the United Kingdom.

23.    Upon information and belief, at all relevant times herein, defendants Certain Underwriters at Lloyd's, London subscribing to Policy No. (UMR) B1526ENNMG1800283, are a collection of syndicates organized and registered under the laws of the United Kingdom.

24.    Upon information and belief, at all relevant times herein, defendants Certain Underwriters at Lloyd's, London subscribing to Policy No. (UMR) B1526ENNMG1800285, are a collection of syndicates organized and registered under the laws of the United Kingdom.

25.     Upon information and belief, at all relevant times herein, defendant General Security Indemnity Company of Arizona is an insurance company organized under the laws of the State of Arizona, with a principal place of business in Scottsdale, Arizona.

26.     Upon information and belief, at all relevant times herein, defendant Great Lakes Insurance SE is a member company of Munich RE.  Great Lakes Insurance SE is an insurance company organized under the laws of the European Union, with its principal place of business in Munich, Germany.

27.     Upon information and belief, at all relevant times herein, defendant HDI Global Insurance Company is an insurance company organized under the laws of the State of Illinois, with a principal place of business in Chicago, Illinois.

28.     Upon information and belief, at all relevant times herein, defendant HDI Global Specialty SE is the successor in interest to International Insurance Company of Hannover SE.  HDI Global Specialty SE is an insurance company organized under the laws of the European Union, with a principal place of business in Hannover, Germany.

29.     Upon information and belief, at all relevant times herein, defendant Helvetia Swiss Insurance Company in Liechtenstein Ltd. is an insurance company organized under the laws of the Principality of Liechtenstein, with a principal place of business in Vaduz, Principality of Liechtenstein.

30.     Upon information and belief, at all relevant times herein, defendant Lancashire Insurance Company (UK) Limited is an insurance company organized under the laws of England and Wales, with a principal place of business in London, United Kingdom.

RLF1 23218569V.1

31.     Upon information and belief, at all relevant times herein, defendant Liberty Mutual Insurance Company is an insurance company organized under the laws of the State of Massachusetts, with a principal place of business in Boston, Massachusetts.

32.     Upon information and belief, at all relevant times herein, defendant Mapfre Re Compañía de Reaseguros, S.A. is the successor in interest to Mapfre Global Risks Companie Internacional De Seguros Y Reaseguros S.A.  Mapfre Re is an insurance company organized under the laws of Spain, with a principal place of business in Madrid, Spain.

33.     Upon information and belief, at all relevant times herein, defendant PartnerRe Ireland Insurance DAC is an insurance company organized under the laws of Ireland, with a principal place of business in Dublin, Ireland.

34.     Upon information and belief, at all relevant times herein, defendant Starr Technical Risks Agency, Inc. is an insurance company organized under the laws of the State of New York, with a principal place of business in New York, New York.

35.     Upon information and belief, at all relevant times herein, defendant Westport Insurance Corporation is a member company of Swiss Re.  Westport Insurance Corporation is an insurance company organized under the laws of the State of Missouri, with a principal place of business in Kansas City, Missouri.

36.     Upon information and belief, at all relevant times herein, defendant XL Insurance America, Inc. is an insurance company organized under the laws of Delaware, with a principal place of business in Stamford, Connecticut.

37.     Upon information and belief, at all relevant times herein, defendant Zurich American Insurance Company is an insurance company organized under the laws of the State of New York, with a principal place of business in Schaumburg, Illinois.

RLF1 23218569V.1

## FACTUAL BACKGROUND

### I. UNDER THE POLICIES, ICBCS IS AN ADDITIONAL INSURED, LOSS PAYEE, AND MORTGAGEE

38.    In 2018, Insurers issued various insurance policies that provide coverage for property damage and/or business interruption losses, effective November 1, 2018 through November 1, 2019, all of which are subject to certain common terms and conditions (collectively, the "**Policies**").[2]

39.    The Policies are governed by and construed in accordance with the laws of the state of New York.  *See* Policies, General Conditions § 44.

40.    The Policies cover "any person or organization to whom or to which the Insured is obligated by virtue of a written contract to name . . . as an Additional Insured . . . with respect to operations performed by or obligations required of the Insured to or for the Additional Insured under the terms and conditions of said contract."  Policies, General Conditions § 5.

