## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | )     Chapter 11 |
| PES HOLDINGS, LLC, *et al.*, | ) |
| | )     Case No. 19-11626 (MFW) |
| Debtors. | ) |
| | )     (Jointly Administered) |
| | ) |
| | ) |
| PES HOLDINGS, LLC, *et al.*, | ) |
| | )     Adversary Proceeding |
| Plaintiffs, | ) |
| | )     Case No. 20-50454 (LSS) |
| -and- | ) |
| | ) |
| ICBC STANDARD BANK PLC, | ) |
| | ) |
| Intervenor-Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ALLIANZ GLOBAL RISKS US INSURANCE CO., *et al.*, | ) |
| | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
## FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................... 1

STATEMENT OF FACTS............................................................................................... 3

LEGAL STANDARDS .................................................................................................... 3

ARGUMENT...................................................................................................................... 5

I.    LABOR MAY NOT BE DEPRECIATED WHEN CALCULATING ACV .................. 5

    A.    Depreciating Labor Defies the Plain Language of the Policy................................. 5

    B.    Depreciating Labor Defies PES's Reasonable Expectations ................................. 7

        1.    Courts Across the Country Have Recognized that Calculating ACV By Depreciating Labor Defies an Insured's Reasonable Expectations ........... 9

        2.    Construing "Physical Depreciation" to Include Labor Depreciation Would Defy PES's Reasonable Expectations........................................... 10

        3.    Insurers Misleadingly Imply that New York Law Supports the Depreciation of Labor .............................................................................. 13

    C.    Using "Indemnity" as a Basis to Depreciate Labor Defies New York Law and Common Logic ..................................................................................... 14

        1.    PES and Insurers Agreed on an Express Definition of Actual Cash Value to Avoid the Uncertainty of Calculating ACV According to Broad Principles Like "Indemnity" ......................................................... 14

        2.    Achieving Indemnity Requires that Insurers Not Depreciate Labor ........ 15

II.   INSURERS ARE OBLIGATED TO VALUE PES'S PD CLAIM PUSUANT TO THE SLV METHOD BECAUSE THE SOA CONTRACTUALLY OBLIGATES PES TO INSURE SPECIFIC PROPERTY FOR A STIPULATED LOSS AMOUNT ... 17

    A.    The SOA Obligates PES to Insure "Specific Property"....................................... 18

        1.    The SOA Obligates PES to Insure Certain "Mortgaged Properties" Comprising the Real Property at the PES Refinery Site.......................... 18

        2.    PES's Obligation to Insure the Mortgaged Properties Was an Obligation to Insure "Specific Property".................................................. 20

    B.    The SOA's Insurance Requirements Obligate PES to Insure the Mortgaged Properties for a "Stipulated Loss Amount" of $750 Million .............................. 22

        1.    Neither the Policy Language nor Insurers' Cited Authority Supports Insurers' Contention that the Policy Requires PES to *Pay* a Stipulated Loss Amount in Order to Benefit from the SLV Clause ......................... 23

        2.    Under the Plain Language of the Policy, the $750 Million Insurance Requirement Is a Stipulated Loss Amount ............................................... 25

DOCS_DE:236752.1 70753/001

III.    PES'S DEMAND FOR ATTORNEYS' FEES IS SUFFICIENT TO SUSTAIN PES'S CLAIM AGAINST INSURERS FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING ............................................... 26

    A.    PES Properly Seeks Attorneys' Fees as Consequential Damages for Insurers' Breach of the Implied Covenant of Good Faith and Fair Dealing ........................ 27

    B.    PES's Claimed Attorneys' Fees Do No Constitute General Damages ................. 29

**CONCLUSION** ....................................................................................................................... **30**

iii

# TABLE OF AUTHORITIES

**Cases**

**Page(s)**

*Adams v. Cameron Mut. Ins. Co.*,
430 S.W.3d 675 (Ark. 2013), *superseded by statute* ..............................................7, 9

*AGCS Marine Ins. Co. v. World Fuel Servs., Inc.*,
220 F. Supp. 3d 431 (S.D.N.Y. 2016)..............................................................10, 11

*Arnold v. State Farm Fire & Cas. Co.*,
268 F. Supp. 3d 1297 (S.D. Ala. 2017).........................................................7, 9, 12

*Bailey v. State Farm Fire & Cas. Co.*,
2015 WL 1401640 (D. Minn. Mar. 25, 2015), *aff'd sub nom*, *Hicks*, 751 F.
App'x 7003 (6th Cir. 2018)...........................................................................9, 16

*Basham v. United Servs. Auto. Assoc.*,
2017 WL 3217768 (D. Colo. July 28, 2017) ...............................................................8

*Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*,
10 N.Y.3d 187 (2008) ..................................................................26, 27, 28, 29

*Branch v. Farmers Ins. Co., Inc.*,
55 P.3d 1023 (Okla. 2002)...........................................................................8, 11

*Brown v. Travelers Cas. Ins. Co.*,
2016 WL 1644342 (E.D. Ky. Apr. 25, 2016) ...............................................................8

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).....................................................................................3

*Certain Underwriters at Lloyd's v. BioEnergy Dev. Grp. LLC*,
178 A.D.3d 463 (N.Y. App. Div. 2019) .....................................................................3, 27

*Columbia Cas. Co. v. Neighborhood Risk Mgmt. Corp.*,
2016 WL 4467548 (S.D.N.Y. Aug. 22, 2016) ...............................................................4

*Craft v. N.Y. Cent. Mut. Fire. Ins. Co.*,
152 A.D.3d 940 (N.Y. App. Div. 2017) .....................................................................27, 30

*CT Inv. Mgmt. Co., LLC v. Chartis Specialty Ins. Co.*,
130 A.D.3d 1 (N.Y. App. Div. 2015) .........................................................................6

*D.K. Prop., Inc. v. Nat'l Union Fire In. Co. of Pittsburgh, Pa.*,
168 A.D.3d 505 (N.Y. App. Div. 2019) ...................................................................30

iv

*Dieudonne v. United Prop. & Cas. Ins. Co.*,
    2021 WL 4476782 (E.D. La. Sept. 30, 2021) ..........................................................................7

*Fed. Ins. Co. v. Am. Home Assur. Co.*,
    639 F.3d 557 (2d Cir. 2011)..........................................................................21

*Graves v. Am. Family Mut. Ins. Co.*,
    686 F. App'x 536 (10th Cir. 2017) ..........................................................................8

*Henn v. Am. Family Mut. Ins. Co.*,
    894 N.W.2d 179 (Neb. 2017)..........................................................................8

*Hicks v. State Farm Fire & Cas. Co.*,
    751 F. App'x 7003 (6th Cir. 2018) ..........................................................................7, 12

*Iaffaldano v. Sun W. Mortg. Co.*,
    2017 WL 9362576 (S.D. Fla. Dec. 11, 2017) ..........................................................................25

*Int'l Marine, LLC v. Integrity Fisheries, Inc.*,
    2016 WL 1408573 (E.D. La. Apr. 11, 2016) ..........................................................................25

*Koppelman v. Std. Fire Ins. Co.*,
    2008 WL 789882 (E.D.N.Y. Mar. 21, 2008) ..........................................................................19, 20

*Lains v. Am. Family Mut. Ins. Co.*,
    2016 WL 4533075 (W.D. Wash. Feb. 9, 2016) ..........................................................................7

*Lammert v. Auto-Owners (Mut.) Ins. Co.*,
    572 S.W.3d 170 (Tenn. 2019) ..........................................................................7

*Maule v. Phila. Media Holdings, LLC.*,
    2010 WL 3859613 (E.D. Pa. Oct. 1, 2010)..........................................................................29

*McAnarney v. Newark Fire Ins. Co.*,
    247 N.Y. 176 (1928) ..........................................................................13

*Medidata Sols., Inc. v. Fed. Ins. Co.*,
    268 F. Supp. 3d 471 (S.D.N.Y. 2017)..........................................................................4, 8, 25

*Mitchell v. State Farm Fire & Cas. Co.*,
    954 F.3d 700 (5th Cir. 2020) ..........................................................................7, 10

*Morris James LLP v. Cont'l Cas. Co.*,
    928 F. Supp. 2d 816 (D. Del. 2013)..........................................................................3, 4

*Mount Vernon Fire Ins. Co. v. Valencia*,
    1993 WL 13150704 (E.D.N.Y. Aug. 6, 1993) ..........................................................................28

v

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. TransCanada Energy USA, Inc.*,
   28 N.Y.S.3d 800 (Sup. Ct. 2016) .................................................................13, 22

*In re Nw. Airlines Corp.*,
   393 B.R. 352 (Bankr. S.D.N.Y. 2008) ...................................................................25

*Ogden Corp. v. Travelers Indemn. Co.*,
   681 F. Supp. 169 (S.D.N.Y. 1988) ...........................................................................5

*One Beacon Ins. Co. v. Old Williamsburg Candle Corp.*,
   2006 WL 3230029 (S.D.N.Y. Nov. 8, 2006) ........................................................28

*Panasia Ests., Inc. v. Hudson Ins. Co.*,
   10 N.Y.3d 200 (2008) .............................................................................26, 27, 29

*Papurello v. State Farm Fire & Cas. Co.*,
   144 F. Supp. 3d 746 (W.D. Pa. 2015) .....................................................................8

*Perry v. Allstate Indem. Co.*,
   953 F.3d 417 (6th Cir. 2020) ..........................................................................7, 12

*Peters Twp. Sch. Dist. v. Hartford Acc. & Indem. Co.*,
   833 F.2d 32 (3d Cir. 1987) .......................................................................................4

*Poyzer v. Amenia Seed & Grain Co.*,
   381 N.W.2d 192 (N.D. 1986) .................................................................................21

*Prezioso v. Aerts*,
   358 Wis. 2d 714 (Wis. App. 2014) ........................................................................22

*Purifoy v. Walter Inv. Mgmt. Corp.*,
   2015 WL 9450621 (S.D.N.Y. Dec. 22, 2015) ......................................................25

