**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PES HOLDINGS, LLC, *et al*., | ) | Case No. 19-11626 (LSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| PES HOLDINGS, LLC, *et al*., | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| -and- | ) | Adversary Proceeding |
| | ) | |
| ICBC STANDARD BANK PLC, | ) | |
| | ) | |
| Intervenor-Plaintiff | ) | |
| | ) | |
| v. | ) | Case No. 20-50454 (MFW) |
| | ) | |
| ALLIANZ GLOBAL RISKS US INSURANCE CO., *et al.,* | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STRIKE PORTIONS OF
THOMAS BRINDLEY'S REPORTS AND TO PRECLUDE HIS TESTIMONY ON
CERTAIN TOPICS**

1

**TABLE OF CONTENTS**

**Page**

STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS ......................................1

SUMMARY OF ARGUMENT .................................................................................................2

RELEVANT FACTS AND BACKGROUND ..........................................................................3

      A.      PES retained Brindley to estimate RCV and ACV
            based upon a limited inspection..........................................................................4

      B.      Brindley added a $60 million "Discovery Allowance"
            to his estimate because his inspection was so limited............................................5

      C.      Brindley had never calculated ACV prior to this case, and
            Brindley's ACV calculation is based entirely on a
            depreciation percentage provided by PES's counsel ...............................................7

ARGUMENT ............................................................................................................................8

      A.      Legal Standard ....................................................................................................8

      B.      Brindley's opinions regarding the "Discovery Allowance"
            are speculative, unsupported, and inadmissible.......................................................8

      C.      Brindley is not qualified to opine on ACV or depreciation ...................................11

CONCLUSION........................................................................................................................13

## TABLE OF AUTHORITIES

**Page**

**Cases**

*AMCO Ins. Co. v. TAF, Inc.*, No. CV 617-022,
   2018 WL 4624097 (S.D. Ga. Sept. 26, 2018)............................................................12, 13

*Branch v. Temple Univ.*, No. CV 20-2323,
   2021 WL 2823071 (E.D. Pa. July 7, 2021)................................................................9, 10

*Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.*,
   350 F. Supp. 2d 582 (D. Del. 2004).........................................................................8, 10

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)........................................ passim

*Fedor v. Freightliner, Inc.*, 193 F. Supp. 2d 820 (E.D. Pa. 2002)................................. 3, 10, 11-12

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ...................................................................2

*Oddi v. Ford Motor Co.*, 234 F.3d 136 (3d Cir. 2000) ....................................................... 8, 9-10

*Riley v. Liberty Ins. Corp.*, No. 3:17 CV 1595,
   2019 WL 5420590 (N.D. Ohio Feb. 15, 2019)...........................................................12, 13

*UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*,
   949 F.3d 825 (3d Cir. 2020).................................................................................2-3, 8-9

**Rules**

Fed. R. Evid. 403  ...........................................................................................................................1

Fed. R. Evid. 702 .................................................................................................... passim

## STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS

Defendant Insurers respectfully submit this Memorandum in support of their Motion to Strike Portions of Thomas Brindley's Reports and to Preclude His Testimony on Certain Topics pursuant to Fed. R. Evid. 403 and 702, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny.

PES Holdings, Inc. ("PES") retained Thomas Brindley of Brindley Engineering ("Brindley") to view the damage at the site, review the data gathered to date, review estimates prepared by Fluor and KBR during the claim adjustment process, and provide an assessment as to the overall cost required to return the unit to its pre-event throughput.   However, Brindley's examination of the damages was cursory at best compared to other experts in this case, and Brindley acknowledges that he intentionally chose not to conduct the testing and inspection needed to provide an accurate estimate of repair costs.   Instead, Brindley included a $60 million "Discovery Allowance" in his estimate, representing "unknown" repairs. The Discovery Allowance is based on Brindley's "general experience" and not based on any scientific basis or testing.  Fed. R. Evid. 403 and 702, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) prohibit experts from providing opinions based upon subjective belief and speculation. By definition, Brindley's Discovery Allowance is speculative and therefore cannot withstand *Daubert*'s scrutiny.

