### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PES HOLDINGS, LLC, et al., | ) | |
| | ) | Case No. 19-11626 (LSS) |
|       Debtors. | ) | Jointly Administered |
| _____ | ) | |
| | ) | |
| PES HOLDINGS, LLC, et al., | ) | |
| | ) | |
|       Plaintiffs, | ) | |
| | ) | |
|       -and- | ) | |
| | ) | |
| ICBC STANDARD BANK PLC, | ) | |
| | ) | |
|       Intervenor-Plaintiff, | ) | |
| | ) | |
|    v. | ) | Adv. No. 20-50454 (MFW) |
| | ) | |
| ALLIANZ GLOBAL RISKS US INSURANCE, | ) | |
| CO., et al., | ) | |
| | ) | Rel. Docs. 1; 204; 205; |
|       Defendants. | ) | 207; 208; 215; 222; 224; |
| _____ | ) | 236; 237 |

### OPINION[1]

Before the Court are cross motions for partial summary
judgment filed by the Debtor, PES Holdings, LLC, and its
affiliates (collectively, "PES") and a subset of its insurers
named as Defendants (the "Insurers") on the proper interpretation
of their insurance policy.  For the reasons stated below, the
Court will grant PES' motion and deny the Insurers' motion.

---

[1]   This Opinion constitutes the findings of fact and
conclusions of law of the Court pursuant to Rule 7052 of the
Federal Rules of Bankruptcy Procedure.

I.    <u>BACKGROUND</u>

PES operated a complex of interdependent oil refineries (collectively, the "Refinery") in Philadelphia, Pennsylvania.  On June 21, 2019, a leak in the hydrofluoric alkylation unit (the "HF Unit") resulted in a fire and a series of explosions (collectively, the "Explosion").  As a result of the Explosion, the HF Unit was destroyed and PES could no longer operate the Refinery.

Prior to the Explosion, PES had mortgaged the Refinery to ICBC Standard Bank PLC ("ICBCS") under the terms of the Sixth Amended and Restated Supply and Offtake Agreement (the "SOA"), which inter alia required that PES insure the Refinery for a minimum of $750 million.  (Adv. D.I. 209, Ex. 3.)[2]  At the time of the Explosion, PES had a total of $1.25 billion in property insurance, divided into five $250 million layers and spread among 30 insurers.  (Adv. D.I. 209, Ex. 2.)  The Defendants are 26 of those insurers.[3]

---

[2]    References to the docket in this adversary proceeding are to "Adv. D. I #" while references to the docket in the main case are to "D.I.#."  The parties have each attached the Policy and the SOA to Declarations in support of their motions.  For convenience, the Court refers to the exhibits attached to PES' Declaration. (Adv. D.I. 209.)

[3]    Four insurers are non-parties because they had arbitration clauses in their policies.  (Adv. D.I. 215 at *10 n.35.)

On July 21, 2019, shortly after the Explosion, PES filed a chapter 11 bankruptcy petition.  (D.I. 1.)  The Fourth Amended Joint Chapter 11 Plan (the "Plan") was confirmed on February 13, 2020.  (D.I. 1004.)  In conjunction with the Plan, the Refinery was sold to Hilco Redevelopment Partners ("Hilco").  As a result, PES will not be rebuilding the Refinery.  Under the terms of the sale, PES retained the right to pursue actions against the Insurers for damages suffered as a result of the Explosion.

On February 12, 2020, PES sued the Insurers asserting property damage and business interruption claims resulting from the Explosion.[4]  The Court granted ICBCS' motion to intervene.

On September 20, 2021, PES and the Insurers filed cross motions for partial summary judgment on PES' property damage claim.  The Insurers also seek to dismiss Count VI of the Complaint, which alleges consequential damages flowing from the alleged breach of their duty of good faith and fair dealing.  On October 27, 2021, the Parties responded to each other's motions. On November 12, 2021, the Parties replied to the responses.  Oral argument was held on December 6, 2021.  The matter is fully briefed and ripe for decision.

---

[4]   On November 9, 2021, the Parties filed a Joint Status Report advising that they had settled the business interruption claim. A hearing on the motion for approval of that settlement is scheduled for December 20, 2021.  Trial on the remaining claims is scheduled to commence on January 24, 2022.

## II. JURISDICTION

The Court has subject matter jurisdiction over this adversary proceeding, which is a core proceeding. 28 U.S.C. §§ 157(2)(A) & (O), 1334. The Court may enter a final order on the Motions because the parties have consented. Wellness Int'l Network, Ltd. v. Sharif, 575 U.S. 665 (2015) (holding that even if the bankruptcy court does not have the constitutional authority to enter a final order, it may do so if the parties consent). PES has expressly consented. (Adv. D.I. 207.) The Insurers have impliedly consented by filing their motion for summary judgment. (Adv. D.I. 204.) Wellness, 575 U.S. at 683 ("Nothing in the Constitution requires that consent to adjudication by a bankruptcy court be express. Nor does the relevant statute."); True Traditions, LC v. Wu, 552 B.R. 826, 838 (N.D. Cal. 2015) (holding that implied consent is given by party who files a motion for summary judgment).

## III. DISCUSSION

### A. Standard of Review

#### 1. Summary Judgment

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a).[5]  The court must rely upon the record of the case,
including the pleadings, exhibits, and declarations submitted by
the parties.  Id. at 56(c).