41.    Philadelphia Energy Solutions Refining and Marketing LLC ("**PESRM**"), PES Holdings, LLC, North Yard GP, LLC, North Yard Logistics, L.P., and PES Administrative Services, LLC (collectively, the "**Transaction Parties**"), each are obligated, by virtue of the Sixth Amended and Restated Supply and Offtake Agreement (the "**SOA**"), to maintain business interruption insurance naming ICBCS as an additional insured, loss payee, and mortgagee.[3]  Ex. 1 §§ 8.16, 10.04, 10.12(b); Schedules 1.01(b), 8.16, 10.04.

42.    Specifically, Section 10.04 of the SOA required each Transaction Party to "keep its property insured at all times in accordance with the insurance requirements set forth in Schedule

---

[2] The Policies at issue are attached to the Debtors' adversary complaint ("**Debtors' Complaint**") as exhibits 1 through 28.  *See* Complaint (Feb. 12, 2020), ECF Nos. 1-1, 1-2, 1-3, 1-4, 1-5, 1-6 & 1-7.

[3] A true and correct copy of the SOA is attached hereto as Exhibit 1.

10.04," and further required that "[a]ll insurance policies . . . name ICBCS as mortgagee, additional insured, and loss payee." Ex. 1 § 10.04(b)–(c).  Schedule 10.04 required that each Transaction Party secure, *inter alia*, "Business Interruption Insurance in an amount reasonably satisfactory to ICBCS," and name "ICBCS as an additional insured as their interests may appear." *Id.*, Schedule 10.04(11).

43.      Each of the Transaction Parties are named "Insureds" under the Policies.

44.      ICBCS is therefore an "Additional Insured" under the Policies pursuant to the terms and conditions of the SOA.

45.      ICBCS is also named a "Loss Payee / Mortgagee" under the Policies.   An endorsement to the Policies names ICBCS as a "Loss Payee / Mortgagee," "as their interests may appear, as required by written contract or agreement, subject to the terms and conditions of" the Policies.  Policies, Endorsements § 4.

46.      Under the Policies, the "limits and/or coverage available to the Additional Insured shall be those agreed to by virtue of a written contract between the Insured and such Additional Insured."  Policies, General Conditions § 5.  The Policies "will respond primary to and without contribution from any valid and collective insurance of such Additional Insured."  *Id.*

47.      The Policies also contain a "Lenders Loss Payable Clause" that applies to ICBCS and provides that "[l]oss or damage, if any, under [the Policies], shall be paid to any lender designated by the Insured and in possession of a written contract . . . as their interests may appear . . . ."  Policies, General Conditions § 33.

48.      A Certificate of Evidence of Property Insurance issued to ICBCS in connection with the Policies (the "**ICBCS Certificate**") confirms ICBCS's status as a "named mortgagee,

loss payee, and additional insured as their interests may appear and where required by written contract." A true and correct copy of the ICBCS Certificate is attached hereto as Exhibit 2.

## II.   ICBCS'S INTERESTS AS THEY APPEAR IN THE SOA TRANSACTION DOCUMENTS

49.     The SOA, together with the Amended and Restated Marketing and Sourcing Agreement (the "**MSA**"), the Amended and Restated Terminaling, Transportation and Storage Agreement (the "**Storage Agreement**"), and numerous related agreements (collectively, the "**SOA Transaction Documents**"), govern the various intermediation services that ICBCS provided to facilitate operations at the Debtors' refining complex located near Philadelphia, PA (the "**Refining Complex**").

50.     The Refining Complex consisted of the Girard Point and Point Breeze refineries. When fully operational, the Refining Complex had a refining capacity of approximately 335,000 barrels of crude oil ("**Crude Oil**" or "**CO**") per day, and produced a full range of transportation fuels and other refined products ("**Refined Product**" or "**RP**"). *Declaration of Jeffrey S. Stein, Chief Restructuring Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* ("**Stein Decl.**") ¶¶ 5–7 (July 22, 2019), ECF No. 32.

51.     Pursuant to the SOA Transaction Documents, ICBCS exclusively sourced and purchased Crude Oil from third parties ("**CO Supply Contracts**") in such volumes as PESRM required for processing at the Refining Complex. Ex. 1 §§ 3.02(a), 3.03.