*Red Line Air, LLC v. G. Howard Assocs., Inc.*,
   2010 WL 2346299 (E.D.N.Y. May 11, 2010) .......................................................25

*Redcorn v. State Farm Fire & Cas. Co.*,
   55 P.3d 1017 (Okla. 2002) ...............................................................8, 11, 13, 16

*Riggins v. Am. Family Mut. Ins. Co.*,
   281 F. Supp. 3d 785 (W.D. Mo. 2017) ...................................................................8

*Riverside S. Plan. Corp. v. CRP/Extell Riverside, L.P.*,
   13 N.Y.3d 398 (2009) ......................................................................................17, 18

*Roc Nation LLC v. HCC Int'l Ins. Co., PLC*,
   2021 WL 827957 (S.D.N.Y. Mar. 4, 2021) ...............................................5, 15, 17

vi

*Rocon Mfg., Inc v. Ferraro*,
  199 A.D.2d 999 (N.Y. App. Div. 1993) ...............................................................4, 23

*S.E.C. v. Credit Bancorp, Ltd.*,
  147 F. Supp. 2d 238 (S.D.N.Y. 2001)........................................................................24

*Satispie, LLC v. Travelers Prop. Cas. Co. of Am.*,
  448 F. Supp. 3d 287 (W.D.N.Y. 2020)......................................................................26

*Sproull v. State Farm Fire & Cas. Co.*,
  2021 WL 4314060 (Ill. Sept. 23, 2021) ............................................................ *passim*

*SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*,
  445 F. Supp. 2d 320 (S.D.N.Y. 2006)................................................................ *passim*

*In re State Farm Fire & Cas. Co.*,
  872 F.3d 567 (8th Cir. 2017) .......................................................................................8

*Sukup v. State*,
  281 N.Y.S.2d 28 (1967) .............................................................................................27

*In re Tenneco Inc.*,
  479 N.Y.S.2d 587 (3d Dep't 1984)...............................................................................7

*Titan Exteriors, Inc. v. Certain Underwriters at Lloyd's, London*,
  297 F.Supp. 3d 628 (N.D. Miss. 2018) ........................................................................7

*U.S. Fid. & Guar. Co. v. Annunziata*,
  67 N.Y.2d 229 (1986) ...................................................................................... *passim*

*United Resin Prods., Inc. v. Great Am. Ins. Co.*,
  213 A.D.2d 711 (N.Y. App. Div. 1995) .....................................................................30

*In re Viking Pump, Inc.*,
  27 N.Y.3d 244 (2016) ............................................................................................8, 12

*Ware v. Metro. Prop. & Cas. Ins. Co.*,
  220 F. Supp. 3d 1288 (M.D. Ala. 2016) ......................................................................8

*Whiteface Real Est. Dev. & Const., LLC v. Selective Ins. Co. of Am.*,
  2010 WL 2521794 (N.D.N.Y. Jun. 16, 2010)............................................................27

*Wilcox v. State Farm Fire & Cas. Co.*,
  874 N.W.2d 780 (Minn. 2016).....................................................................................8

*XL Specialty Ins. Co. v. Christie's Fine Art Storage Servs., Inc.*,
  137 A.D.3d 563 (N.Y. App. Div. 2016) .....................................................................25

*Young v. Pleasant Valley Sch. Dist.*,
   2011 WL 1485648 (M.D. Pa. Apr. 9, 2011) ...................................................................28, 29

**Statutes**

Ark. Code Ann. § 23-88-106(a)(2) (2017)....................................................................................7

Cal. Ins. Code § 2051(b) ..............................................................................................................9

**Dictionaries**

BLACK'S LAW DICTIONARY (11th ed. 2019) .............................................................................6, 25

*Dictionary.com*.............................................................................................................................24

*Merriam-Webster.com* ............................................................................................................22, 25

**Other Authorities**

Depreciation of Labor Expenses in Property Loss Claims, Miss. Ins. Dep't
   Bulletin 2017-8 (Aug. 4, 2017)..................................................................................................9

Edwin E. Huddleson, III, Old Wine in New Bottles: UCC Article 2a-Leases, 39
   Ala. L. Rev. 615 (1988) ............................................................................................................23

Property Loss Claims: No Labor Depreciation, VT Dep't Fin. Reg., Div. of Ins.,
   Bulletin No. 184 (May 1, 2015)...............................................................................................10

DOCS_DE:236752.1 70753/001

Plaintiff PES[1] submits this brief in opposition (the "Opposition") to Defendants' Motion for Summary Judgment (D.I. 204) ("Insurers' Motion").   For the reasons set forth in this Opposition and in PES's Motion for Partial Summary Judgment (D.I. 207) ("PES's Motion") (incorporated here by reference), PES respectfully requests that this Court deny Insurers' Motion in its entirety.

## PRELIMINARY STATEMENT

Insurers' Motion seeks summary judgment with respect to three stated issues: (1) the proper method for calculating Actual Cash Value ("ACV"); (2) the applicability of the Policy's Stipulated Loss Value ("SLV") Clause; and (3) PES's entitlement to consequential damages.   Insurers' Motion ignores the plain language of the Policy terms at issue, conspicuously omits key applicable law, contains numerous internal inconsistencies, and ultimately fails to establish that Insurers are entitled to judgment as a matter of law on any of the three issues raised therein.[2]

First, Insurers ask the Court to ignore the Policy's plain language and issue a ruling that the Policy's definition of ACV—"Replacement Cost less deduction for physical depreciation"— allows Insurers to apply a deduction for the depreciation of inherently intangible costs like labor when calculating ACV.   *See* Insurers' Mot. 18–23.   Insurers insist that vague principles of "indemnity" justify the illogical notion that labor, which neither has a useful life, nor suffers wear and tear, can nonetheless physically depreciate.   But PES's Policy expressly defines "actual cash value" and therefore reflects the Parties' intention to "sacrifice[] the elusive, and perhaps illusory,

---

[1] Capitalized terms not separately defined herein have the same meaning as in PES's Motion.

[2] Insurers' Motion substantially overlaps with PES's Motion, in which PES petitioned the Court to rule as a matter of law that (1) Insurers must value PES's PD Claim pursuant to the SLV Method prescribed by the SLV Clause (PES's Mot. 22–28); (2) by defining "Actual Cash Value" as "Replacement Cost less deduction for physical depreciation," the calculation of ACV allows only for the depreciation of tangible, physical materials (*id.* at 28–33); and (3) the Policy's ACV definition prohibits a deduction for obsolescence (*id.* at 33–35).

goal of complete indemnity, in favor of predictability." *See SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 445 F. Supp. 2d 320, 346–47 (S.D.N.Y. 2006) ("*SR Int'l*"). Under New York law, Insurers cannot rely on the nebulous concept like "indemnity" to override the Parties' intent as expressed in the plain language of the Policy. Moreover, even if Insurers could rewrite the Policy based on indemnity principles, Insurers fail to address the well-reasoned decisions from numerous courts holding that depreciating labor costs improperly *under*-indemnifies the insured. *Infra* § II.C.3.

Second, Insurers ask this Court to rule that the Policy's SLV Clause is inapplicable because "the relevant provisions of the SOA . . . do not require PES to *pay* a stipulated loss amount." *See* Insurers' Mot. 5, 12–18 (emphasis added). But the SLV Clause only requires that PES "*insure* specific property for a stipulated loss amount." Insurers cannot avoid their obligations by rewriting the Policy to modify the conditions that trigger the SLV Clause. Insurers also argue that the SLV Clause does not apply because the SOA "do[es] not reference specific property." *Id.* This is incorrect. The SOA contains numerous internal references that direct the reader from provision to provision and identify the "specific property" PES is obligated to insure. Insurers imply that adhering to the SOA's internal references produces an interpretation that is too "strained," but by refusing to read the SOA as written, Insurers improperly ignore critical provisions in the agreement. The SOA must be construed in its entirety, and Insurers may not disregard the very provisions that establish PES's obligation to insure "specific property for a stipulated loss amount" merely because the contract establishing such obligation is a complex transactional document.

Third, Insurers seek a judgment dismissing PES's cause of action for Breach of the Implied Covenant of Good Faith and Fair Dealing. *See* Insurers' Mot. 23–29. Insurers insist that PES failed to prove "any consequential damages that were foreseen at the time the Policy was entered"

2

into. *Id.* at 24. But PES has plainly demanded attorneys' fees as consequential damages (Compl. ¶ 163), as permitted under New York law. *See Certain Underwriters at Lloyd's v. BioEnergy Dev. Grp. LLC*, 178 A.D.3d 463, 464 (N.Y. App. Div. 2019) (holding that "given the purpose of and particular circumstances of the property damage and business interruption policies," it was foreseeable that insurer's breach caused policyholder to incur attorneys' fees to obtain coverage) (citations omitted). Fact discovery has closed, but contrary to Insurers' contention, PES is not left with "no opportunity" to come forward with evidence of the attorneys' fees PES incurred as a result of Insurers' breach. Insurers' Mot. 25. PES's attorneys' fees continue to accrue, and the appropriate time to quantify those fees, if and when awarded, is in a fee application after trial. Until then, the demand for attorneys' fees in PES's prayer for relief is sufficient.

Because Insurers fail to establish that they are entitled to judgment as a matter of law on any of the three issues addressed in Insurers' Motion, PES respectfully requests that Insurers' Motion be denied in its entirety.

## STATEMENT OF FACTS

PES respectfully directs the Court to the Statement of Undisputed Facts in the Memorandum of Law in Support of PES's Motion for Partial Summary Judgment (D.I. 208). To the extent that there are additional facts material to this Opposition not contained in that Statement of Undisputed Facts, they are cited with proper evidentiary support herein.

## LEGAL STANDARDS

As the moving party, Insurers bear the burden to demonstrate that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56); *Morris James LLP v. Cont'l Cas. Co.*, 928 F. Supp. 2d 816, 820–21 (D. Del. 2013).