In addition, Brindley openly admits that he *could have* conducted the additional tests and inspections needed to refine his estimated repair scope and eliminate – or at least reduce – his $60 million Discovery Allowance.  Brindley chose not to perform these tests and inspections because he thought they were too expensive and were beyond the scope of his retention.  Fed. R. Evid. 403 and 702, and *Daubert* and its progeny, do not allow experts to provide speculative expert opinions

simply because obtaining the necessary foundation for the opinions would be expensive and beyond the scope of their retention.

In addition to providing an estimate of repair costs, Brindley also provides an opinion regarding an Actual Cash Value (ACV) estimate. To calculate the ACV, in his primary report Brindley used a depreciation percentage provided by PES's counsel and in his reply report utilized depreciation percentages calculated by KBR and based on further instruction from counsel. Prior to this project, Brindley had never calculated an ACV, and Brindley states that he has no opinion regarding the proper depreciation percentage. Brindley professes no experience or expertise in either calculating ACV or applying deprecation percentages. Brindley is not qualified to offer an opinion regarding ACV, the method of calculating ACV, or the proper application of depreciation and he should be precluded from offering such testimony.

### SUMMARY OF ARGUMENT

1.      Under Federal Rule of Evidence 702, the Court must ensure that all scientific testimony or evidence admitted is both relevant and reliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469, 27 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

2.      Fed. R. Evid. 702 requires the trial court to act "as a gatekeeper to ensure that any and all expert testimony or evidence is not only relevant, but also reliable." *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832 (3d Cir. 2020). "As gatekeeper, a trial judge has three duties: (1) confirm the witness is a qualified expert; (2) check the proposed testimony is reliable and relates to matters requiring scientific, technical, or specialized knowledge; and (3) ensure the expert's testimony is 'sufficiently tied to the facts of the case,' so

that it 'fits' the dispute and will assist the trier of fact." *Id.*, quoting *Daubert*, 509 U.S. at 591. Speculative expert opinions are inadmissible. *UGI Sunbury*, 949 F.3d at 832-33.

3.      Thomas Brindley includes a $60 million "Discovery Allowance" in his $301 million Replacement cost estimate.  Brindley could have gathered the necessary information to reduce the Discovery Allowance by conducting more testing and inspection, but he intentionally chose not to conduct this additional testing and inspection for "economic reasons." Brindley's expert opinions regarding the "Discovery Allowance" are improper and speculative and he should not be permitted to testify at trial regarding such opinions.

4.      "Rule 702 requires the witness to have 'specialized knowledge' regarding the area of testimony." *Fedor v. Freightliner, Inc.*, 193 F. Supp. 2d 820 (E.D. Pa. 2002).

5.      Brindley has no "specialized knowledge" regarding calculating ACV or the proper depreciation factor to apply in this case and he has never calculated ACV prior to this case. Accordingly, he should not be permitted to testify at trial regarding calculation of ACV or depreciation.

## RELEVANT FACTS AND BACKGROUND

As this Court is aware, this lawsuit arises out of a fire and explosion that occurred in the hydrofluoric acid alkylation unit at the Girard Point refinery (the "Incident").  Following the Incident, PES did not repair or replace the damaged property and instead sold the refinery. During the adjustment of PES's insurance claim, PES did not retain anyone to conduct a damage assessment.  Instead, it chose to wait until the expert deadlines in the litigation to produce a report from Thomas Brindley, offering his opinion on the scope of damage, the Replacement Cost Value ("RCV") of the damage resulting from the Incident, and the Actual Cost [sic] Value ("ACV") of the damages.  (Exhibit A, Brindley 6/7/2021 Report at 15 and 108).  The relevant insurance policy

values property on a Replacement Cost basis, unless the property is not repaired or replaced, in

which case the ACV is used.  (Exhibit B, Allianz Global Risks US Insurance Company Policy No.

USN00016718 ("Policy") at § 1.5(a)(1)).   Here, because the refinery was never repaired or

replaced, ACV is the operative calculation.[1]

### A.    PES retained Brindley to estimate RCV and ACV based upon a limited inspection

According to Brindley's report, PES retained Brindley to "to view the damage at site,

review the data gathered to date, review the estimates by [other experts], and provide an assessment

of the recommended strategy and overall cost required to return the unit to its pre-event

throughput."  (Exhibit A, Brindley 6/7/2021 Report at 3).  However, unlike other experts in this

case who spent more than forty days conducting their on-site examination, Brindley spent a total

of three days on site.  (Exhibit A, Brindley 6/7/2021 Report at 3; Exhibit C, Brindley Dep. at

125:18-127:16,  367:6-10).  Brindley's  investigation  was  limited  to  non-destructive  visual

observation, and Brindley did not perform any testing on the property.  (Exhibit C, Brindley Dep.

at 346:5-11, 397:2-6).  Brindley acknowledges that the equipment he had on hand to conduct his

visual inspection was "fairly limited." (*Id*. at 123:1-17).  Indeed, Brindley did not have access to

---

[1] The Policy defines ACV as the Replacement Cost less deduction for physical depreciation. (Policy § 1.6(a)).