The movant bears the initial burden of proving its case from
the established record and showing that there is no genuine
dispute of material fact.  Celotex Corp. v. Cartrett, 477 U.S.
317, 323 (1986).  The court must view the record "in the light
most favorable to the party opposing the motion."  United States
v. Diebold, Inc., 369 U.S. 654, 655 (1962).  See also McNamee v.
MinXray, 370 F. Supp. 3d 928, 929 (N.D. Ill. 2019) ("In deciding
cross motions for summary judgment, the Court views the facts in
the light most favorable to the respective non-moving party").
Where a court finds that there is no genuine dispute of material
fact, it may enter judgment as a matter of law, either for or
against the movant, in full or in part, applying the applicable
substantive law.  Fed. R. Civ. P. 56(a) & (f).

    2.    Interpretation of Contracts Under New York Law[6]

New York law interprets insurance contracts using general
principles of contract construction.  Olin Corp. v. Am. Home

---

[5]    Federal Rule of Civil Procedure 56 is made applicable to
adversary proceedings by Federal Rule of Bankruptcy Procedure
7056.

[6]    The parties agree that New York law is the applicable law
for interpretation of the contracts at issue here.  (Adv. D.I.
209, Exs. 1 at ¶ 8 & 3 at § 16.01.)

Assur. Co., 704 F.3d 89, 98 (2d Cir. 2012); McGrail v. Equitable
Life Assur. Soc'y of U.S., 55 N.E.2d 483, 486 (N.Y. 1944).  Under
New York law, contracts may be construed as a matter of law -
and, hence, through summary judgment - unless "determination of
the intent of the parties depends on the credibility of extrinsic
evidence or on a choice among reasonable inferences to be drawn
from extrinsic evidence."  Uniroyal, Inc. v. Home Ins. Co., 707
F. Supp. 1368, 1374-75 (E.D.N.Y. 1988) (citing Hartford Acc. &
Indem. Co. v. Wesolowski, 305 N.E.2d 907 (N.Y. 1973)).  Where a
contract is unambiguous, a court may always construe it as a
matter of law.  Wesolowski, 305 N.E.2d at 909.  Where a contract
is ambiguous, a court may still construe the contract, including
ambiguous terms, as a matter of law based on extrinsic evidence
if there is no issue of credibility or ambiguity regarding any
such evidence.  Uniroyal, 707 F. Supp. at 1375.

     B.   The Disputed Provisions of the Policy

        1.   Stipulated Loss Value Clause

The Policy provides, inter alia:

> where the Insured is contractually obligated to insure
> specific property for a stipulated loss amount, then in
> the event of a loss, this Policy will provide for the
> stipulated loss value regardless of whether such
> property is replaced.  However, in no event shall this
> amount exceed the Replacement Cost Value of such
> property (plus in addition the covered cleanup costs).
> In the event of a loss up to USD 250,000,000,
> regardless [sic] whether the affected property is
> replaced, the loss settlement will be on a replacement
> cost basis.  In the event of a loss in excess of USD

> 250,000,000 and the insured does not replace the
> affected property, the loss settlement will be on the
> basis of Actual Cash Value with a minimum of USD
> 250,000,000.

(Adv. D.I. 209, Ex. 1 at §I, 5(e) (emphasis added) (hereinafter
"the SLV Clause").)

The Parties dispute whether the SLV Clause is applicable
and, in particular, whether PES was "contractually obligated to
insure specific property for a stipulated loss amount." PES
contends that the SOA between it and ICBCS provided a contractual
obligation satisfying that requirement. The Insurers contend
that the SLV Clause is not applicable because the SOA does not
provide for an obligation to insure "specific property" or
require that it be for a "stipulated loss amount."

    a.   <u>Specific Property</u>

PES argues that the SOA, taken as a whole, specifies the
Refinery as property required to be insured. It asserts that the
SOA grants a mortgage in its property to ICBCS and specifically
describes the Mortgaged Property by metes and bounds to encompass
the entire Refinery complex. PES further notes that the SOA
provides, in pertinent part, that PES

> shall maintain . . . **Comprehensive Property Insurance**
> on a replacement cost basis, subject to a minimum
> amount of $750,000,000 (SEVEN HUNDRED FIFTY MILLION
> USD) for All Risk of Physical Loss or Damage. Coverage
> must apply to all Crude Oil and Refined Product.
> Coverage shall be comprehensive and include but not be
> limited to Fire, Explosion, Property Damage, Business
> Interruption, Flood, Earthquake, Named Windstorm,

> Tornado, Tsunami, and Volcano.  In the event that a
> Transaction Party purchases insurance in excess of the
> limits specified in this section, such higher limits
> shall apply to ICBCS as an additional insured.  Not
> later than 30 Business Days from the Effective Date,
> each Transaction Party shall name ICBCS as a loss payee
> and as an Additional Insured as their interests may
> appear.  Once annually, each Transaction Party shall
> provide ICBCS a certificate of insurance evidencing the
> required insurance.  At the reasonable request of
> ICBCS, and not later than 30 Business Days from the
> Effective Date, each Transaction Party shall provide
> ICBCS with a complete copy of such insurance policy.

(Adv. D.I. 209, Ex. 3, Part 10, Schedule 10.04 (hereinafter

referred to as the "Insurance Requirement Clause.")