52.     Simultaneously with each CO Supply Contract, ICBCS and PESRM entered into a forward contract, under which ICBCS agreed to sell Crude Oil (of the same type, grade and volume as the CO Supply Contract) to PESRM, and each sale would take place upon delivery at one of the refineries' processing intake valves (each sale, a "**CO Transaction**"). *Id.* § 3.02, Schedule 3.02(c).

53.     ICBCS also agreed to purchase from PESRM all Refined Product that the Refining Complex produced each day (each day's purchase, an "**RP Production Contract**"). *Id.* § 4.06. ICBCS further agreed to source and purchase additional Refined Product from third party suppliers (each purchase, a "**RP Supply Contract**") as needed to meet demand facing the Refining Complex. *Id.* § 4.05.

54.     ICBCS, with PESRM's assistance, coordinated the sale of Refined Product to either PESRM or third party customers or distributors by truck, rail, pipeline, and waterborne vessels throughout the northeastern United States and to international markets. *Id.* § 4.02(b), 3(f); Stein Decl. ¶ 6.

55.     In the ordinary course of business, in accordance with the terms of the SOA Transaction Documents, ICBCS generated its revenues by earning various fees from PESRM during the duration of the supply and offtake process, including but not limited to, costs and expenses relating to the transportation, storage, and handling of Crude Oil and Refined Product that ICBCS owned ("**ICBCS Inventory**"). Ex. 1 §§ 3.08, 4.12. Certain of ICBCS's fees were fixed in the SOA Transaction Documents, including the monthly **"Sourcing Fee**," which was ICBCS's fee for sourcing Crude Oil and Refined Product from third party suppliers. *See id.*, Schedule 5 § B(3). Another fixed fee was the "**Base Handling Fee**," which accounted for certain costs associated with bringing Crude Oil and Refined Product to various delivery points each month. *See id.,* Schedule 5 § B(1). Other of ICBCS's fees were variable, but also specifically provided for in the SOA and the SOA Transaction Documents. These variable fees include, for example, the Crude Oil Inventory Carry Fees, Refined Product Inventory Carry Fees, Crude Oil Intermediation Fees, and Refined Product Intermediation Fees, among others. *See id.,* Schedules 5-DEF, 5(a), 5(b). The various fees earned on the supply of Crude Oil are known as the "**Crude**

**Revenues**," and the various fees earned on the offtake of Refined Product are known as the "**Product Revenues**." The Transaction Parties were also liable to ICBCS for its "hedging gains and losses for hydrocarbons," that is, "any gains or losses incurred or accrued by ICBCS as the result of any deemed hedging adjustments made by ICBCS." *Id.* § 5.04.

56.    ICBCS's "interests as they appear" in the SOA Transaction Documents survive termination of the agreements. For example, in the event of an "Early Termination" pursuant to a "PESRM Event of Default," ICBCS is entitled to recover from PESRM a "Termination Payment," which includes ICBCS's "Loss," as well as any "Unpaid Amounts," plus Default Interest. *Id.* §14.04(c). Moreover, under the SOA, in a PESRM Event of Default, PESRM is required to indemnify and hold harmless ICBCS for "any damages, losses, fees, costs and expenses which [ICBCS] may pay or incur from, as a result of or in connection with the enforcement of and protection of any of its rights and remedies under this Agreement, any PESRM Transaction, any Third Party Transaction or any other PESRM Transaction Document…." *Id.* § 14.04(d); *see also id.* § 16.19, Article VII.[4] PESRM also remains liable for storage costs, as well as any expenses incurred to remove ICBCS Inventory from storage at the Refining Complex. *Id.* § 14.04(a)(ii)(B). The indemnification provisions in the SOA expressly survive termination. *Id.* § 16.17.

57.    SOA § 1.01 defines "**Unpaid Amounts**" to mean "the aggregate of the amounts that became payable (whether or not due) to . . . ICBCS . . . prior to the occurrence of such Early Termination Date or as a result of the termination of this Agreement and that remain payable (whether or not due) as at such Early Termination Date together with interest thereon. . . ."

---

[4] The SOA also provides that "PESRM shall be responsible for, and shall indemnify ICBCS against, any and all losses, costs and damages that ICBCS incurs, directly or indirectly, in connection with the occurrence of a Force Majeure event that prevents either party from performing its obligations including hedging losses incurred by ICBCS arising from delivery reductions under any PESRM Transactions or Third Party Transactions due to such Force Majeure event." Ex. 1 § 15.