Insurers' burden is not eased or altered as a result of the overlap between Insurers' and PES's Motions. *See Peters Twp. Sch. Dist. v. Hartford Acc. & Indem. Co.*, 833 F.2d 32, 34 (3d Cir. 1987) (holding cross-motions for summary judgment do not alter the parties' respective burdens).

The Parties agree that New York substantive law governs this dispute,[3] meaning that, with respect to "materiality," New York law governs "which facts are critical and which [are] irrelevant." *See id.* To evaluate whether a genuine dispute of material fact exists under New York law, the Court "may not make credibility determinations or weigh the evidence" proffered by the Parties, but rather must "draw all reasonable inferences in favor of the nonmoving party." *See Morris James LLP*, 928 F. Supp. 2d at 820–21 (*citing Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

The proper method for calculating ACV and the applicability of the SLV Clause—two of the issues with respect to which Insurers seek summary judgment—are questions of pure contract interpretation. If, after applying general rules of contract construction,[4] the Court determines that the relevant contract provisions are "clear and unambiguous, they must be enforced as written." *Rocon Mfg., Inc v. Ferraro*, 199 A.D.2d 999, 999 (N.Y. App. Div. 1993) (citation omitted). However, if the Court finds the SLV Clause to be ambiguous, the Court may then turn to "extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." *See Columbia Cas. Co. v. Neighborhood Risk Mgmt. Corp.*, 2016 WL 4467548, at *4 (S.D.N.Y. Aug. 22, 2016) (internal citations omitted). Under New York law, provisions are generally

---

[3] *See* Ex. 1 (the "Policy") at Declaration 8 (GS0004967) (choice of law provision specifying application of New York law); Insurers' Mot. 10. Unless otherwise stated, all Exhibits referenced in this Opposition refer to and correspond with the Exhibits attached to the September 20, 2021 Declaration of Chelsea L. Ireland in Support of PES's Motion (D.I. 209).

[4] "Under New York law, insurance policies are interpreted according to general rules of contract interpretation." *Medidata Sols., Inc. v. Fed. Ins. Co.*, 268 F. Supp. 3d 471, 475–76 (S.D.N.Y. 2017). *See* PES's Mot. 18–21 (setting forth New York standards of policy construction).

"construed in favor of the insured, and ambiguities, if any, are to be resolved in the insured's favor and against the insurer." *See U.S. Fid. & Guar. Co. v. Annunziata*, 67 N.Y.2d 229, 232 (1986); *Ogden Corp. v. Travelers Indemn. Co.*, 681 F. Supp. 169, 173–74 (S.D.N.Y. 1988).

## ARGUMENT

## I.    LABOR MAY NOT BE DEPRECIATED WHEN CALCULATING ACV

To calculate ACV, the Policy's plain language requires that the only component deducted from RCV is "physical depreciation."  However, Insurers insist that this language also permits a deduction for "labor depreciation" and apply this construction to improperly devalue PES's losses by more than $100 million.[5]  Insurers' surface-level "analysis" of cherry-picked, uniformly distinguishable, non-New York cases is insufficient to overcome the Policy's plain language and fails to establish that Insurers' may depreciate labor as a matter of law.  The Court should deny Insurers' Motion, grant PES's Motion, and hold that Insurers may not depreciate labor when calculating ACV.

### A.    Depreciating Labor Defies the Plain Language of the Policy

New York courts addressing the proper calculation of actual cash value in the insurance context expressly delineate between insurance policies that define ACV and those that do not.  *See SR Int'l*, 445 F. Supp. 2d at 346–47 (prohibiting insurers from applying depreciation to anything other than the categories specified in the ACV definition); *accord, Roc Nation LLC v. HCC Int'l Ins. Co., PLC*, 2021 WL 827957, at *20 (S.D.N.Y. Mar. 4, 2021) (finding that an insurer cannot deduct from a loss calculation unless "clearly require[d]" by the policy).  PES's Policy expressly

---

[5] Insurers have also improperly deducted "obsolescence" from RCV to calculate ACV, but Insurers' Motion does not address this issue.  For the reasons set forth in PES's Motion, the Court should hold that Insurers may not deduct obsolescence when calculating ACV.

defines ACV as "[t]he Replacement Cost less deduction for *physical depreciation*."[6]  The initial RCV calculation is described in the Policy in detail and no one disputes that it includes the costs of labor necessary to repair or replace the damaged property.[7]  Therefore, Insurers can only prevail on this Motion if they show that the words "physical depreciation" unambiguously permit depreciation of a *non*-physical cost that is undisputely part of RCV.  This they cannot do.

Since neither "physical" nor "depreciation" is defined in the Policy, the Court must consider their meaning in common speech and in the insurance context.  *See CT Inv. Mgmt. Co., LLC v. Chartis Specialty Ins. Co.*, 130 A.D.3d 1, 6–7 (N.Y. App. Div. 2015).  "Depreciation," with no modifying descriptors, means "a decline in an asset's value because of use, wear, obsolescence or age."  *Depreciation*, BLACK'S LAW DICTIONARY (11th ed. 2019).[8]  The "physical" modifier in PES's Policy clarifies that only costs "pertaining to real *tangible* objects" can be deducted.  *Physical*, BLACK'S LAW DICTIONARY (11th ed. 2019) (emphasis added).  The plain language of the Policy therefore prohibits the depreciation of non-physical components of the RCV like labor.  And even if one could read the language to unambiguously permit additional deductions (which one cannot), deducting depreciation from an intangible thing that has no useful life and cannot experience "wear and tear" simply makes no sense.  *See infra* § II.B.  The plain meaning of "physical depreciation" excludes depreciation of intangible labor costs, and Insurers may not ignore the plain language of the Policy in order to escape their coverage obligations.

Tellingly, Insurers sole attempt to address the Policy's plain language derives from a 1984 tax appraisal case that, under New York law, is wholly inapplicable in the insurance context.  *See*

---

[6] Policy § I(6)(a) (Ex. 1 at GS0004983) (emphasis added).

[7] Policy § I(6)(f) (Ex. 1 at GS0004985).

[8] Insurers' expert admits that obsolescence is a separate category that cannot be deducted to calculate ACV.  *See* Ex. 69 (Expert Report of J. Held) at 4.

6

*SR Int'l*, 445 F. Supp.2d at 351–52 (rejecting insurers' reliance on "appraisal . . . case law" to interpret "depreciation" in an ACV definition, as such authority fails to "shed light on the terminology as generally understood in the *particular* trade or business involved in this litigation—the property insurance industry").    Insurers argue that the Policy "does not preclude labor depreciation" because the modifier "physical" in "physical depreciation" "simply defines the type of depreciation that can be applied to replacement cost."    *See* Insurers' Mot. 19 (citing *In re Tenneco Inc.*, 479 N.Y.S.2d 587, 589 (3d Dep't 1984)).    But there is no dispute that "physical depreciation" is the "type of depreciation" that may be deducted from RCV, and Insurers wholly fail to address the operative question of *how* that physical depreciation is calculated.    Insurers offer no textual support for their assertion that "physical depreciation" may include the depreciation of inherently intangible, non-deteriorating costs, and *Tenneco* does not address this issue.    Without any genuine analysis of the Policy text, Insurers' Motion fails to establish that Insurers may depreciate labor as a matter of law.

### B.    Depreciating Labor Defies PES's Reasonable Expectations

As written, the Policy's plain language is sufficient to establish that Insurers may not depreciate labor when calculating ACV.    Moreover, though it remains an open issue in many states, a growing weight of authority suggests that allowing insurers to depreciate labor costs generally fails to comport with a reasonable policyholder's expectations.[9]    Though undoubtedly aware of

---

[9] Courts across the country have disallowed labor depreciation when calculating ACV, both in circumstances where ACV is expressly defined (by policy, statute, or regulation) and in circumstances where it is not.    Cases where ACV was defined include *Dieudonne v. United Prop. & Cas. Ins. Co.*, 2021 WL 4476782 (E.D. La. Sept. 30, 2021); *Lammert v. Auto-Owners (Mut.) Ins. Co.*, 572 S.W.3d 170 (Tenn. 2019); *Lains v. Am. Family Mut. Ins. Co.*, 2016 WL 4533075 (W.D. Wash. Feb. 9, 2016); *Sproull v. State Farm Fire & Cas. Co.*, 2021 WL 4314060 (Ill. Sept. 23, 2021); *Mitchell v. State Farm Fire & Cas. Co.*, 954 F.3d 700 (5th Cir. 2020); *Perry v. Allstate Indem. Co.*, 953 F.3d 417 (6th Cir. 2020); *Hicks v. State Farm Fire & Cas. Co.*, 751 F. App'x 7003

7

this trend, Insurers never sought to modify the ACV definition to expressly permit labor depreciation.  Insurers cite opinions from several courts that allowed labor to be depreciated, but none of these cases apply New York law and none of the policies at issue define ACV such that "physical depreciation" is the only permissible deduction from replacement cost.[10]  Insurers never explain why PES should reasonably expect the phrase "physical depreciation" to encompass depreciation of inherently non-physical, non-deteriorating labor costs.  The Court should reject Insurers' invitation to read that language into the Policy, as this violates settled New York law requiring a policy to be construed in accordance with PES's reasonable expectations.  *See Medidata*, 268 F. Supp. 3d at 476 (the court "should focus 'on the reasonable expectations of the average insured upon reading the policy and employing common speech.'") (citing *Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 25 N.Y.3d 675, 680 (2015)); *In re Viking Pump, Inc.*, 27 N.Y.3d 244, 257 (2016) (holding that policies must be construed "consistent with

---

(6th Cir. 2018); *Arnold v. State Farm Fire & Cas. Co.*, 268 F. Supp. 3d 1297 (S.D. Ala. 2017). Cases where ACV was undefined include: *Titan Exteriors, Inc. v. Certain Underwriters at Lloyd's, London*, 297 F.Supp. 3d 628, 633 (N.D. Miss. 2018); *Adams v. Cameron Mut. Ins. Co.*, 430 S.W.3d 675, 679 (Ark. 2013), *superseded by statute*, Ark. Code Ann. § 23-88-106(a)(2) (2017).