PES also asserts that the Stipulated Loss Value provision requires Replacement Cost coverage up to $250 million. Insurers assert that the SLV clause is not triggered and ACV is the proper valuation method. This issue is the subject of the parties' respective motions for summary judgment. Regardless of whether the SLV is triggered, PES's ACV calculation exceeds $250 million and it has therefore asserted its claim on an ACV basis. Furthermore, even if the SLV is triggered, the Replacement Cost must still exceed $250 million for PES to receive the full $250 million. Defendant Insurers dispute that the Replacement Cost exceeds $250 million. Brindley's inclusion of a $60 million discovery allowance is at the heart of that dispute.

any cranes or high reach booms to aid his visual inspection.  (*Id*.).    Brindley admitted that his

work was "basically a cursory review. We didn't spend weeks at it." (*Id*. at 123:3-9).

> **B.      Brindley added a $60 million "Discovery Allowance" to his estimate because his inspection was so limited**

According to Brindley, a Discovery Allowance is "an allowance in the estimate that

accounts for scope that was not previously confirmed as required when the estimate for that phase

of the project was completed because it is either impossible or impractical to gather the information

necessary for confirmation at that time."   (Exhibit A, Brindley 6/7/21 Report at 12).    Thus,

according to Brindley, "the less inspection that is done in advance, the greater the amount of

Discovery [Allowance]." (*Id.* at 81).   According to Brindley "[s]o what we are trying to point out

with discovery is discovery is unknown." (Exhibit C, Brindley Dep. 275:20-22).

Brindley included a $60 million Discovery Allowance in his estimate, which is in addition

to the $31 million Contingency Allowance.[2]  (Exhibit A, Brindley 6/7/21 Report at 15; Exhibit C,

Brindley Dep. 102:15-19).   Together, the Discovery and Contingency Allowances make up

approximately 30% of Brindley's $301 million RCV estimate ($91 million ÷ $301 million).

Brindley testified that the Contingency was for "unknown scope." (Exhibit C, Brindley Dep.

262:5-8)

Brindley acknowledges that the high Discovery Allowance in his estimate is the result of

his limited inspection.  (*Id*. at 292:3-24, 299:1-23).   Indeed, Brindley admits that there are "non-

destructive evaluation techniques" that would reduce the discovery allowance.  (*Id*. at 292:8-21).

These techniques would include internal inspections of the damages – as opposed to superficial

visual examinations – and testing.  (*Id*. at 299:1-23, 348:2-5).   However, Brindley chose not to

---

[2] Brindley describes the Contingency Allowance as accounting for oversights, mistakes and issues with existing scope, while Discovery Allowance accounts primarily for new scope. (*Id*. at 12).

conduct any of this additional testing or inspection. (*Id*. at 292:3-24, 345:22-346:11). Brindley

admitted that his failure to conduct any internal inspections increased the Discovery Allowance he

added to PES's claim. (*Id*. at 348:2-5). Brindley admitted that the loss was "unknown because that

would go outside the scope of what we were there to do." (*Id*. at 274:19:23).

Brindley admits that he could have conducted additional inspection and testing to reduce

uncertainty and thereby reduce the $60 million Discovery Allowance in his estimate. (*Id*. at 102:5-

103:13). But Brindley did not think conducting this additional testing and inspection made

"economic sense." (*Id*. at 99:8-12). Brindley said that he did not take the extra steps necessary to

make sure the estimate was as accurate as possible because:

> now you're expending hard dollars to try to understand estimated dollars, right?· So
> we are talking about the unknowns, defining the unknowns.· And if you have a
> bucket of unknown scope, discovery is what we are talking about.· You would have
> to spend real dollars to try to eliminate more of that discovery.