PES contends that the Insurance Requirement Clause obligated

it to maintain property insurance on, inter alia, the Mortgaged

Properties (i.e., the Refinery) which were damaged in the

Explosion and are the subject of its dispute with the Insurers.

The Insurers argue that the Insurance Requirement Clause

does not mention the Mortgaged Properties but, instead, only

specifically refers to insurance on the Crude Oil and Refined

Product.  (Adv. D.I. 209, Ex. 3, Part 10.)  They contend that

this is understandable because the SOA was in essence a supply

agreement between ICBCS and PES dealing with the refinement of

crude oil.  They argue that reference to other parts of the

Agreement is improper and that PES' attempt to hobble together

diverse provisions of the SOA is not sufficient to evidence an

agreement to obligate PES to insure the specific property at

issue in this case.

The Court disagrees with the Insurers' argument. Under New York law, the Court must consider the agreement as a whole and give effect to every term. See, e.g., In re Viking Pump, 52 N.E.3d 1144, 1151 (N.Y. 2016) (holding that unambiguous terms must be enforced in accordance with their plain meaning and all terms must be given effect); Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P., 920 N.E.2d 359, 363-64 (N.Y. 2009) (noting that New York courts construe contracts holistically, rather than taking each term in isolation).

The SOA provides in relevant part:

- Section 10.04(b) requires that PES "Keep its property insured at all times in accordance with the insurance requirement set forth in Schedule 10.04." (Adv. D.I. 209, Ex. 3, Part 1.)
- Section 10.12 requires that PES "shall deliver to ICBCS Mortgages" relating to each of the Mortgaged Properties and "shall deliver to ICBCS a copy of, or a certificate as to coverage under, and a declaration page relating to, the insurance policies required by Section 10.04." (Id. at Part 4.)
- Mortgaged Properties is a defined term that includes all of PES' Real Property, described by metes and bounds in Schedule 1.01(h). (Id. at Part 1.)
- Schedule 10.04 includes the requirement to maintain "so long as the Agreement remains in effect and until all Obligations have been paid in full" twelve different forms of insurance, including "Comprehensive Property Insurance on a replacement cost basis, subject to a minimum amount of $750,000,000 . . . for All Risk of Physical Loss or Damage. Coverage must apply to all Crude Oil and Refined Product." (Id. at Part 10.)

(Adv. D.I. 209, Ex. 3.)

The Court concludes that the SOA taken as a whole unambiguously obligates PES to maintain insurance on all its

property, including the property at issue here, which is specifically described in detail in the SOA.  The fact that the SOA also requires that PES maintain insurance on other property does not detract from this obligation.  Therefore, the Court concludes that the SOA meets the first requirement of the SLV Clause that PES be "contractually obligated to insure specific property."  (Adv. D.I. 209, Ex. 1.)

b.  <u>Stipulated Loss Amount</u>

The Insurers also argue that the Insurance Requirement Clause fails to satisfy the SLV Clause because it does not provide for a Stipulated Loss Amount.  They contend, specifically, that the "minimum insurance" requirement of the Insurance Requirement Clause is not a stipulated loss amount. They contrast it with liquidated damages and other like provisions that actually obligate a party to pay a specific amount on a breach of contract or incurrence of a loss.  <u>Damages</u>, Black's Law Dictionary (11th ed. 2019) (defining liquidated damages as "an amount contractually stipulated as a reasonable estimation of actual damages"); Edwin E. Huddleson, III, <u>Old Wine in New Bottles: UCC Article 2a - Leases</u>, 39 Ala. L. Rev. 648-40 (1988) ("Typical liquidated damages clauses in wide-spread commercial use, [set] the lessor's damages equal to the so-called "stipulated loss value" of the goods.")

The Insurers seek to bolster their argument by noting that extrinsic evidence (presented by PES in its own brief) proves that the SLV Clause was intended to require payment of a stipulated loss amount.  In 2012 when negotiating the terms of the Policy, PES insisted on the SLV Clause in order to satisfy its contractual obligation to Carlyle and Sunoco who had invested $250 million in the Refinery and wanted to guarantee that PES repaid that investment in the event the Refinery was destroyed and not rebuilt.  (Adv. D.I. 215 at 5.)

The Court finds it unnecessary to consider extrinsic evidence, however, because the language of the SLV Clause is unambiguous.[7]  Further, the extrinsic evidence offered by the Insurers does not change that unambiguous language.  The SLV Clause does not require that PES be contractually obligated to <u>pay</u> anyone a stipulated loss amount, it requires that PES be obligated to <u>insure</u> specific property for a stipulated loss value.  That is what PES has done in the SOA: it has obligated itself to maintain insurance on its property for a minimum of $750 million.

---

[7]    Only if a term is ambiguous may a court consider extrinsic evidence.  <u>Viking Pump</u>, 52 N.E.3d at 1151 (under New York law unambiguous terms must be enforced in accordance with their plain meaning); <u>Ellington v. EMI Music, Inc.</u>, 21 N.E.3d 1000, 1003 (N.Y. 2014) (ambiguity arises "when the contract . . . fails to disclose its purpose and the parties' intent, or when specific language is susceptible of two reasonable interpretations").