58.     SOA § 1.01 defines "**Loss**," to mean, with respect to the SOA or one or more terminated transactions, ICBCS's "total losses and costs," including "loss of bargain, cost of funding and (i) in any case where ICBCS is the Performing Party, without duplication, losses and costs (or gains) incurred by ICBCS as a result of its terminating, liquidating, obtaining, amending or reestablishing any [transaction] . . . (but solely with respect to unreimbursed market structure risks (i.e., deemed basis risks and deemed roll risks), grade differentials and/or locational differentials related to such contracts or transactions, as applicable), any losses and costs (or gains) incurred in liquidating any Crude Oil or Refined Product inventory or removing any such inventory from storage and/or piping, and any unreimbursed CO Transportation and Other Costs and RP Transportation and Other Costs…." *Id.* § 1.01.

59.     ICBCS has a secured claim against the Transaction Parties, who are liable under the SOA for certain of ICBCS's losses and expenses incurred as a result of the Explosion.  Further, Judge Gross recently held that ICBCS has a first priority lien with respect to any business interruption proceeds recovered by the Debtors.  *See* Op. at 49–51, *PES Holdings, LLC, v. UCC (In re PES Holdings, LLC)*, Adv. Pro. No. 19-50282 (KG) (Feb. 28, 2020) (the "**Priority Dispute**"), ECF No. 66.  Thus, any business interruption proceeds recovered by the Debtors may be used to satisfy at least part of ICBCS's secured SOA claim.  However, Judge Gross's decision in the Priority Dispute is not yet final, and the Debtors and the Term Loan Lenders have filed notices of appeal.  Accordingly, ICBCS in this action seeks to protect its direct rights under the Policies.

## III.    THE POLICIES PROVIDE COVERAGE FOR ICBCS'S BUSINESS INTERRUPTION LOSSES

60.     The Policies provide "Time Element" coverage, which insures against "actual loss sustained by the Insured resulting from the necessary interruption of business caused by direct

physical loss or damage, by a peril insured against, to property insured herein, occurring during the Term of Insurance." Policies § II.1.

61.     "Perils insured" against include "all risks of direct physical loss or damage occurring during the Term of Insurance to Property Insured…." Policies § I.3.

62.     "Property insured" includes "Real and Personal Property of the Insured of every kind and description, including, but not limited to: (a) real and personal property owned by the Insured or in which the Insured has an insurable interest or is responsible to insure . . . ." Policies § I.1.

63.     The Policies contain a "Basis of Valuation" clause relating to Time Element coverage, which provides, "Recovery in the event of loss hereunder shall be the actual loss sustained by the Insured directly resulting from such interruption of business, but not exceeding the reduction in gross earnings less charges and expenses which do not necessarily continue during the interruption of business . . ." ("**Lost Profits**"). Policies § II.8(a).

64.     The Policies further cover "Extra Expenses necessarily incurred by the Insured in continuing as nearly as practicable Normal business activities . . . ." Policies § II.2. "**Extra Expense**" means "the total cost of conducting the Insured's business during the period of restoration which exceeds the cost of conducting such business that would have been incurred had no loss occurred…." Policies § II.8(c).

65.     The Policies also provide coverage for "**Expenses to Reduce Loss,**" which includes those "expenses as are necessarily incurred for the purpose of reducing loss under this Policy . . . ." Policies § II.5.

66.     The Policies further provide for certain coverage extensions that "apply to . . . time element" coverage. Policies § III.

67.     One such "coverage extension" is for "demurrage charges incurred by the Insured as a result of a delay in loading or unloading of vessels, containers, rail cars or other transportation or storage mediums due to physical loss as insured by" the Policies ("**Demurrage**").  Policies § III.8.

68.     The Policies also extend coverage for losses resulting from "vessels or conveyances being denied access to or egress from a Facility of the Insured or a third party due to or arising out of physical loss of or physical damage to any property . . ." ("**Port Blockage Expenses**").  Policies § III.19(a).  "Facility" means "any port, terminal, dock, wharf, jetty or similar property or vessel loading or unloading facilities."  Policies § III.19.