[10] All courts allowing insurers to depreciate labor when calculating ACV have done so either where the policy at issue either does not limit the deductions permissible when calculating ACV, or permits deductions beyond the sole "physical depreciation" deduction permitted by PES's Policy.  *See In re State Farm Fire & Cas. Co.*, 872 F.3d 567, 570 (8th Cir. 2017) (ACV not defined); *Henn v. Am. Family Mut. Ins. Co.*, 894 N.W.2d 179, 182–83 (Neb. 2017) (same); *Wilcox v. State Farm Fire & Cas. Co.*, 874 N.W.2d 780, 782 (Minn. 2016) (same); *Papurello v. State Farm Fire & Cas. Co.*, 144 F. Supp. 3d 746, 759 (W.D. Pa. 2015) (same); *Redcorn v. State Farm Fire & Cas. Co.*, 55 P.3d 1017, 1019 (Okla. 2002) (same); *Brown v. Travelers Cas. Ins. Co.*, 2016 WL 1644342, at *1 (E.D. Ky. Apr. 25, 2016) (ACV definition requires deductions different than and beyond "physical depreciation"); *Graves v. Am. Family Mut. Ins. Co.*, 686 F. App'x 536, 537 (10th Cir. 2017) (same); *Riggins v. Am. Family Mut. Ins. Co.*, 281 F. Supp. 3d 785, 786 (W.D. Mo. 2017) (same); *Basham v. United Servs. Auto. Assoc.*, 2017 WL 3217768, at *1 (D. Colo. July 28, 2017) (same); *Ware v. Metro. Prop. & Cas. Ins. Co.*, 220 F. Supp. 3d 1288, 1289 (M.D. Ala. 2016) (same); *Branch v. Farmers Ins. Co., Inc.*, 55 P.3d 1023, 1026 (Okla. 2002) (same).

the reasonable expectation of the average insured").

     **1.**     **Courts Across the Country Have Recognized that Calculating ACV By Depreciating Labor Defies an Insured's Reasonable Expectations**

Just last month, the Illinois Supreme Court became the latest high court to rule that labor cannot be depreciated where ACV is defined as "replacement cost . . . less depreciation." *See Sproull*, 2021 WL 4314060 (decided Sept. 23, 2021). The court grounded itself in the practical realities of labor and materials and held that "labor is not logically depreciable, as it does not lose value over time due to wear and tear. Materials deteriorate with time, but labor does not. Labor is a fixed cost that is not subject to wear and tear, deterioration, or obsolescence." *Id*. at *13 (citations omitted). Construing the applicable ACV definition accordingly, the *Sproull* court held that "only the property structure and materials are subject to a reasonable deduction for depreciation, and depreciation may not be applied to the intangible labor component." *Id*. at *4.[11]

Relying on this common-sense distinction between labor and materials, various other courts have likewise held that a policyholder would reasonably expect that its ACV recovery would *not* be subject to a deduction for depreciation of labor. *See*, *e.g.*, *Adams* 430 S.W.3d at 678 ("The very idea of depreciating the value of labor is illogical.") (quotation omitted); *Bailey v. State Farm Fire & Cas. Co.*, 2015 WL 1401640, at *8 (D. Minn. Mar. 25, 2015) ("The very idea of depreciating the value of labor defies good common society."), *aff'd sub nom*, *Hicks*, 751 F. App'x 7003 (6th Cir. 2018); *Arnold*, 268 F. Supp. 3d at 1312 (noting the "inherent logical contradiction of depreciating non-depreciating things"). Several state governments have also weighed in on the issue, either prohibiting the depreciation of labor or cautioning insurers to write policies that

---

[11] The *Sproull* court held that the policy's required deduction for "depreciation" would not permit the depreciation of labor. By including the "physical" modifier, PES's Policy defines a scope of permissible depreciation that is *narrower* than the policy at issue in *Sproull*.

clearly permit it.  *See, e.g.*, Depreciation of Labor Expenses in Property Loss Claims, Miss. Ins. Dep't Bulletin 2017-8 (Aug. 4, 2017),  https://www.mid.ms.gov/legal/bulletins/20178bul.pdf (insurers must "clearly provide for the depreciation of labor in the insurance policy").[12]

While some courts have sanctioned the depreciation of labor (*see supra* n.10), the *Sproull* court cited the *very existence of a split in nationwide authority* as an additional basis supporting the insured's argument that it reasonably expected that intangible labor costs would not be depreciated.  *See Sproull*, 2021 WL 4314060, at *13 ("[T]he belief that labor does not depreciate 'is a plausible conception for a wealth of thoughtful, knowledgeable judges, and is even more so for lay insureds with no special competence in property or insurance matters.'") (quoting *Arnold*, 268 F. Supp. 3d at 1312).  At a minimum, Insurers cannot plausibly argue to this Court that the *only* reasonable interpretation of "physical depreciation" includes depreciation of non-physical labor costs.  *See Mitchell*, 954 F.3d at 707 (noting that, while both parties' interpretations of "depreciation" may be reasonable, the insurers' definition "is not so singularly compelling as to make [the insured's] definition of ACV unreasonable").  Accordingly, under New York law, Insurers' Motion must be denied.  *See Annunziata*, 67 N.Y.2d at 232 ("[A]mbiguities, if any, are to be resolved in the insured's favor and against the insurer.").

### 2.    Construing "Physical Depreciation" to Include Labor Depreciation Would Defy PES's Reasonable Expectations

In New York, parties to an insurance contract are "assumed to negotiate against the backdrop of [relevant] case law."  *AGCS Marine Ins. Co. v. World Fuel Servs., Inc.*, 220 F. Supp.

---

[12] *See also* Cal. Ins. Code § 2051(b) (West) ("[D]eduction for physical depreciation shall apply only to components of a structure that are normally subject to repair and replacement during the useful life of that structure").  The Vermont state regulator went so far as to advise insurers that depreciating labor was an unfair claim settlement practice.  Property Loss Claims: No Labor Depreciation, VT Dep't Fin. Reg., Div. of Ins., Bulletin No. 184 (May 1, 2015), https://dfr.vermont.gov/sites/finreg/files/regbul/dfr-bulletin-insurance-184.pdf  ("Labor, unlike physical materials, does not break down or lose value over time.").

10

3d 431, 438 (S.D.N.Y. 2016) (citing *CGS Indus., Inc. v. Charter Oak Fire Ins. Co.*, 720 F.3d 71, 77 (2d Cir. 2013)).  At the time of the Policy's underwriting in 2018, Insurers knew or should have known that the question of labor depreciation was being actively litigated around the country.  The seminal state supreme court case on the issue was decided in 2002—more than 15 years earlier.  *See Redcorn*, 55 P.3d 1017 (Okla. 2002); *Branch*, 55 P.3d 1023 (Okla. 2002).  At present, at least 20 courts have ruled on whether labor costs can be depreciated when calculating ACV.  This growing body of case law, and the existence of a jurisdictional split, bears directly on the reasonableness of Insurers' interpretation of ACV.  *AGCS*, 220 F. Supp. 3d at 438 (in the insurance context, case law is presumed to "inform[] the understandings imputed to the contracting parties").  In the context of the nationwide jurisdictional split over whether "replacement cost less *depreciation*" allows for the depreciation of labor, it is wholly reasonable that PES would expect "Replacement Cost less deduction for *physical depreciation*" to exclude the depreciation of labor.

Absent language expressly permitting the depreciation of labor, Insurers have no basis to argue that the phrase "physical depreciation" unambiguously permits depreciation of labor costs or that PES reasonably could have expected labor to be depreciated.  The Policy Insurers sold PES identifies "physical depreciation" as the only permissible depreciation deduction to be applied when calculating ACV.  Moreover, Insurers agreed that the Policy would be governed by New York law, which holds the plain language of a policy as paramount.  By 2018, a substantial number of courts had disallowed the depreciation of labor, but Insurers made no attempt to modify the Policy to expressly permit depreciation of labor costs.  Insurers did not require that the Policy be governed by the law of a state whose highest court has ruled in favor of depreciating labor.  Insurers did not insist that the Policy include language expressly providing that labor was depreciable.

Insurers did not omit the "physical" modifier from "physical depreciation."[13]

If Insurers wanted to ensure that labor would be depreciated, they should have done so in clear language. Indeed, several courts have faulted insurers for failing to use clear policy language when they had the chance. *See, e.g.*, *Arnold*, 268 F. Supp. 3d at 1310 n.18 (insurer had "not explained why it should be judicially protected from [a] foreseeable consequence of its own imprecise drafting regarding an issue of which it has been actually aware . . . since at least 2002"); *Hicks*, 751 F. App'x at 709 (insurer could have drafted "its policies to expressly include labor depreciation when calculating ACV" but did not); *Perry*, 953 F.3d at 423 (same). Last month, Illinois's highest court held that where ACV is defined as "replacement cost . . . less depreciation, if any," allowing insurers to depreciate labor would impermissibly rewrite to definition to read "replacement cost . . . less depreciation, if any, *applied even to intangibles such as labor that do not deteriorate*." *Sproull*, 2021 WL 4314060, at *11.

Insurers—all of which have decades of experience underwriting property insurance, especially in the energy sector—are well aware that after a loss like the Explosion, sophisticated engineering, procurement, and installation labor will make up most of the rebuild cost. Insurers were on notice of the labor depreciation issue for more than 15 years but sold a Policy requiring that ACV be calculated such that the only permissible deduction is "physical depreciation." Now, seeking to reduce PES's claim by as much as $140 million,[14] Insurers ask the Court to disregard the "inherent logical contradiction of depreciating non-depreciating things" like labor. *Arnold*, 268 F. Supp. 3d at 1312. In so doing, Insurers ask this Court to violate the settled New York law

---

[13] Under the weight of authority Insurers would still lose on this Motion if the Policy just said "depreciation," but the Policy's "physical" modifier reiterates how unmoored Insurers' interpretation is from the actual plain language.