(*Id*. at 99:19-100:3). Rather than conducting the additional testing and inspection necessary to

obtain what Brindley would consider a "more thorough" representation of actual damage and

necessary repairs, Brindley simply added $91 million to his estimate in the form of Contingency

and Discovery Allowances. (*Id*. at 388:19-390:3).

Brindley states that "discovery is what you don't know" and "the purpose of discovery is

understanding that you don't have all the information, so that's why discovery was put in." (*Id*. at

317:19-23). But this is not a situation where the claimed "unknowns" were unknowable at the

time the estimate was formulated. Brindley added the Discovery Allowance to his estimate due to

his *intentional* ignorance. (*Id*. at 99:7-100:15, 271:2-14, 350:4-9, 388:8-390:23). Brindley admits

he could have conducted additional testing and inspection to refine his estimate and reduce the

Discovery Allowance. (Brindley Dep. 102:6-103:13, 271:2-14). Brindley, and PES, chose not to

spend the necessary money and effort on testing and inspections in order to arrive at an accurate

understanding of the actual repair or replacement costs.  Taking this extra step would have required a "change in cost complexity and real dollar execution," which Brindley chose not to do. (Brindley Dep. 271:2-14).  Instead of spending the time and money to test, Brindley simply added $60 million to his estimate to account for unknown damage. This is the definition of speculative.

C.      **Brindley had never calculated ACV prior to this case, and Brindley's ACV calculation is based entirely on a depreciation percentage provided by PES's counsel**

Brindley opined that the RCV is approximately $301 million, and the ACV is $281,767,417.  (Exhibit A, Brindley 6/7/21 Report at 15, 108).   Brindley calculated ACV by applying a 50% depreciation factor to materials in his RCV estimate. (*Id.* at 16).  Brindley's report states that he "takes no position on the appropriate depreciation factor to apply to any portion of its replacement cost estimate when calculating ACV." (*Id.*).  In his reply report, he calculated a new ACV number using KBR's depreciation factors and removed obsolescence. (Exhibit C, Brindley Dep. 411:6-20; Exhibit D, Brindley Reply Report).

Prior to this project, Brindley had never calculated the ACV for any property.  (*Id*. at 76:4-8, 416:11-14).  Brindley acknowledges that, to calculate ACV for this project, all he did was take KBR's percentage and apply it to the material numbers at the instruction of PES's counsel.  (*Id*. at 415:1-9).  The depreciation percentage – and thus the ACV calculation – came from PES's counsel. (*Id*. at 415:1-9).  Brindley admits that his depreciation assumptions and calculations did not require any engineering expertise.  (*Id*. at 415:10-15).   Brindley did no independent analysis of depreciation.

## ARGUMENT

### A.    Legal Standard

Fed. R. Evid. 702 requires the trial court to act "as a gatekeeper to ensure that any and all expert testimony or evidence is not only relevant, but also reliable." *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832 (3d Cir. 2020). "As gatekeeper, a trial judge has three duties: (1) confirm the witness is a qualified expert; (2) check the proposed testimony is reliable and relates to matters requiring scientific, technical, or specialized knowledge; and (3) ensure the expert's testimony is 'sufficiently tied to the facts of the case,' so that it 'fits' the dispute and will assist the trier of fact." *Id.*, quoting *Daubert*, 509 U.S. at 591. In doing so, "the court must assess whether the methodology underlying the testimony is scientifically valid and whether it can properly be applied to the facts at issue." *Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.*, 350 F. Supp. 2d 582, 587–88 (D. Del. 2004). Factors relevant under *Daubert* include:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subjected to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000). The party offering expert testimony has the burden of proving its admissibility. *Chemipal*, 350 F. Supp. 2d at 588.

### B.    Brindley's opinions regarding the "Discovery Allowance" are speculative, unsupported, and inadmissible

Speculative expert opinions are inadmissible. *UGI Sunbury*, 949 F.3d at 832-33. As a minimum threshold, Rule 702 "requires expert testimony to be based on the methods and procedures of science, not on subjective belief and unsupported speculation." *Id.* at 833-34.