The Insurers argue further, however, that the Required Insurance Provision does not satisfy the SLV Clause because it provides that ICBCS is to be an additional insured and loss payee on the comprehensive property insurance.  (Adv. D.I. 209, Ex. 3, Part 10.)  As a result, they argue that PES and ICBCS agreed that the latter would have the right to a direct action against the Insurers if there were a loss but not that ICBCS would be entitled to be paid a "stipulated loss amount" by PES.

Again, the Court rejects the Insurers' argument, because the SLV Clause does not require that PES be obligated as the payor of the stipulated loss amount, only that it insure its property for such an amount.  (Adv. D.I. 209, Ex. 1.)  The fact that PES agreed that ICBCS would be named a loss payee on the Policy does not negate the fact that the SOA specifically required that PES maintain insurance in the amount of $750 million on its property.  As stated above, the express terms of the SLV Clause in the Policy require an obligation to insure the property for a specific amount, not an obligation to pay a specific amount.

The Insurers also argue that the obligation in the SOA is not sufficient to satisfy the SLV Clause because it just specifies a "minimum" insurance that is required without stating a specific loss amount.  The Court rejects this argument.  While PES is permitted in the SOA to insure its property for more than

12

$750 million, it is not obligated to do so.  But it is obligated to insure the property for $750 million.  This, the Court concludes, satisfies the SLV Clause in the Policy that PES "is contractually obligated to insure specific property for a stipulated loss amount."  (Adv. D.I. 209, Ex. 1 at § I(5)(e).)

       2.   <u>Effect of the SLV Clause</u>

Under the SLV Clause, the Policy provides for the payment of the Stipulated Loss Value.  (Adv. D.I. 209, Ex. 1 § I(5)(e).)  If the loss is less than $250 million the payment will be the replacement cost ("RC"); if the loss is more than $250 million and the property is not replaced, the payment will be the Actual Cash Value ("ACV") with a minimum of $250 million.  (<u>Id.</u>)

RC is defined in the Policy, in pertinent part, as "[t]he amount it would take to repair or replace the damaged or destroyed property with materials of like kind and quality, without deduction for depreciation or obsolescence . . . all determined at the time and place of loss."  (<u>Id.</u>)  ACV is defined in the Policy as the "Replacement Cost less deduction for physical depreciation."  (<u>Id.</u>)

The Parties dispute the meaning of "physical depreciation." PES argues that, as a matter of law, physical depreciation does not include obsolescence or labor depreciation.  While the Insurers agree that obsolescence is not included in the term "physical depreciation," they contend that labor depreciation is included.

The Insurers assert that the public policy underlying indemnity insurance is simply to return the insured to as good a position as it was at the time of the loss. McAnarney v. Newark Fire Insurance Co., 159 N.E. 902, 904-05 (N.Y. 1928). In keeping with that principle, the Insurers argue that physical depreciation must include depreciation of labor where PES does not repair its property because otherwise PES "would receive a windfall based on labor costs [it] never incurred . . . ." Graves v. Am. Fam. Mut. Ins. Co., 686 F. Appx. 536, 539 (10th Cir. 2017) (concluding that depreciation of labor in calculation of actual cash value was appropriate under general principles of indemnity insurance which seek "to prevent an insured from directly profiting through the receipt of cash funds beyond the actual cash value of the loss.").[8]

---

[8]    See also Papurello v. State Farm Fire & Cas. Co., 144 F. Supp. 3d 746, 765-67 (W.D. Pa. 2015) (where contract just uses term actual cash value, court applied Pennsylvania law to determine that labor was part of depreciation); Henn v. Am. Fam. Mut. Ins., Co., 894 N.W.2d 179, 189-91 (Neb. 2017) (because actual cash value was not defined in the policy, court applied well-developed case law that labor was included in depreciation); Wilcox v. State Farm Fire & Cas. Co., 874 N.W.2d 780, 785 (Minn. 2016) (holding that if policy did not define actual cash value, trial court was permitted to include labor-cost depreciation when estimated cost to repair or replace damaged property included materials and embedded-labor components); Redcorn v. State Farm Fire & Cas. Co., 55 P.3d 1017, 1020 (Okla. 2002) (in determining actual cash value of a damaged roof, court held that a roof is the product of both materials and labor and therefore both should be depreciated under general purpose of indemnification).

14

PES argues, however, that many of the cases cited by the Insurers are distinguishable because they had no express definition of the actual cash value to be paid and therefore reliance on the broad concepts of indemnity insurance was appropriate.  However, where the term actual cash value is defined by the parties in their contract those principles cannot be applied to change the actual language chosen by the parties. In the latter instance, PES contends that the Court must enforce the terms of the contract as the parties wrote them.  See SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC, 445 F. Supp. 2d 320, 346 (S.D.N.Y. 2006) (rejecting the ruling in McAnarney that broad evidence of the meaning of actual cash value should be considered in contrast to the express terms defined in the parties' contract).

The Court agrees with PES.  Because the parties have defined the term ACV in their Policy, general principles of indemnity law cannot be applied in contravention of that express language.  SR Int'l, 445 F. Supp. 2d at 346.