69.     The Policies further extend coverage for "physical loss or damage . . . to Property Insured while in transit by an insured peril (including general average and salvage charges) within the Territorial Limits as defined herein.  In addition, the loss resulting from the necessary interruption of business and/or Extra Expense resulting from physical loss or damage to property in transit is covered" ("**Transit Expenses**").  Policies § III.22.  "Transit means all shipments within and between the territory of [the Policies], including intercoastal and inland waterways, but not ocean marine transit, by any means of conveyance, from the time the property is moved for purpose of loading and continuously thereafter while awaiting and during loading and unloading and in temporary storage, including temporary storage on any conveyance, including during any deviation, delay and consignment until safely delivered into place of final destination."  Policies § III.22.

70.     Time Element Coverage is subject to a 60-day waiting period retention beginning on the date of the Occurrence.  *See* Policies, Declarations § 6.  Time Element Coverage covers

business interruption losses during a Period of Indemnity that spans a maximum of twenty-four months "after application of the Retentions." Policies, Section II, 10(c).

71.    For the reasons set forth herein, the date of Occurrence for purposes of ICBCS's claim is June 21, 2019, at or around 4:00 a.m. EST (the "**Occurrence Date**").  ICBCS's claim accounts for the 60-day waiting period and seeks coverage for those losses incurred from August 20, 2019, at 4:00 a.m., through August 19, 2021, at 3:59 a.m. (the "**Eligible Period**").

72.    All coverage under the Policies is subject to an aggregate limit of $1,250,000,000, in excess of any applicable insured retentions.  Policies, Declarations § 5.  Certain sub-limits apply to specific categories of losses.  *Id.*

## IV.    AN EXPLOSION AT THE REFINING COMPLEX CAUSED ICBCS TO SUFFER BUSINESS INTERRUPTION LOSSES

73.    At or around 4:00 a.m. on June 21, 2019, a catastrophic explosion (the "**Explosion**") caused significant physical damage to the Girard Point Refinery.

74.    As a result of the Explosion, the Debtors ceased all operations at the Refining Complex, causing ICBCS to suffer massive disruption to its business operations and also incur additional charges, costs, and extra expenses that would not ordinarily have been incurred ("**Non-Business as Usual Expenses**" or "**Non-BAU Expenses**").

75.    For example, ICBCS has incurred substantial Expenses to Reduce Loss, in the form of breakage costs, including costs associated with the redirection or resale of oil at a discount to alternate buyers (other than PESRM).  ICBCS has also incurred expenses relating to Port Blockage, Demurrage, and Transit.  ICBCS also has paid for certain costs and expenses on the Debtors' behalf, in order to ensure that the Debtors had continued access to and utilization of third party infrastructure (*e.g.,* storage, transportation, and loading) ("**Cured Costs**").  *Id.*

76.     ICBCS has also incurred many Extra Expenses as a result of the Explosion, including but not limited to, hedge revaluation, inventory unwind, interest on receivables issued to PES under the SOA.  *Id.*

77.     ICBCS also has incurred (and continues to incur) millions of dollars in costs relating to the extraction of hydrocarbons that remain in storage tanks at the Refining Complex ("**HEEP Extraction Costs**"), for which the Transaction Parties are liable under the SOA Transaction Documents.

78.     Further, ICBCS owns significant volumes of hydrocarbons that are stored in Third Party Infrastructure with Sunoco Partners Marketing & Terminals, L.P. and its affiliates (collectively, "**Sunoco**").   Pursuant to the SOA Transaction Documents, the Debtors are responsible for all costs (including any extraction costs) related to the hydrocarbons stored with Sunoco.  *See* Ex. 1 § 3.08, 4.12.

## V.     THE DEBTORS' CLAIM AND THE INSURER'S RESPONSE

79.     The Debtors notified Insurers of the Explosion on June 21, 2019.   Debtors' Complaint ¶ 94.

80.     On August 13, 2019, the Debtors provided Insurers with an update on their investigation into the Explosion and a preliminary calculation of their losses.  *See id.* ¶ 96.

81.     At that time, Insurers agreed to advance funds on account of the Debtors' claim for property damage to the Refining Complex.  *Id.* ¶ 98.

82.     By October 24, 2019, Insurers had advanced a total of approximately $65 million to the Debtors' claim for losses due to physical damage to the Refining Complex.  *See id.* ¶¶ 98, 104.