[14] The monetary effect of depreciating or not depreciating labor will ultimately depend on the calculation of RCV, which remains an issue of fact to be determined at trial.

that where the language of a policy must be construed in accoradance with the reasonable expectations of the insured. *See Viking Pump,* 27 N.Y.3d at 257.

### 3.    Insurers Misleadingly Imply that New York Law Supports the Depreciation of Labor

New York courts have not ruled on whether the term "depreciation" alone allows for depreciation of labor costs in the insurance context, yet Insurers argue that a court applying New York law should depreciate labor based on the notion of "indemnity." Insurers' Mot. 19.    Insurers suggest that courts permitting depreciation of labor rely on New York authority and urge this Court to likewise sanction Insurers' bold decision to depreciate potentially more than one hundred million dollars of PES's RCV.    *Id.* at 19–20, 22.    Insurers' argument is highly misleading, as the New York authority in question is a single, nearly one hundred-year-old case that did not involve depreciation of labor and was expressly distinguished in *SR Int'l. See McAnarney v. Newark Fire Ins. Co.*, 247 N.Y. 176 (1928).    *SR Int'l*, the leading New York case on ACV *for insurance policies that define the term*, dedicates five pages to distinguishing *McAnarney*, where the policy did not define ACV.    *SR Int'l*, 445 F. Supp. 2d at 342–46.    Indeed, all of the foreign cases Insurers reference in this context cite *McAnarney* for the simple proposition that "[i]ndemnity is the basis and foundation of insurance law."    *See, e.g.*, *Redcorn*, 55 P.3d at 1020 (quoting *McAnarney*, 247 N.Y. at 184).

Regardless of whether indemnity is "the basis and foundation of insurance law," it is of little importance in light of the Policy's clear and unambiguous language.    The Court's analysis must be grounded in the plain language of the Policy, as opposed to any vague "principles" to which Insurers seek to focus the Court's attention.    Indeed, under New York law, "[t]he best evidence of what the parties to an agreement intended is the language of the agreement itself, especially where . . . the parties to the insurance policy were sophisticated entities."    *Nat'l Union*

*Fire Ins. Co. of Pittsburgh, Pa. v. TransCanada Energy USA, Inc.*, 28 N.Y.S.3d 800, 806 (Sup. Ct. 2016).  Accordingly, "physical depreciation" must be interpreted according to common speech, regardless of whether the resulting ACV aligns with the amorphous concept of "indemnity."

### C.    Using "Indemnity" as a Basis to Depreciate Labor Defies New York Law and Common Logic

Rather than engage with the actual Policy language, Insurers justify depreciating labor based on "the fundamental principle that the purpose of property insurance is to indemnify policyholders by returning them to the position they were in before the loss."  Insurers' Mot. 19, 22.  This argument fails for two, independent reasons: (1) New York law is explicit that where the Policy defines "actual cash value," that definition—*not* overarching principles like indemnity— governs the loss measurement; and (2) should the Court decide to consider "overarching principles" as part of its analysis, the principle of indemnity requires that labor *not* be depreciated because depreciating labor in fact *under*-indemnifies the policyholder.

### 1.    PES and Insurers Agreed on an Express Definition of Actual Cash Value to Avoid the Uncertainty of Calculating ACV According to Broad Principles Like "Indemnity"

Insurers insist that principles of indemnity can override the plain Policy language, but Insurers' argument is directly refuted by leading New York cases conspicuously absent from Insurers' Motion.  In *SR Int'l*, which involved a policy where ACV was expressly defined, the court rejected the same indemnity argument that Insurers' make and unequivocally held that "broadly phrased theoretical principles of property insurance law *do not require that all insurance contracts be read to provide complete indemnity*[.]"  *SR Int'l*, 445 F. Supp. 2d at 346 (emphasis added).  The court continued, explaining that indemnity cannot "override contractual language that foregoes the unbounded fact-finding . . . in favor of a more predictable method of determining ACV."  *Id*.  Accordingly, the *SR Int'l* court resoundingly rejected the insurers' citation to various

14

outside sources of evidence in service of achieving purported "indemnity." *Id.*

SR *Int'l* repeatedly cites *Dickler v. CIGNA Prop. and Cas. Co.*, a leading federal appellate decision interpreting actual cash value under New York law, which Insurers also omit from their Motion. 957 F.2d 1088 (3d Cir. 1992). The *Dickler* court recognized that, under New York law, if an insurance contract includes an agreed-upon definition of ACV, insurers may not deduct costs for categories other than those specified in the ACV definition. *See id.* at 1098 (citation omitted). The court held that the insurer could not "ignore the language of the contract" and apply deductions targeted to the property's so-called fair market value. *Id.*[15]

Insurers and PES contracted for a clear and unambiguous method of calculating ACV that "sacrifice[s] the elusive, and perhaps illusory, goal of complete indemnity, in favor of predictability." *SR Int'l*, 445 F. Supp. 2d at 346. Now that PES has suffered a substantial loss, Insurers may wish the Policy guaranteed only "actual loss value" (*see* Insurers' Mot. 12), but this is not the language Insurers underwrote or that PES purchased. Insurers may not use the vague concept of indemnity to rewrite the Policy now. *Id.* at 346–47 (rejecting insurers' invitation to construe a provision based on "broad principles" as opposed to "the actual words at hand"); *accord*, *Roc Nation*, 523 F. Supp. 3d at 566–67 (refusing to rewrite even *ambiguous* provisions based solely on general indemnity principles, and noting that insurer could cite no authority "under which ambiguous text can be rendered clear and concrete under such general principles").

### 2.    Achieving Indemnity Requires that Insurers <u>Not</u> Depreciate Labor

Even *if* this Court is obligated to base its ACV determination on the vague principle of "indemnity" (it is not), leaving labor undepreciated most closely aligns with indemnity principles.

---

[15] Insurers' ACV expert, Jonathon C. Held, opined on ACV in *Dickler* based on general principles rather than the policy definition. *Id.* at 1092. The Third Circuit rejected his opinion for improperly looking outside the policy language. *Id.* at 1100.

Contrary to Insurers' argument, several cases, including the recent *Sproull* decision, have found that depreciating labor *violates* the principle of indemnity and could result in *under-*indemnification. *See, e.g.*, *Sproull*, 2021 WL 4314060, at *14 (holding that not depreciating labor is "simply proper indemnity" because "depreciating labor can result in the insured being placed in a worse position than he was in before the loss"); *see also Redcorn*, 55 P.3d at 1017 (Boudreau, J., dissenting) ("[A]llowing [insurer] to depreciate the cost of labor would leave [policyholder] with a significant out-of-pocket loss, a result that is inconsistent with the principle of indemnity.").

The objective of "indemnity" is to "put the insured back in the position he or she enjoyed before the loss" (*see Bailey*, 2015 WL 1401640, at *5), and depreciating labor deprives a policyholder of the financial means by which to restore its pre-loss position. The hypothetical posited by the *Bailey* court is instructive on this point:

> [I]f the affected property was a ten year old garage, the insured would not be given the cash equivalent of a brand new garage but one that had stood for ten years. The calculation would take into account wear and tear of the materials. However, labor is not subject to wear and tear. Indeed, the cost of labor to install a new garage would be same as installing a garage with 10 year old materials. In other words, depreciated labor costs would result in **under** indemnification. As the insurance contract is one for indemnity, depreciating the cost of labor violates the contract.

*See Bailey*, 2015 WL 1401640, at *6. Accordingly, the principle of indemnity is best served by leaving labor undepreciated.[16]

Because the Policy's ACV definition unambiguously allows for only the depreciation of *physical* materials to be deducted from RCV, and because principles of indemnity weigh against depreciating labor costs, the Court should deny Insurers' Motion, grant PES's Motion, and hold

---

[16] Insurers highlight the large percentage of PES's RCV attributed to labor (Insurers' Mot. 22), but Insurers also calculate labor as the majority of a hypothetical RCV. *See* Ex. 1 to Ireland Decl. in Supp. of PES's Opposition, filed concurrently with this Opposition. In any event, the breakdown between labor and materials is a fact issue not before the Court in either Party's Motion.

16

that Insurers may not apply a "labor depreciation" deduction when calculating ACV.

## II.    INSURERS ARE OBLIGATED TO VALUE PES'S PD CLAIM PUSUANT TO THE SLV METHOD BECAUSE THE SOA CONTRACTUALLY OBLIGATES PES TO INSURE SPECIFIC PROPERTY FOR A STIPULATED LOSS AMOUNT

Insurers do not dispute that if the SOA "contractually obligated [PES] to insure specific property for a stipulated loss amount,"[17] then Insurers must value PES's PD Claim pursuant to the SLV Method.[18]   Therefore, whether the SLV Clause applies depends on this Court's combined construction of both the Policy and the SOA, each of which is governed by New York law.[19]   *See Roc Nation LLC*, 2021 WL 827957, at *18–20 (holding that if a policy incorporates a separate agreement by reference, policy terms are interpreted in the context of the entire integrated agreement, and the incorporated agreement is not extrinsic evidence).[20]

Insurers' interpretation of the SOA violates New York law.   While Insurers concede that the SOA contractually obligates PES to insure the PES Refinery for no less than $750 million, they insist that the SLV Clause is inapplicable because the SOA does "not reference specific property and [does] not require PES to pay a stipulated loss amount . . . ."   Insurers' Mot. 5, 17. Insurers ignore the plain language of the contract and construe the SOA's provisions "as if isolated from the context" of the entire agreement, rather than "in the light of the obligation as a whole and the intention of the parties as manifested thereby."   *See Riverside S. Plan. Corp. v. CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 404 (2009).   Moreover, Insurers' suggestion that the SOA must

---

[17] Policy § I(5)(e) (Ex. 1 at GS0004982-4983); Insurers' Mot. 5.

[18] Policy § I(5)(e) (Ex. 1 at GS0004982-4983)

[19] The SOA specifies that its terms must be construed "in accordance with the internal laws of the State of New York."   *See* SOA § 16.01(a) (Ex. 3 at ACE0005896).