Expert opinions must be supported by "good grounds" and be the product of "rigor." *Id.* "[H]aphazard, intuitive inquiry" is insufficient. *Id.* Stated differently, an expert's testimony is reliable only when it is grounded in "methods and procedures of science," not when it is based upon "subjective belief or unsupported speculation." *Branch v. Temple Univ.*, No. CV 20-2323, 2021 WL 2823071, at *2 (E.D. Pa. July 7, 2021), quoting *Daubert*, 509 U.S. at 590. Therefore, "[w]hen an expert opinion is not supported by sufficient facts and is based on 'subjective belief or unsupported speculation', the judge must act as a 'gatekeeper' and exclude such unreliable testimony." *Id.* at *4.

Here, Brindley includes a $60 million Discovery Allowance in his $301 million Replacement cost estimate. Brindley included the Discovery Allowance because he lacked "all the information" and "you never know what you are going to find." (Exhibit C, Brindley Dep. 269:19-22, 317:9-23). Brindley acknowledges that he could have gathered the necessary information to reduce the Discovery Allowance by conducting more testing and inspection. (*Id.* at 299:1-23). But Brindley intentionally chose not to conduct this additional testing and inspection for "economic reasons." (*Id*. at 99:7-100:15, 271:2-14, 350:4-9, 388:8-390:23). This is a textbook example of inadmissible speculative expert opinion.

Although Brindley asserts that a $60 million Discovery Allowance is reasonable, that reasonableness is not based on any testing, inspections, or any other objective findings at the refinery. It is instead based merely on Brindley's "experience." (Brindley Dep. 284:18-285:16). This is precisely the type of *ipse dixit* reasoning that does not withstand *Daubert*'s scrutiny.

"An expert's opinion must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation." *Oddi*, 234 F.3d at 158. In *Oddi*, the Third Circuit found that an engineer's proffered expert opinion regarding alleged design defects was

inadmissible because the expert "conducted no tests and failed to attempt to calculate any of the forces on [the plaintiff] or the truck during this accident, he used little, if any, methodology beyond his own intuition." *Id.* Similarly, in *Fedor v. Freightliner, Inc.*, 193 F. Supp. 2d 820 (E.D. Pa. 2002), the proposed expert admitted that he did not undertake sufficient investigation to assess his opinions, but that those opinions were instead based upon his "understanding" and "basic physics." *Id.* at 830. Ultimately, the *Fedor* court held that the expert's "methodology is unreliable and therefore his opinions … would not assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.*

Here, Brindley's opinions regarding the Discovery Allowance are even more speculative and egregious than those in *Oddi* and *Fedor* because Brindley's opinion is *intentionally* speculative. Brindley opines that the Discovery Allowance is necessary due to *his own* lack of testing and inspection, but Brindley admits that he could have conducted the necessary testing and inspection. The lack of testing and inspection was not due to an impossibility, or even an impracticability. Brindley did not conduct the testing and inspection because he (and PES) deemed them to be too expensive. As a consequence, the $60 million "Discovery Allowance" is based entirely upon Brindley's claimed "experience." This is not a methodology that can be tested, peer reviewed, or interrogated on cross-examination. *See Oddi*, 234 F.3d at 145 (discussing factors considered in a *Daubert* analysis); *Chemipal*, 350 F. Supp. 2d at 594 (excluded a damage expert's opinion because his conclusions were "not objectively verifiable because he has not developed enough of an objective basis in the record for such opinions."); *Branch*, No. CV 20-2323, 2021 WL 2823071, at *3 ("an expert's [damage] calculations [must] be accompanied by sufficient factual foundation before submission to the jury.").

Simply put, Brindley's opinions regarding the Discovery Allowance are speculative and inadmissible under Rule 702 and *Daubert*. The Discovery Allowance, by definition,[3] is a placeholder representing unknown scope and costs. Indeed, Brindley admits that "discovery is what you don't know." (Exhibit C, Brindley Dep. 353:18-19). Here, Brindley added the Discovery Allowance only because Brindley, and PES, chose not to conduct the necessary testing and inspection. The Court should preclude Brindley from offering any opinions or testimony regarding the Discovery Allowance and the Discovery Allowance should be stricken from Brindley's Replacement Cost estimate.