The Insurers contend nonetheless that, even where the actual cash value is defined in the policy, courts conclude that a deduction for depreciation includes labor depreciation.[9]

---

[9]    E.g., Graves, 686 F. App'x at 537 (affirming decision that "physical deterioration and depreciation" used in calculation of actual cash value had to include "all costs necessary to

PES responds that none of the cases cited by the Insurers
construe New York law.  It argues that the trend in this area is
to exclude labor from the term "depreciation" as evidenced by
more recent cases and recent legislation.[10]  Even if the term

────────────────

(re)creating the insured 'property' – including the costs
associated with labor – when calculating actual cash value"); In
re State Farm Fire & Cas. Co., 872 F.3d 567, 572 (8th Cir. 2017)
(reversing order certifying class because deducting the cost of
labor as part of depreciation was not unreasonable); Basham v.
U.S. Auto. Ass'n, C.A. No. 16-cv-03057-RBJ, 2017 WL 3217768, at
*3 (D. Col. July 28, 2017) (concluding that labor is included in
depreciation because, although labor itself does not depreciate,
it can add value to an asset and that value depreciates); Branch
v. Farmers Ins. Co., 55 P.3d 1023, 1027 (Okla. 2002) (concluding
that labor was depreciable under broad evidence rule even where
actual cash value defined in the policy as replacement cost less
depreciation).

[10]    E.g., Perry v. Allstate Indem. Co., 953 F.3d 417, 423 (6th
Cir. 2020) (concluding that plaintiff's "interpretation — that in
calculating ACV depreciation does not include labor costs — has
been recognized as reasonable by numerous state and federal
courts, including our own, because depreciation traditionally
refers to value lost from physical wear and tear"); Hicks v.
State Farm Fire & Cas. Co., 751 F. App'x 703, 709 (6th Cir. 2018)
(holding that a "layperson confronted with State Farm's policy
could reasonably interpret the term depreciation to include only
the cost of materials"); Cal. Fair Plan Ass'n v. Garnes, 218 Cal.
Rptr. 3d 246, 259-62 (Cal. Ct. App. 2017) (holding that labor is
not depreciable under California statute which provides "a
deduction for physical depreciation shall apply only to
components of a structure that are normally subject to repair and
replacement during the useful life of that structure") (citing
Cal. Ins. Code § 2051(b) (West 2021)); Lains v. Am. Family Mut.
Ins. Co., Case No. C14-1982-JCC, 2016 WL 4533075, at *2-3 (W.D.
Wash. Feb. 9, 2016) (finding policy ambiguous and construing it
in favor of insured to exclude labor costs in depreciation);
Lammert v. Auto-Owners (Mut.) Ins. Co., 572 S.W.3d 170, 179
(Tenn. 2019) (same); Adams v. Cameron Mut. Ins. Co., 430 S.W.3d
675, 678 (Ark. 2013) (stating that the court, like the dissent in
Redcorn, "simply cannot say that labor falls within that which

depreciation includes labor, however, PES argues that the Policy
mandated that RC only be reduced by "physical depreciation" not
by depreciation.

The Court agrees with PES that it need not decide which line
of cases is correct and whether depreciation includes the
depreciation of labor.  The Court is called upon to determine the
meaning of the term "physical depreciation" which the parties in
this case used, rather than the term depreciation.

PES argues that the only reasonable interpretation of
"physical depreciation" is that it does not include the
depreciation of intangible, non-material costs, such as labor.
PES argues that, because physical depreciation is not defined in
the Policy, it must be considered based on its meaning in common
speech.  It contends that the term "depreciation" in common

---

can be depreciable"), superseded by statute, Ark. Code Ann. §
23-88-106(a)(2) (2017).  See also Wash. Admin. Code § 284-20-010
(2021), printed in 2021 WA REG TEXT 587383 (netscan) ("Except for
the intrinsic labor costs that are included in the cost of
manufactured materials or goods, the expense of labor necessary
to repair, rebuild, or replace covered property is not a
component of physical depreciation and may not be subject to
depreciation or betterment."); Depreciation of Labor Expenses in
Property Loss Claims, Miss. Ins. Dep't Bulletin 2017-8 (Aug. 4,
2017), https://www.mid.ms.gov/legal/bulletins/20178bul.pdf
(insurers must "clearly provide for the depreciation of labor in
the insurance policy"); Property Loss Claims: No Labor
Depreciation, VT Dep't Financial Reg., Div. of Ins., Bullet No.
184 (May 1, 2015), available at https://dfr.vermont.gov/sites/
finreg/files/regbul/dfr-bulletin-insurance-184.pdf ("Labor,
unlike physical materials, does not break down or lose value over
time.").

parlance means "a decline in an asset's value because of use, wear, obsolescence, or age." Depreciation, Black's Law Dictionary (11th ed. 2019). PES argues that adding "physical" as a modifier to depreciation in the definition of ACV means that the deduction only includes depreciation "of, or relating to, or involving material things" or "pertaining to real tangible objects." Physical, Black's Law Dictionary (11th ed. 2019). Consequently, PES contends that labor that is not already imbedded in the materials' costs[11] cannot be part of the physical depreciation component of ACV.

The Insurers argue that the term "physical depreciation" means that economic and functional obsolescence must be excluded from the depreciation deduction. In their view, all other depreciation - including labor depreciation - is included in the term "physical depreciation."