RLF1 23218569V.1

83.    On February 3, 2020, a representative from Insurers' loss adjuster,  Integra Technical Services ("**Integra**"), emailed two of the Debtors' principals and expressed a willingness to provide a small, partial payment for the Debtors' business interruption losses.

84.    At the same time, however, Insurers have frustrated the Debtors' attempts to recover under the Policies.  While Insurers have already advanced roughly $65 million in property damage insurance proceeds, they have also indicated that they may seek to disclaim coverage for the Debtors' business interruption claim.  Debtors' Complaint ¶ 106.

85.    On February 12, 2020, the Debtors initiated this Adversary Proceeding to recover for physical damage and business interruption losses under the Policies.  *See id.*

86.    The Debtors estimate that their total claim will exceed the aggregate $1,250,000,000 under the Policies.  *See id.* ¶¶ 2, 83–92, 108.  The Debtors anticipate that a period of restoration would exceed twenty-four month period of indemnity provided for in the Policies.

87.    On February 21, 2020, the Debtors filed a refined claim submission with Integra. Their total claim still exceeds the aggregate limit under the Policies.

## VI.    ICBCS'S CLAIM AND THE INSURER'S RESPONSE

88.    On July 12, 2019, ICBCS sent a notice of claim letter (the "**Notice**") to Aon Risk Services Southwest, Inc. ("**Aon**"), the broker on the Policies.  A true and correct copy of the Notice is attached hereto as Exhibit 3.

89.    The Notice explained that "the [Refining Complex] was severely damaged by explosion on June 21, 2019," and that ICBCS had suffered, *inter alia*, "time element losses, from the damage to the [Refining Complex]."  Ex. 3 at 1.  The Notice advised that ICBCS would "be making a claim under the…Policy for its losses as an Additional Insured," and also that ICBCS intended to "exercise its full rights under the…Polic[ies] and applicable law as Loss Payee and Mortgagee and under the Lenders Loss Payable Clause."  *Id.*

90.    On September 20, 2019, Integra responded to the Notice by formal letter "to advise that [Insurers'] investigation of ICBC[S]'s potential claims is being done under a full reservation of rights."  A true and correct copy of Integra's September 20, 2019 letter is attached hereto as Exhibit 4.

91.    In its letter, Integra proceeded to identify "several policy terms, conditions, limitations and/or exclusions that," Integra asserted "could potentially impact [Insurers]' obligations to pay ICBC[S] for any claimed loss or any part thereof."  Ex. 4 at 1.

92.    On November 14, 2019, the Court entered the *Final Order (I) Authorizing Debtors to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 262, 263(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b)*, ECF No. 580 (the "**Final DIP Order**").

93.    The Final DIP Order modified the automatic stay to permit ICBCS "to communicate and attend meetings with [Integra] or other representative [sic] of [Insurers] to pursue the ICBCS Direct Claim," as defined therein.  *See* Final DIP Order, Ex. C.

94.    ICBCS retained FTI Consulting ("**FTI**"), a leading forensic accounting firm, to help calculate the loss from the interruption to ICBCS's operations at the Refinery Complex and to present ICBCS's claim to the Insurers.

95.    On January 15, 2020, ICBCS submitted an initial claim to Integra, in which ICBCS claimed business interruption losses in the amount of $242,163,256.  ICBCS advised that the initial claim accounted for "ongoing expenses, and as such, will continue to be revised as they are incurred."  ICBCS also "expressly reserved all of its rights to amend, modify, supplement, add to or otherwise revise the initial claim at any time and in any respect, including, without limitation,

RLF1 23218569V.1

as necessary or appropriate to amend, quantify, or correct amounts, to reclassify or recategorize certain incurred expenses, to provide additional detail regarding the Claim set forth herein, or to reflect or account for any and all additional expenses of whatever kind or nature that ICBCS incurs that may be included in ICBCS's Claim, including additional Non-Business as Usual Expenses."

96.     On February 12, 2020, ICBCS submitted a refined claim seeking $231,578,842 in business interruption losses, and noted that additional expenses and costs were continuing to accrue (the "**ICBCS Claim**").  In the ICBCS Claim, ICBCS seeks: (i) $104,448,488 for Lost Profits; (ii) $80,265,654 for outstanding invoiced expenses, (iii) $46,364,700 for HEEP Extraction Costs, and (iv) $500,000 for Claim Preparation Expenses.