[20] The Policy grants PES permission to enter into and assume liability under contracts customary or necessary to PES's business, without prejudice to PES's recovery under the Policy, and Insurers agreed to be governed by the terms of PES's contracts to the extent they effect loss under the Policy.   *See* PES's Mot. 23–24; Policy at General Condition 35 (Ex. 1 at GS0005009) ("insofar as [such contracts] effect any loss [under the Policy]", provided that such are concluded prior to such loss, "the rights and obligations of the Insurers shall be governed by the terms of such contracts").

obligate PES to *pay* a stipulated loss amount in order to trigger the SLV Clause imposes an additional condition that is not supported by the Policy language.  Insurers' construction of the SLV Clause must be rejected.  *See Annunziata*, 67 N.Y.2d at 234–35 (a policy "may not be rewritten *against* the interests of the [insured] by imposing an obligation which the policy omits").

**A.     The SOA Obligates PES to Insure "Specific Property"**

**1.     The SOA Obligates PES to Insure Certain "Mortgaged Properties" Comprising the Real Property at the PES Refinery Site**

There can be no dispute that the SOA obligated PES (1) to insure the property at the PES Refinery for a minimum of $750 million; and (2) to provide proof of that coverage to ICBCS.  The SOA's Insurance Requirements obligate PES to maintain "Comprehensive Property Insurance on a replacement cost basis, subject to a minimum amount of $750,000,000 . . . for All Risk of Physical Loss or Damage . . . [and] Coverage shall be comprehensive and include but not be limited to Fire, Explosion, [and] Property Damage . . . ."[21]  Insurers' observation that the SOA's Schedule 10.04 Insurance Requirements "make[] no reference to the 'Refinery' or 'Refinery Real Property'" (Insurers' Mot. 18) is beside the point.  Reading the SOA as a whole, the property to be insured is identified in great detail, and there is no credible argument that the property to be insured is in any doubt.  Insurers' conclusion that the Insurance Requirements "do[] not directly connect any particular property to this [$750 million] minimum coverage figure" (*id.*) requires the Court to read the 10.04 Insurance Requirements in isolation, in violation of New York law.  *See Riverside S. Plan. Corp.*, 13 N.Y.3d at 404 (noting a contract should be construed "in its entirety," and contract terms should be considered "not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby").

Insurers wrongly suggest that the "only property" subject to the Schedule 10.04 Insurance

---

[21] *See id.* at Schedule 10.04(6) (Ex. 3 at ACE0006225).

Requirements is the property "specifically mentioned" in the text thereof.  *See* Insurers' Mot. 18.

This construction is "not supported by a review of the entire agreement," and should be rejected.

*See Koppelman v. Std. Fire Ins. Co.*, 2008 WL 789882, at *4 (E.D.N.Y. Mar. 21, 2008) (citation

omitted).  Schedule 10.04 defines the type and minimum amount of insurance required, and the

body of the SOA, via internal references directing the reader to Schedule 10.04, specifies which

property is subject to those requirements.  Read collectively, the SOA unambiguously establishes

that PES's property located at the Refinery is subject to the SOA's Insurance Requirements, and

thus is sufficient to trigger the SLV Clause.

First, the SOA identifies certain "Mortgaged Properties" relevant to the agreement, defined

as "the parcels of Real Property described by metes and bounds on Schedule 1.01(h) [of the

agreement]."[22]  Schedule 1.01(h), titled "Mortgaged Property," identifies twelve "Lots" and

specifies each Lot by a metes-and-bounds description identical to what one would expect in a

deed.[23]  The SOA separately identifies the "Refinery" as the "refinery located in Philadelphia,

Pennsylvania (consisting of two formerly separate refining operations commonly known as 'Point

Breeze' and 'Girard Point'), . . . further described" as "a 335,000 bpd refinery with a Nelson

complexity of 9.8 located in Philadelphia . . . [that] is known and configured today is a combination

of two formerly separate refineries often referred to as Girard Point and Point Breeze . . . located

on an approximately 1,300 acre site and processes light, sweet, residual cracking and heavy sweet

crudes."[24]  "Refinery Real Property" is defined in the SOA as the "real property interests at the

---

[22] *See id.* § 1.01 (Ex. 3 at ACE0005751).
[23] *See id.* at Schedule 1.01(h) (Ex. 3 at ACE0005962-5971)
[24] *See id.* § 1.01 (Ex. 3 at ACE0005757), Schedule 1.01(l) (Ex. 3 at ACE0005981)

site of the Refinery as described in <u>Schedule 1.01(m)</u>."[25] Schedule 1.01(m) states "See Schedule

1.01(h)."[26] As Schedule 1.01(h) is also the schedule that defines the Mortgaged Properties, under

the SOA, the Mortgaged Properties and the Refinery Real Property are one and the same.

Second, SOA Section 10.12 provides that "[w]ith respect to the Mortgaged Properties,"

PES is required to "deliver to ICBCS a copy of, or a certificate as to coverage under, and a

declaration page relating to, the insurance policies required by Section 10.04 of this Agreement . .

. ."[27] Section 10.04 directs PES to "[k]eep its property insured at all times in accordance with the

insurance requirements set forth in <u>Schedule 10.04</u> (the '<u>Insurance Requirements</u>')."[28]  The

Mortgaged Properties—being the same as the Refinery Real Property—are therefore subject to the

SOA's Schedule 10.04 Insurance Requirements that obligate PES to maintain "Comprehensive

Property Insurance on a replacement cost basis, subject to a minimum amount of $750,000,000."[29]

Under the plain language of the SOA, PES was contractually obligated to insure the "real property

interests at the site of the Refinery"[30] for no less than $750 million.  This reading of the SOA is

not "strained," but rather derives from a careful reading of, and adherence to, the SOA's internal

references and citations as required by New York law.  *See Koppelman*, 2008 WL 789882, at *4

(requiring a contract interpretation to be "supported by a review of the entire agreement.")

### 2.    PES's Obligation to Insure the Mortgaged Properties Was an Obligation to Insure "Specific Property"

Insurers argue that the Insurance Requirements of "Section 10.04 do not refer to any

'specific' property, they refer to 'all property' and 'its property.'"  Insurers' Mot. 18.  But, as

---

[25] *See id.* § 1.01 (Ex. 3 at ACE0005757)

[26] *See id.* at Schedule 1.01(m) (Ex. 3 at ACE0005982).

[27] *See id.* § 10.12(b) (Ex. 3 at ACE0005838-5839).

[28] *See id.* § 10.04(b) (Ex. 3 at ACE0005833).

[29] *See id.* at Schedule 10.04(6) (Ex. 3 at ACE0006225).

[30] *See id.* at Schedule 1.01 (Ex. 3 at ACE0005757).

20

explained in the previous section, this construction requires the Court to read the Insurance Requirements in a vacuum.  The SOA establishes that the Mortgaged Properties—being the same as the Refinery Real Property—are subject to the SOA's Schedule 10.04 Insurance Requirements. The Insurance Requirements do not apply to all property everywhere, or even PES's offices not situated at the Refinery.  Therefore, if the Court finds that the Mortgaged Properties constitute "specific property," PES's obligation to insure the Mortgaged Properties pursuant to the SOA's Insurance Requirements is sufficient to meet the "specific property" prong of the SLV Clause.

Insurers correctly note that "specific" is not defined by the Policy, but, as permitted under New York law, both PES and Insurers define "specific" according to its dictionary definition.  *Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 567 (2d Cir. 2011) (noting that "it is common practice for the courts of [New York] State to refer to the dictionary to determine the plain and ordinary meaning of words to a contract" (internal citations omitted)); Insurers' Mot. 13 (citing Merriam-Webster to define "specific").  Insurers define "specific" as "constituting or falling into a specifiable category," but then go on to improperly define "specifiable" as "to name or state explicitly or in detail."[31]  As "specifiable" is not a verb, it can be assumed that Insurers intended to assert that "specific" is properly understood as "constituting or falling into a . . . category" that is capable of being "name[d] or state[d] explicitly or in detail."  Insurers' Mot. 13.

PES noted in its Motion that Merriam-Webster's also defines "specific" to mean either "sharing or being those properties of something that allow it to be referred to a particular category," or "free from ambiguity."  PES's Motion also identifies case law wherein courts construed the contractual phrase "specific property" to mean "property capable of identification" (*Poyzer v.*

---

[31] Insurers also reference a "Kids Definition" of "specific", but PES assumes this was an error as using kids' definitions in sophisticated corporate contracts worth tens of millions of dollars would not comport with the reasonable expectations of the parties.

*Amenia Seed & Grain Co.*, 381 N.W.2d 192, 195 (N.D. 1986) (citation omitted)), or property identified such that "a reasonable third party would be able to pinpoint the specific property to which the parties were referring." *Prezioso v. Aerts*, 358 Wis. 2d 714, 729 (Wis. App. 2014).

Under either Parties' proposed construction of "specific property", PES's contractual obligation to insure the "real property interests at the site of the Refinery"[32] is an obligation to insure "specific property" as required by the SLV Clause. Schedule 1.01(h) identifies the "real property interests at the site of the Refinery"[33] by the exact metes and bounds of each individual Lot down to the hundredth of foot using global positioning and directional coordinates. Contrary to Insurers' contention, the property PES was obligated to insure under the terms of the SOA was not "generally defined", but rather was property "constituting or falling into a . . . category" that that was in fact "name[d] or state[d] explicitly or in detail."[34] The boundary lines drawn by Schedule 1.01(h) explicitly delineate two categories of property: property that falls within the boundary lines and property that falls beyond. A reasonable person reading the SOA would have no trouble determining that all property falling within the boundary lines designated by Schedule 1.01(h) is property that PES was unambiguously obligated to insure.[35]

### B.    The SOA's Insurance Requirements Obligate PES to Insure the Mortgaged Properties for a "Stipulated Loss Amount" of $750 Million

There is no dispute that the SLV Clause is triggered if PES is "contractually obligated to insure specific property for a stipulated loss amount."[36] New York law requires the Policy to "be interpreted so as to give effect to the intention of the parties," and the "best evidence of what the

---

[32] SOA § 1.01 (Ex. 3 at ACE0005757)

[33] *See id.* at Schedule 1.01(h) (Ex. 3 at ACE0005962-5971).