### C.      Brindley is not qualified to opine on ACV or depreciation

"Rule 702 requires the witness to have 'specialized knowledge' regarding the area of testimony." *Fedor*, 193 F. Supp. 2d at 826. Brindley has no "specialized knowledge" regarding calculating ACV or the proper depreciation factor to apply in this case. Brindley admits that he had never calculated ACV prior to this case. (Exhibit C, Brindley Dep. 76:4-8, 416:11-14). And, to calculate ACV, Brindley simply used the Replacement Cost estimate and applied a depreciation percentage that was supplied by PES's counsel. (*Id*. at 415:1-9). Brindley admits that this calculation did not require any engineering expertise. (*Id*. at 415:10-15).

The *Fedor* decision is instructive. There, the court stated that, "at a minimum, a proffered expert witness…must possess skill or knowledge greater than the average layman." *Fedor*, 193 F. Supp. 2d at 826. The *Fedor* court excluded certain opinions proffered by a human factors and ergonomics expert because the areas in which he was offering opinions "are not areas which related

---

[3] Brindley's Report states that "Discovery is an allowance to quantify the 'known unknowns' of the project because the estimator would know what they estimated during the current scope development / estimating phase of the project and can use this information to quantify what the potential for, and magnitude of, additional scope may be." (Exhibit A, Brindley 6/7/21 Report at 81).

to the field of human factors; rather, they involve the field of engineering and physics," and the

expert "proffered scant evidence, namely minimal coursework many years ago while in college,

that [he] has any experience or training in the field of engineering." *Id.* at 828.

Applying similar principles, courts have precluded engineers from providing opinions

regarding ACV and depreciation.  For example, in *AMCO Ins. Co. v. TAF, Inc.*, No. CV 617-022,

2018 WL 4624097 (S.D. Ga. Sept. 26, 2018), the court considered whether a structural engineer

should be permitted to provide opinions regarding ACV and depreciation under *Daubert* and Rule

702.  The *AMCO* court found that the expert was "not qualified to render an opinion regarding

depreciation [because] [e]stimating depreciation is an entirely different area of expertise than

determining the damages suffered by the structural components of a building."  *Id.* at *8.  The

*AMCO* court reasoned that "[d]etermining structural damages requires knowledge concerning the

physical properties of building components and the effect of various physical stressors on those

components[, whereas] [d]epreciation involves accounting concepts and depends on the terms of

the insurance contract."  *Id.*  As a result, "the Court exclude[d] the portions of [the expert's]

testimony opining upon AMCO's depreciation calculations."  *Id.* at *10; *see also Riley v. Liberty

Ins. Corp.*, No. 3:17 CV 1595, 2019 WL 5420590, at *5 (N.D. Ohio Feb. 15, 2019) (precluded an

expert opinion regarding RCV and ACV values under *Daubert* because the expert was "unable to

describe a reliable principle or method used to determine RCV and ACV values.").

This case law requires the exclusion of Brindley's testimony on ACV and deprecation.

Brindley admits that he does not have any training or experience in calculating ACV or applying

depreciation percentages. And, Brindley acknowledges that his opinions regarding the ACV and

depreciation did not require any specialized knowledge.  Therefore, like the experts in *Fedor*,

*AMCO*, and *Riley*, the Court should preclude Brindley from providing any expert opinions or testimony regarding ACV and depreciation.

**CONCLUSION**

For the foregoing reasons, Brindley should be precluded from offering opinions or testimony regarding the Discovery Allowance, ACV, and depreciation.

Dated: November 12, 2021

**HOGAN MCDANIEL**

*/s/ Garvan F. McDaniel*
Garvan F. McDaniel [Del. Bar No. 4167]
1311 Delaware Avenue
Wilmington, Delaware 19806
Telephone 302-656-7540
gmcdaniel@dkhogan.com

-and

**WILMER CUTLER PICKERING HALE
AND DORR LLP**
Philip D. Anker
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: 212-230-8890
philip.anker@wilmerhale.com

Benjamin W. Loveland
60 State Street
Boston, MA 02109
Telephone: 617-526-6000
benjamin.loveland@wilmerhale.com
*Counsel for Defendant Insurers*

 -and-

**ZELLE LLP**
Jonathan R. MacBride
1635 Market Street, Suite 1600
Philadelphia, PA 19103
Telephone: 484-532-5330

13

jmacbride@zelle.com

Matthew Gonzalez
45 Broadway, Suite 920
New York, NY 10006
Telephone 646-876-4410
mgonzalez@zelle.com
*Co-Counsel for Defendant Insurers*

14

4862-8028-9539v1