The Court disagrees with the Insurers on this point. Obsolescence is already excluded from depreciation under the terms of the Policy because the definition of RC uses

---

[11]   PES concedes that some labor costs – intrinsic labor costs – reflected in the price of materials and equipment will be depreciated as those materials and equipment are themselves depreciated. PES does not argue that the Court must extricate these costs from the cost of tangible things to avoid their depreciation. PES argues, however, that extrinsic labor costs, namely the costs to plan and implement a rebuild or repair on site, which it would pay as overhead rather than as part of the materials, cannot be physically depreciated.

depreciation and obsolescence as two separate and distinct terms.
See SR Int'l, 445 F. Supp. 2d at 351-53 (holding that
depreciation did not include obsolescence where ACV was defined
as RC less "physical deterioration, depreciation, obsolescence
and depletion").  Therefore, the use of the term "physical
depreciation" in the definition of ACV could not have been
intended to exclude obsolescence.

The Court further agrees with PES that physical depreciation
must mean something less than depreciation.  E.g., Westview
Assocs. v. Guar. Nat. Ins. Co., 740 N.E.2d 220, 222 (N.Y. 2000)
("surplusage [is] a result to be avoided").  Therefore, the cases
cited by the Insurers concluding that depreciation includes labor
depreciation are not on point.[12]

_____

[12]   While three of the cases the Insurers cite have policy
definitions of ACV that include reference to "physical," all
three based their conclusion on a finding that "depreciation"
alone includes "labor depreciation."  Graves, 686 F. App'x at 537
(policy defined ACV as RC less "physical deterioration and
depreciation, including obsolescence"); Riggins v. Am. Fam. Mut.
Ins. Co., 281 F. Supp. 3d 785, 789 (W.D. Mo. 2017) (policy
defined ACV as RC "less depreciation for physical deterioration
and obsolescence"); Ware v. Metro. Prop. & Cas. Ins. Co., 220 F.
Supp. 3d 1288, 1290-91 (M.D. Ala. 2016) (policy defined ACV as
the replacement cost "less allowance for physical deterioration
and depreciation including obsolescence").  Notably, the Riggins
Court originally ruled that the term "less depreciation for
physical deterioration and obsolescence" excluded labor
depreciation. Riggins, 281 F. Supp. 3d at 786.  After the Eighth
Circuit's State Farm decision, however, the Riggins Court
concluded that labor depreciation was included in "depreciation"
because the policy did not expressly exclude it.  Id. at 789
(citing State Farm, 872 F.3d at 570-77).

Moreover, the Court agrees with PES that "physical" should properly be given its plain meaning and the reference to its definition in Black's Law Dictionary is appropriate. See CT Inv. Mgmt. Co., LLC v. Chartis Specialty Ins. Co., 9 N.Y.S.3d 220, 223 n.2 (N.Y. App. Div. 2015) ("It is common practice for the courts of [New York] to refer to the dictionary to determine the plain and ordinary meaning of words to a contract."). Thus, the Court concludes that "physical" depreciation is the physical deterioration or wear and tear of tangible property resulting in a diminution in value. See also 2 Real Estate Transactions: Structure and Analysis with Forms section 19:7 (stating that depreciation is "the deterioration or the physical wearing out of man-made buildings or improvements due to the passage of time, the effect of weather, or the manner of using the property").

The Court concludes that labor costs that are imbedded in the cost of materials is depreciable as the value of those materials depreciate through wear and tear. Brown v. Travelers Cas. Ins. Co., Civ. No. 15-50-ART, 2016 WL 1644342 (E.D. Ky. Apr. 25, 2016) (concluding that "[t]o the extent that labor does not increase the market value of a finished good — as with a haircut — the value of the labor does not depreciate along with the good. For this reason, the ordinary meaning of "depreciation" allows an insurer to depreciate the value of labor that has merged with a

finished good.  It does not, however, allow an insurer to depreciate the value of pure labor that has not merged with a finished good").  However, the Court agrees that labor which is procured separately from materials, is unlike physical property and it is hard to conceive of how it can be <u>physically</u> depreciated.  The labor used in constructing the Refinery was not subject to deterioration or wear and tear from the elements.  The Illinois Supreme Court recently expressed just this analysis in concluding that labor is not included in the term depreciation – let alone <u>physical</u> depreciation - in calculating the actual cash value in an insurance policy.

> [L]abor is not logically depreciable, as it does not lose value over time due to wear and tear.  Materials deteriorate with time, but labor does not.  Labor is a fixed cost that is not subject to wear and tear, deterioration, or obsolescence.

<u>Sproull v. State Farm Fire & Cas. Co.</u>, Docket No. 126446, 2021 WL 4314060, *13 (Ill. Sept. 23, 2021).[13]  While the Court does not opine on whether depreciation simpliciter includes labor

---

[13]   <u>See also</u> <u>Bailey v. State Farm Fire & Cas. Co.</u>, Civ. A. No. 14-53-HRW, 2015 WL 1401640, at *8 (D. Minn. Mar. 25, 2015) ("The very idea of depreciating labor defies good common society."), <u>aff'd sub nom</u> <u>Hicks</u>, 751 F. App'x 703; <u>Arnold v. State Farm Fire & Cas. Co.</u>, 268 F. Supp. 3d 1297, 1312 (S.D. Ala. 2017) (noting the "inherent logical contradiction of depreciating non-depreciating things" in considering what a reasonable insured would understand the term actual cash value to include); <u>Adams</u>, 430 S.W.3d at 679 ("The very idea of depreciating the value of labor is illogical.") (superseded by statute) Ark. Code Ann. § 23-88-106(a)(2) (2017).

depreciation, it finds the reasoning of these courts supportive of its conclusion that the use of the term "physical depreciation" was meant to exclude depreciation of extrinsic labor.[14]

For the foregoing reasons, the Court concludes that the definition of ACV in the Policy, which reduces RC only by "physical depreciation" means that ACV is not reduced by any extrinsic "labor depreciation." Accordingly, the Court will grant PES' Motion and deny the Insurers' Motion for summary judgment on this issue.