97.     FTI calculated ICBCS's Lost Profits by projecting ICBCS's gross earnings over a 24-month period.  ICBCS's projected gross earnings were calculated as the sum total of projected monthly Crude Oil Revenues and Refined Product Revenues, the net Monthly Source Fee and the net monthly Base Handling Fee (two fees specifically set forth in the SOA), less certain saved expenses.

98.     Non-BAU expenses include categories of expenses such as Expenses to Reduce Loss, Extra Expenses/Mitigation Cost, Demurrage, Transit, and Port Blockage.

99.     The HEEP Extraction Costs are specifically set forth in the HEEP Budget, executed by ICBCS and PESRM, which sets forth the total amount of costs incurred by ICBCS in extracting its inventory from the Refining Complex.

100.    Despite ICBCS's best efforts, Insurers have not paid ICBCS, and continue to obstruct ICBCS's clear contractual right to coverage under the Policies.

101.    On February 21, 2020, after receiving ICBCS's refined submission, Integra sent another letter to "update [Insurers'] existing reservation of rights . . . given the potential sale of the

Girard Point [refinery]."  A true and correct copy of Integra's February 21, 2020 letter is attached

hereto as Exhibit 5.  In the letter, Integra contended that the Debtors' "decision to sell the [Girard

Point refinery] may terminate any alleged business interruption losses as of the date of the sale,"

and that "any claimed business interruption loss occurring after the sale of the property would not

accrue." Ex. 5 at 4.  Integra also asserted that "Insurers never intended to cover ICBCS's Business

Interruption losses as PES never reported BI values for ICBCS . . . ." *Id.* at 5.

102.    On February 26, 2020, a meeting was held between ICBCS, FTI, Integra, and

Integra's experts, where ICBCS presented its February 12 Claim in detail.  Representatives from

the Debtors were also at the meeting.

103.    To date, no payment has been made by the Insurers.

104.    Moreover, there is a significant risk of policy exhaustion if ICBCS's rights to policy

proceeds are not protected.

## COUNT I:  DECLARATORY JUDGMENT
### (against Defendant-Insurers)

105.    ICBCS repeats and re-alleges each and every allegation set forth in paragraphs 1

through 104 above, with the same force and effect as if set forth here in full.

106.    The Policies provide coverage for business interruption losses arising out of

physical damage caused by a peril insured thereunder, to property insured thereunder, during the

Eligible Period.

107.    The Policies cover ICBCS as an additional insured, loss payee, and mortgagee as

its interests may appear in the SOA Transaction Documents.

108.    ICBCS has incurred and continues to incur business interruption losses arising out

of physical damage caused by the Explosion to the Refining Complex during the Term of

Insurance.

109.    The Explosion is a "peril insured against" under the Policies.

110.    The Refining Complex is "property insured" under the Policies.

111.    Insurers are contractually obligated under the Policies to indemnify ICBCS for its business interruption losses.

112.    ICBCS has sought payment and indemnification from Insurers under the terms of the Policies for the ICBCS Claim, which represents the business interruption losses ICBCS has incurred and will continue to incur during the Eligible Period.

113.    To date, Insurers have failed to make any payment to ICBCS for its business interruption losses.

114.    By reason of the foregoing, an actual case or controversy exists and ICBCS seeks a declaration from the Court that Insurers are liable for ICBCS's business interruption losses incurred during the Eligible Period.

**COUNT II:  BREACH OF CONTRACT**
**(against Defendant-Insurers)**

115.    ICBCS repeats and re-alleges each and every allegation set forth in paragraphs 1 through 114 above, with the same force and effect as if set forth here in full.

116.    The Policies provide coverage for business interruption losses arising out of physical damage caused by a peril insured against, to property insured thereunder, during the Eligible Period.

117.    The Policies cover ICBCS as an additional insured, loss payee, and mortgagee as its interests may appear in the SOA Transaction Documents.

118.    ICBCS has incurred and continues to incur business interruption losses arising out of physical damage caused by the Explosion to the Refining Complex during the Term of Insurance.

119.    The Explosion is a "peril insured against" under the Policies.

120.    The Refining Complex is "property insured" under the Policies.

121.    Insurers are contractually obligated under the Policies to pay ICBCS for its business interruption losses.

122.    ICBCS has sought payment from Insurers under the terms of the Policies for the ICBCS Claim, which represents the business interruption losses ICBCS has incurred and will continue to incur during the Eligible Period.