[34] *See* Insurers' Mot. 13 (citing *Specific*, Merriam-Webster, https://www.merriam-webster.com/dictionary/specific).

[35] *See, e.g.*, Ex. 62 at 105:23–106:5 (Dep. Tr. of A. Mendrys) (corporate representative for HDI Specialty agreed that such was a reasonable reading of the SOA).

[36] Policy § I(5)(e) (Ex. 1 at GS0004982-4983).

parties to an agreement intended is the language of the agreement itself, especially where . . . the parties to the insurance policy were sophisticated entities." *See TransCanada*, 28 N.Y.S.3d at 806.

Insurers argue that because "the relevant provisions of the SOA . . . do not require PES to *pay* a stipulated loss amount in the case of a loss," the SLV Clause is not triggered. Insurers' Mot. 5 (emphasis added). The SLV Clause does not require that PES "pay" a stipulated loss amount, and the Insurers' may not rewrite the provision to "impos[e] an obligation which the [P]olicy omits." *See Annunziata*, 67 N.Y.2d at 234–35. Because even Insurers admit that their proposed Policy construction is unmoored from the Policy language at issue (Insurers' Mot. 16–18) the Court should reject it entirely.

### 1.    Neither the Policy Language nor Insurers' Cited Authority Supports Insurers' Contention that the Policy Requires PES to *Pay* a Stipulated Loss Amount in Order to Benefit from the SLV Clause

Rather than contend with the SLV Clause as written, Insurers begin their analysis of the SLV Clause by seeking to supplant the "stipulated loss amount" language with the term "liquidated damages." Inexplicably, Insurers argue that "'[s]tipulated loss value' clauses are more typically used in commercial contracts as a form of liquidated damages," and then go on to define "liquidated damages" as "[a]n amount contractually stipulated as a reasonable estimation of actual damages to be recovered by one party if the other party breaches." *Id.* at 16. Insurers then urge the Court to hold that the SOA's $750 million insurance requirement is not a "stipulated loss amount" solely because it "is not a requirement for a minimum *payment* in the event of a loss." *Id.* at 17 (emphasis added).

Not only does this substitution of language contravene the New York rule of policy construction requiring policy provisions to "be enforced as written," *see, e.g.*, *Rocon Mfg., Inc.*, 605 N.Y.S.2d at 592, but, tellingly, Insurers' *only authority* for the substitution is a thirty-year-old Alabama Law Review article addressing the application of Article 2a of the UCC to "personal

property lease transactions." *See* Edwin E. Huddleson, III, *Old Wine in New Bottles: UCC Article 2a-Leases*, 39 Ala. L. Rev. 615, 618 (1988). Moreover, contradicting their own argument, Insurers then concede in the very next paragraph that the SLV Clause's "stipulated loss amount" is not analogous to "commercial liquidated damages situations" addressed by the article because the SLV Clause refers to "an insured amount rather than an estimate of damage in the event of a contractual breach." Insurers' Mot. 17. In any event, the Alabama Law Review article is neither authoritative nor persuasive, and the definition of "liquidated damages" proffered by Insurers is plainly irrelevant to the proper construction of the SLV Clause.

Next, though nothing in the Policy requires PES to make a payment to trigger the SLV Clause, Insurers attempt to read in a payment requirement by defining "stipulate" to mean "to arrange expressly or specify in terms of an agreement: *to stipulate a price*." *See id.* at 13 (citing "Stipulated," *Dictionary.com*, https://www.dictionary.com/browse/stipulated). But this source is improperly cited, as the italicized language is not part of the definition of "stipulate," but rather an example of the word's proper use. While a contract may contain a "stipulated price," a "stipulated payment," or "stipulated damages," the only provision at issue here requires property to be insured for a "stipulated loss amount." By the Policy's plain language, the SLV Clause is not triggered by a contractual obligation to *pay* a stipulated loss amount; it is triggered by an obligation to *insure* property for a stipulated loss amount. New York law prohibits insurers from rewriting the Policy to impose a payment obligation that the plain Policy language omits. *See Annunziata*, 67 N.Y.2d at 234–35. Therefore, "having drafted the policy language without a '[payment]' requirement, the Insurers must live with the policy language they wrote." *See S.E.C. v. Credit Bancorp, Ltd.*, 147 F. Supp. 2d 238, 261 (S.D.N.Y. 2001) (citation omitted) (rejecting insurers' attempt to "rewrite the policy to include . . . [additional] language as a 'logical' extension" of the policy at issue).

24

### 2.    Under the Plain Language of the Policy, the $750 Million Insurance Requirement Is a Stipulated Loss Amount

"Stipulated loss amount" is not defined by the Policy and therefore must be construed in accordance with common speech and the reasonable understanding of PES.  *See Medidata*, 268 F. Supp. 3d at 476.  Merriam-Webster provides that something "stipulated" is something "specif[ied] as a condition or requirement."  *See Stipulate*, Merriam-Webster, [https://www.merriam-webster.com/dictionary/stipulate](https://www.merriam-webster.com/dictionary/stipulate).  In the insurance context, "loss" means "the amount of financial detriment caused by . . . an insured property's damage, for which the insurer becomes liable."  *See Loss*, BLACK'S LAW DICTIONARY (11th ed. 2019).  The SOA's $750 million insurance requirement was not a requirement to maintain "sufficient insurance" or "adequate insurance"[37] on the property, as is common with respect to a mortgaged property.[38]  Rather, the SOA specified a minimum dollar amount of recovery for which Insurers could be liable in the event of a loss.  Under the plain Policy language, the $750 million Insurance Requirement is therefore a "stipulated loss amount."  This construction is consistent with New York law, which recognizes that the purpose of stipulated loss provisions is to, *inter alia*, "set[] the amount for which the [borrower] must insure [the property]" that is the subject of the contract.[39]  This is precisely what the Insurance Requirements do—they set an amount that PES must insure PES's property located at the Refinery.

---

[37] *See Int'l Marine, LLC v. Integrity Fisheries, Inc.*, 2016 WL 1408573, at *3 (E.D. La. Apr. 11, 2016) (quoting a contract requiring a party to "maintain . . . sufficient insurance"); *XL Specialty Ins. Co. v. Christie's Fine Art Storage Servs., Inc.*, 137 A.D.3d 563, 564 (N.Y. App. Div. 2016) (quoting a contract requiring party to "effect and maintain adequate insurance").

[38] *See, e.g.*, *Iaffaldano v. Sun W. Mortg. Co.*, 2017 WL 9362576, at *1 (S.D. Fla. Dec. 11, 2017) (noting mortgager's obligation to maintain adequate insurance is "required by standard mortgage agreements"); *accord Purifoy v. Walter Inv. Mgmt. Corp.*, 2015 WL 9450621, at *2 n.2 (S.D.N.Y. Dec. 22, 2015) (referencing mortgager's obligation to "maintain adequate insurance as required by the lender and homeowner's mortgage contract").

[39] *See Red Line Air, LLC v. G. Howard Assocs., Inc.*, 2010 WL 2346299, at *4 (E.D.N.Y. May 11, 2010); *see also In re Nw. Airlines Corp.*, 393 B.R. 352, 355 (Bankr. S.D.N.Y. 2008) (noting stipulated loss provisions are "common in aircraft leases" and "set[] the amount for which the lessee must insure the plane and is also used to calculate damages after a default").

Therefore, under the plain Policy language, PES's obligation to insure the "real property interests at the site of the Refinery" for the stipulated loss amount of $750 million triggers the SLV Clause.  Accordingly, the Court should deny Insurers' Motion and grant PES's Motion.

### III.    PES'S DEMAND FOR ATTORNEYS' FEES IS SUFFICIENT TO SUSTAIN PES'S CLAIM AGAINST INSURERS FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

Insurers move this Court to issue a judgment dismissing Count VI of PES's Complaint (D.I. 1) for breach of the implied covenant of good faith and fair dealing ("Count VI").  Implicit in all contracts of insurance "is a covenant of good faith and fair dealing, such that 'a reasonable insured would understand that the insurer promises to investigate in good faith and pay covered claims.'" *See Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 10 N.Y.3d 187, 194 (2008) (citations omitted).  Under New York law, "the covenant of good faith and fair dealing 'is breached when a party acts in a manner that, *although not expressly forbidden by any contractual provision*, would deprive the other party of the right to receive the benefits under the agreement.'"  *See Satispie, LLC v. Travelers Prop. Cas. Co. of Am.*, 448 F. Supp. 3d 287, 294 (W.D.N.Y. 2020) (citation omitted).  If the Court finds Insurers' liable under Count VI, PES may recover consequential damages arising from Insurers' breach, "so long as the damages were 'within the contemplation of the parties as the probable result of a breach at the time of or prior to contraction."  *See Panasia Ests., Inc. v. Hudson Ins. Co.*, 10 N.Y.3d 200, 203 (2008) (citation omitted).

Tellingly, Insurers do not seek dismissal of Count VI on the grounds that Insurers' *conduct* does not constitute a breach of the covenant of good faith and fair dealing.  Rather, Insurers seek dismissal of Count VI solely on the grounds that, even if Insurers breached the covenant, "PES has not proven any consequential damages that were foreseen at the time the Policy was entered as the likely result of a breach of the covenant of good faith and fair dealing."  Insurers' Mot. 24.  Because PES's claim for attorneys' fees is sufficient to sustain PES's cause of action for breach of the

26

covenant of good faith, Insurers' motion for judgment with respect to Count VI must be denied.