C. Consequential Damages

In their motion for summary judgment, the Insurers also ask the Court to dismiss Count VI of the Complaint which seeks consequential damages for breach of the implied covenant of good faith and fair dealing. The Insurers acknowledge that New York law recognizes such a claim with respect to insurance contracts. See, e.g., Bi-Econ. Mkt. Inc. v. Harleysville Ins. Co. of N.Y., 886 N.E.2d 127, 131 (N.Y. 2008) (holding that the implied covenant requires an insurer to "investigate in good faith and pay covered claims."). However, they note that the burden to establish such a breach is extremely high. Sukup v. New York, 227 N.E.2d 842, 844 (N.Y. 1967) ("It would require more than an

---

[14]   See cases cited at n. 10 supra.

arguable difference of opinion between carrier and insured over coverage to impose an extra-contractual liability for legal expenses in a controversy of this kind.  It would require a showing of such bad faith in denying coverage that no reasonable carrier would, under the given facts, be expected to assert it.").

While not conceding that there has been any breach of the covenant of good faith and fair dealing, the Insurers argue that they are entitled to summary judgment on this count because PES has presented no evidence in discovery (or in response to their summary judgment motion) to establish it suffered any damages as a result of any such breach. They contend that all the damages alleged in the Complaint and articulated in PES' expert reports and discovery responses are not consequential damages but, instead, are merely damages resulting from the Insurers' alleged breach of the Policy.  E.g., Biotronik A.G. v. Conor Medsystems Ireland, Ltd., 11 N.E.3d 676, (N.Y. 2014) ("General damages 'are the natural and probable consequence of the breach' of a contract.") (citations omitted)).

PES responds that it seeks the attorneys' fees it incurred as consequential damages resulting from the Insurers' breach of the implied covenant of good faith and fair dealing.  PES argues that its claim for attorneys' fees is the type of damages

foreseeable from such a breach and have been allowed by New York courts.  E.g., <u>Certain Underwriters at Lloyd's v. BioEnergy Dev. Grp. LLC</u>, 115 N.Y.S.3d 240, 241 (N.Y. App. Div. 2019) (denying motion to dismiss claim for attorneys' fees for the breach of the implied covenant of good faith and fair dealing because it was foreseeable that an insurer's breach would cause the policyholder to incur attorneys' fees in order to obtain payment of its claim).

The Insurers argue in response that any claim for attorneys' fees is expressly excluded under the terms of the Policy.  (Adv. D.I. 209, Ex. 1 at § 3 ¶ 4 (excluding expenses of public adjusters or attorneys).)  They contend that New York courts do not allow attorneys' fees for a breach of the implied covenant of good faith and fair dealing in the face of such express contract provisions.[15]

---

[15]   E.g., <u>30-40 E. Main Street Bayshore, Inc. v. Rep. Franklin Ins. Co.</u>, 981 N.Y.S. 2d 616, 617 (N.Y. App. Div. 2014) (denying leave to amend complaint where "the inability of the plaintiffs to recover an attorney's fee, costs, and interest as consequential damages in this affirmative action against their insurer is clear and free from doubt"); <u>N.Y. Univ. v. Cont'l Ins. Co.</u>, 662 N.E.2d 763, 769-72 (N.Y. 1995) (noting that "[t]t is well established that an insured may not recover the expenses incurred in bringing an affirmative action against an insurer to settle its rights under the policy"); <u>Stein, LLC v. Lawyers Title Ins. Corp.</u>, 953 N.Y.S.2d 303 (N.Y. App. Div. 2012) ("nothing in <u>Bi-Economy</u> or <u>Panasia</u> alters the common-law rule that, absent a contractual or policy provision permitting the recovery of an attorney's fee, an "insured may not recover the expenses incurred in bringing an affirmative action against an insurer to settle

PES contends that any language of the Policy excluding attorneys' fees is irrelevant because under New York law, "an insured may recover foreseeable damages, beyond the limits of its policy, for breach of the covenant of good faith." Panasia Ests., 886 N.E.2d at 136-37 (citation omitted) (affirming denial of motion for partial summary judgment which asserted that contract provision precluding attorneys' fees barred any action seeking such fees as consequential damages for breach of covenant of good faith and fair dealing). Accord Bi-Econ., 886 N.E.2d at 196.

The Court agrees with PES. The attorneys' fees claimed by PES are not for breach of the insurance policy but rather for breach of the covenant of good faith and fair dealing. Consequential damages are recoverable for a breach of the covenant of good faith and fair dealing under New York law, if they are proximately caused by the breach and are foreseeable to the parties at the time of contracting. Bi-Econ., 886 N.E.2d at 192-93; Sukup, 227 N.E.2d at 844 (acknowledging that attorneys' fees may be awarded if bad faith were found but denying them in the absence of such a finding). Such attorneys' fees are recoverable even in the face of a contract provision that generally precludes attorneys' fees, such as the one here.