123.    To date, Insurers have failed to make any payment to ICBCS for its business interruption losses and are in breach of the terms of the Policies.

124.    By reason of the foregoing, Insurers are liable to ICBCS in an amount to be determined at trial, but believed to be in excess of $231 million.

## COUNT III:  DECLARATORY JUDGMENT
### (against Defendant-Insurers)

125.    ICBCS repeats and re-alleges each and every allegation set forth in paragraphs 1 through 124 above, with the same force and effect as if set forth here in full.

126.    The Policies provide coverage for both property damage and business interruption losses arising out of physical damage caused by a peril insured thereunder, to property insured against, during the Eligible Period.

127.    The Policies cover ICBCS as an additional insured, loss payee, and mortgagee as its interests may appear in the SOA Transaction Documents.

128.    ICBCS and the Debtors have equal rights to recover under the Policies.

129.    All coverage under the Policies is subject to an aggregate $1.25 billion limit.

130.    The Debtors allege that their losses are likely to exceed the Policies' $1.25 billion limit.

131.    If the Debtors' claim is adjudicated before ICBCS's claim is adjudicated, and the Insurers cover the Debtors' claim, it is possible that ICBCS will be unable to recover any insurance proceeds for its own business interruption losses.

132.    ICBCS seeks a declaration that if the amount of the Debtors' claim against Insurers is determined (by settlement or adjudication) prior to an adjudication of ICBCS's rights, then the Insurers shall place any insurance proceeds awarded to the Debtors under the Policies in a constructive trust pending adjudication of ICBCS's rights under the Policies so that there can be a proper allocation of the Policies' proceeds as between the Debtors and ICBCS, except to the extent that the parties agree in advance to a stipulation or other agreement for the payment of certain proceeds.

## **PRAYER FOR RELIEF**

WHEREFORE, ICBCS respectfully demands judgment in its favor and against all Defendants as follows:

a.    Declaring that ICBCS's losses incurred as a result of the disruption to its ordinary business operations arising out of the Explosion at the Refining Complex are covered under the Policy

b.    For damages on ICBCS's breach of contract claim in the amount to be proven at trial, but believed to be in excess of $200 million;

c.    Declaring that the Insurers shall place any insurance proceeds awarded to the Debtors in a constructive trust pending the adjudication of ICBCS's rights under the Policies, including ICBCS's right to recover on the ICBCS Claim, except for those proceeds that the parties agree, in a stipulation or other agreement, may be paid in advance;

   d. For all costs and expenses, including but not limited to legal fees, associated

with Plaintiff's attempts to mitigate the amount owed by Insurers under the Policies;

   e. Interest, costs, and disbursements of this action; and

   f. Any other relief as this Court deems just and proper.

Dated:  April 6, 2020          By:    */s/ Zachary I. Shapiro*
Wilmington, Delaware                  WEIL, GOTSHAL & MANGES LLP
                                      David L. Yohai (*pro hac vice*)
                                      John P. Mastando III (*pro hac vice*)
                                      767 Fifth Avenue
                                      New York, New York 10153
                                      (212) 310-8000
                                      David.yohai@weil.com
                                      John.mastando@weil.com

                                      -and-

                                      QUINN EMANUEL URQUHART &
                                      SULLIVAN, LLP
                                      Richard I. Werder, Jr. (*pro hac vice*)
                                      Jane Byrne (*pro hac vice*)
                                      Deborah Newman (*pro hac vice*)
                                      Eric Kay (*pro hac vice*)
                                      Zachary Russell (*pro hac vice*)
                                      51 Madison Avenue, 22nd Floor
                                      New York, NY 10010

                                      -and-

                                      RICHARDS, LAYTON & FINGER,
                                      P.A.
                                      Mark D. Collins (No. 2981)
                                      Daniel J. DeFranceschi (No. 2732)
                                      Zachary I. Shapiro (No. 5103)
                                      One Rodney Square
                                      920 North King Street
                                      Wilmington, DE 19801
                                      Telephone:  (302) 651-7700
                                      Facsimile:  (302) 651-7701
                                      collins@rlf.com
                                      defranceschi@rlf.com
                                      shapiro@rlf.com

                                      *Counsel to ICBC Standard Bank Plc*