### A.    PES Properly Seeks Attorneys' Fees as Consequential Damages for Insurers' Breach of the Implied Covenant of Good Faith and Fair Dealing

If the Court finds Insurers liable for breaching the covenant of good faith and fair dealing, PES may recover consequential damages to the extent such damages were foreseeable and within the Parties' contemplation at the time of contracting.  *See Bi-Econ. Mkt., Inc.*, 10 N.Y.3d at 192; *Panasia*, 10 N.Y.3d at 203.  Under New York law, "a defendant insurer moving for summary judgment dismissing a claim for consequential damages must make a *prima facie* showing that the damages sought were a type of damage not within the contemplation of the parties when they executed the insurance policy."  *See Craft v. N.Y. Cent. Mut. Fire. Ins. Co.*, 152 A.D.3d 940, 943 (N.Y. App. Div. 2017) (*citing Pandarakalam v. Liberty Mut. Ins. Co.*, 137 A.D.3d 1234, 1236 (N.Y. App. Div. 2016)).  "Whether consequential damages were reasonably contemplated" is related to "'the nature, purpose and particular circumstances of the contract known by the parties' . . . as well as 'what liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed, when the contract was made.'"  *Bi-Econ. Mkt., Inc.*, 10 N.Y.3d at 193 (internal citations omitted).

In *BioEnergy*, the New York Appellate Division, First Department, held that "given the purpose of and particular circumstances of the property damage and business interruption policies," it was foreseeable that an insurer's breach would cause policyholder to incur attorneys' fees necessary to obtain coverage an insured's claim.  178 A.D.3d at 464 (citations omitted). Accordingly, PES may recover attorneys' fees as consequential damages for Insurers' breaches with respect to the Policy.  *Id.*; *accord, Sukup v. State*, 281 N.Y.S.2d 28, 31 (1967) (holding that attorneys' fees may be available as consequential damages upon "a showing of such bad faith in denying coverage that no reasonable carrier would, under the given facts, be expected to assert

27

it"); *Whiteface Real Est. Dev. & Const., LLC v. Selective Ins. Co. of Am.*, 2010 WL 2521794, at *5 (N.D.N.Y. Jun. 16, 2010) ("A reasonable fact finder could conclude that the consequential damages [including attorneys' fees] sought by [policyholder] were reasonably contemplated by the parties and are necessary to return [policyholder] to where it would have been had coverage been provided.").

Insurers insist that, because fact discovery has ended, PES has "no opportunity . . . to come forward with evidence of damages it has not already provided." Insurers' Mot. 25. However, as the most appropriate factual support of PES's attorneys' fees are the invoices themselves, and as PES's legal fees are continuing to accrue, the most appropriate method to quantify attorneys' fees is in a fee application after trial. *See generally One Beacon Ins. Co. v. Old Williamsburg Candle Corp.*, 2006 WL 3230029 (S.D.N.Y. Nov. 8, 2006) (determining the specific amount of attorneys' fees owed by insurer after trial and appeal, based on submitted invoices); *Mount Vernon Fire Ins. Co. v. Valencia*, 1993 WL 13150704 (E.D.N.Y. Aug. 6, 1993) (calculating attorneys' fees to be awarded after submission of a fee application).

The attorneys' fees PES incurred as consequential damages are not "speculative or conjectural," but plainly quantifiable through a review of the relevant counsel invoices containing fees and costs PES was forced to incur because of Insurers' breach. *See Bi-Econ. Mkt., Inc.*, 10 N.Y.3d at 193. PES has not refused to calculate consequential damages, and in no way intends to "ambush" Insurers during or at the conclusion of trial. *See* Insurers' Mot. 27 n.17.[40] PES simply acknowledges that attorneys' fees cannot be calculated until the conclusion of trial. PES included a demand for such attorneys' fees in its Complaint (*see* Compl. ¶ 163) and fully intends to submit

---

[40] Insurers' reliance on *Young v. Pleasant Valley Sch. Dist.*, 2011 WL 1485648 (M.D. Pa. Apr. 9, 2011), is inapposite. The plaintiff in *Young* failed even to *identify* the damages sought. Here, PES has plainly stated that it seeks attorneys' fees as damages, so Insurers' may not claim surprise.

a timely fee application for attorneys' fees when appropriate.  This is sufficient notice to Insurers of PES's claimed damages.  *See Maule v. Phila. Media Holdings, LLC.*, 2010 WL 3859613, at *5 n.3 (E.D. Pa. Oct. 1, 2010).[41]

### B.    PES's Claimed Attorneys' Fees Do No Constitute General Damages

Under New York law, "an insured may recover foreseeable damages, *beyond the limits of its policy*," for breach of the covenant of good faith.  *See Panasia*, 10 N.Y.3d at 203 (emphasis added).  Insurers argue that the categories of damages PES seeks for Insurers' breach all "reflect coverage provided under the Policy" and are therefore "general damages," rather than "consequential damages."  Insurers' Mot. 28.  This is incorrect.

PES's request for an award of attorneys' fees constitutes a request for consequential damages which are separate and distinct from the coverage afforded by the Policy.  Insurers appear to concede as much, noting in their Motion that "legal fees" "are explicitly contemplated by the Policy and are excluded from coverage."  Insurers' Mot. 28.  Moreover, contrary to Insurers' contention, whether legal fees are excluded *loss* under the Policy is irrelevant to whether they are recoverable as consequential *damages* for Insurers' breach.  *See Bi-Econ. Mkt., Inc.*, 10 N.Y.3d at 196 ("Nor do we read the contractual exclusions for certain consequential 'losses' as demonstrating that the parties contemplated, and rejected, the recoverability of consequential 'damages' in the event of a contract breach.").

Insurers argue that because "PES's business decision to retain counsel predated any

---

[41] The *Maule* defendant argued that it had "no notice" plaintiff was seeking attorneys' fees "until [plaintiff] filed its fee application."  *Id.*  The court rejected defendant's argument, awarded attorneys' fees against defendant, and held that plaintiff's demand for attorneys' fees at summary judgment was sufficient.  *Id.*  The court further noted that under Fed. R. Civ. P. 54(d), "a prevailing party may seek reimbursement of costs and fees by motion within 14 days after the entry of judgment unless a court order provides otherwise."  *Id.* (Fed. R. Civ. P. 54(d)(2)(B) is made applicable to this proceeding by Fed. R. Bankr. P. 7054 (b)(2)).

29

substantial claims handling," it is "impossible for any claim-related legal fees to be proximately caused by the adjustment process." Insurers' Mot. 29. But PES is not seeking consequential damages relating to the cost of *retaining* counsel, but rather for the continuously accruing attorneys' fees PES incurred as a direct result of Insurers' improper conduct. Regardless of *when* PES retained coverage counsel, if Insurers' bad faith conduct increased the attorneys' fees PES was forced to incur during the adjustment process—such as the costs of reviewing and responding to Insurers' voluminous and duplicative information requests—PES is entitled to recover those fees. *See Craft*, 152 A.D.3d at 943 (holding that plaintiff's allegation that she incurred "increased" repair costs due to defendant's bad faith conduct was sufficient to sustain plaintiff's claim for consequential damages); *D.K. Prop., Inc. v. Nat'l Union Fire In. Co. of Pittsburgh, Pa.*, 168 A.D.3d 505, 506 (N.Y. App. Div. 2019) (holding that plaintiff's request for legal fees relating to insurer's alleged bad faith investigatory methods, including making "unreasonable and increasingly burdensome information demands," was sufficient to sustain plaintiff's claim for consequential damages). The extent to which Insurers' bad faith conduct contributed to the attorneys' fees PES was forced to incur is an issue of fact upon which PES will present evidence at trial. *See, e.g.*, *United Resin Prods., Inc. v. Great Am. Ins. Co.*, 213 A.D.2d 711, 712 (N.Y. App. Div. 1995) (affirming trial court's denial of insurers' summary judgment motion because the extent to which insurers' conduct proximately caused plaintiff's injuries was a triable issue of fact).

Because Insurers have failed to make even a "a *prima facie* showing" that PES's claim for attorneys' fees as consequential damages were a type not within the contemplation of the parties at the time of contraction, Insurers' motion for summary judgment with respect to Count VI should be denied. *See Craft*, 152 A.D.3d at 943.

## **CONCLUSION**

For the reasons set forth herein, PES respectfully requests that this Court deny Insurers'

30

Motion in its entirety.

Dated:  October 27, 2021

*/s/ Peter J. Keane*

Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Peter J. Keane (DE Bar No. 5503)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:     (302) 652-4100
Facsimile:     (302) 652-4400
Email:          ljones@pszjlaw.com
                     joneill@pszjlaw.com
                     pkeane@pszjlaw.com

- and -

Edward O. Sassower, P.C.
Steven N. Serajeddini (admitted *pro hac vice*)
Matthew C. Fagen (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          edward.sassower@kirkland.com
                     steven.serajeddini@kirkland.com
                     matthew.fagen@kirkland.com

Andrew A. Kassof, P.C. (admitted *pro hac vice*)
Nader R. Boulos, P.C. (admitted *pro hac vice*)
Michael B. Slade (admitted *pro hac vice*)
William T. Pruitt (admitted *pro hac vice*)
Whitney L. Becker (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 N. LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          andrew.kassof@kirkland.com
                     nader.boulos@kirkland.com
                     michael.slade@kirkland.com
                     william.pruitt@kirkland.com
                     whitney.becker@kirkland.com

31

Kenneth H. Frenchman (admitted *pro hac vice*)
Robin L. Cohen (admitted *pro hac vice*)
Marc T. Ladd (admitted *pro hac vice*)
Alexander M. Sugzda (admitted *pro hac vice*)
Nicholas R. Maxwell (admitted *pro hac vice*)
Chelsea L. Ireland (admitted *pro hac vice*)
**COHEN ZIFFER FRENCHMAN & MCKENNA LLP**
1350 Avenue of the Americas, 25th Floor
New York, New York 10019
Phone: (212) 584-1890
Email: kfrenchman@cohenziffer.com
      rcohen@cohenziffer.com
      mladd@cohenziffer.com
      asugzda@cohenziffer.com
      nmaxwell@cohenziffer.com
      cireland@cohenziffer.com

*Counsel for Plaintiffs PES Energy, Inc., PES Holdings LLC, PES Administrative Services, LLC, PES Intermediate, LLC, PES Ultimate Holdings, LLC, and Philadelphia Energy Solutions Refining and Marketing LLC*

DOCS_DE:236752.1 70753/001