---

its rights under the policy") (citations omitted)).

Panasia Ests., 886 N.E.2d at 136-37 (contract provision
precluding attorneys' fees does not bar recovery of such fees as
consequential damages for breach of covenant of good faith and
fair dealing).

While the Insurers cite New York cases denying attorneys'
fees, the Court finds them unpersuasive.  For example, the
Bayshore case cites the Bi-Econ. case as support for its blanket
assertion that attorneys' fees cannot be recovered as
consequential damages.  981 N.Y.S. 2d at 617.  However, the Bi-
Econ. court made no such holding; to the contrary it upheld the
right of the insured to assert consequential damages for breach
of the covenant of good faith and fair dealing even in the face
of a contract provision precluding consequential losses.  886
N.E.2d at 132.  Furthermore, while the Court in the NYU case
ruled that generally attorneys' fees are not recoverable for an
ordinary breach of contract, it did not address whether they are
recoverable for a breach of the implied covenant of good faith
and fair dealing.  N.Y.U., 662 N.E.2d at 772.  Similarly, the
Stein case dealt with a breach of insurance contract, not a claim
for breach of the covenant of good faith and fair dealing.  953
N.Y.S.2d at 304.

In addition, however, the Insurers argue that they are
entitled to summary judgment on Count VI because PES provided no

evidence during discovery (or in response to their motion) supporting its claim for attorneys' fees.  E.g., In re Indesco Int'l, Inc., 451 B.R. 274, 316 (Bankr. S.D.N.Y. 2011) (granting summary judgment for defendant because plaintiff failed to prove any damages).

While PES acknowledges that no evidence to support the attorneys' fees has been presented to date, it contends that the time to do so is after the Court finds bad faith.[16]  This, PES contends, is appropriate because those fees continue to accrue and it is not possible to finally calculate them until the trial is concluded.  In the event the Court does find bad faith, PES asserts that it will submit a fee application detailing those damages.

The Court agrees with PES that the time to consider any claim it may have for legal fees is after trial.  Such consequential damages are due only if, and when, the Court determines that the Insurers' acted in bad faith.  If it does, PES will be in a better position to present evidence of any claim for consequential damages and the Insurers will be in a better

---

[16]   E.g., Maule v. Phila. Media Holdings, LLC, 2010 WL 3859613, at *5 n.3 (E.D. Pa. Oct. 1, 2010) (rejecting argument that defendant had no notice of claim for attorneys' fees, noting that prayer for relief clearly asserted such a claim); Fed. R. Civ. P. 54(d), incorporated by Fed. R. Bankr. P. 7054 (allowing the filing of a motion and proof of fees incurred by prevailing party after a favorable award).

position (after reviewing any fee request) to respond if they are not properly characterized as consequential damages because they were not foreseeable or not a consequence of their bad faith.

The Court will accordingly, sua sponte, bifurcate the trial on Count VI between liability and damages.  Fed. R. Bankr. P. 7042, incorporating Fed. R. Civ. P. 42(b) ("For convenience, to avoid prejudice, or to expedite and economize, <u>the court may order</u> a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims.") (emphasis added).  <u>See also</u> <u>Franklin Music Co. v. Am. Broadcasting Cos., Inc.</u>, 616 F.2d 528, 538 (3d Cir. 1979) (upholding district court's sua sponte decision to bifurcate).  Courts have discretion to bifurcate issues in a case if it will not be prejudicial to the parties.  <u>Barr Labs., Inc. v. Abbott Labs.</u>, 978 F.2d 98, 115 (3d Cir. 1992); <u>Lis v. Robert Packer Hosp.</u>, 579 F.2d 819, 824 (3d Cir. 1978).

The Court finds that there will be no prejudice to PES because bifurcation will protect any attorney-client privilege PES may have by not requiring the production of the attorneys bills while this litigation is pending.  Similarly, the Court concludes that bifurcation will not be prejudicial to the Insurers.  First, this is not a jury trial, where prejudice arising from bifurcation has usually been contested.  <u>E.g.</u>, <u>Lis</u>,

28

579 F.2d at 821.  Second, the Court will provide ample
opportunity for discovery and preparation for the damages trial,
in the event one is necessary.  E.g., In re Vaso Active Pharm.,
Inc., 500 B.R. 384, 400 (Bankr. D. Del. 2014) (amending
scheduling order to avoid prejudice flowing from bifurcation).


    Bifurcation will also promote judicial economy by allowing
the Court to consider the threshold and potentially dispositive
issue of liability alone, without the necessity to consider any
proof of damages unless liability is established.  This is
especially true, where, as here, the plaintiff has a heavy burden
in establishing liability.  Sukup, 227 N.E.2d at 844.  This
benefit has no significant counterbalance: the issues of
liability and damages are not, in this case, inseparable.  Barr,
978 F.2d at 115 (bifurcation is proper where issues are not
"inextricably interwoven").

    Accordingly, the Court will deny the Insurers' Motion for
summary judgment on Count VI and will enter an order bifurcating
the issues of liability and damages on that Count.


IV. CONCLUSION

    For the foregoing reasons, the Court will grant PES' Motion

29

for summary judgment and deny the Insurers' Motion for summary
judgment.


Dated: December 15, 2021     BY THE COURT:

Mary F. Walrath
United States Bankruptcy Judge