**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| PES HOLDINGS, LLC, *et al.*, | ) |
| | ) Case No. 19-11626 (LSS) |
| Debtors. | ) |
| | ) (Jointly Administered) |
| | ) |
| | ) |
| PES HOLDINGS, LLC, *et al.*, | ) |
| | ) Adversary Proceeding |
| Plaintiffs, | ) |
| | ) Case No. 20-50454 (MFW) |
| -and- | ) |
| | ) |
| ICBC STANDARD BANK PLC, | ) |
| | ) |
| Intervenor-Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ALLIANZ GLOBAL RISKS US INSURANCE | ) |
| CO., *et al.*, | ) |
| | ) |
| Defendants. | ) |

**JOINT PRETRIAL MEMORANDUM PURSUANT TO LOCAL RULE 7016-2(d)**

The Plaintiffs and Defendants in the above-captioned adversary proceeding (collectively, the "Parties"), by and through undersigned counsel, hereby submit this Joint Pretrial Memorandum pursuant to Rule 7016-2(d) of the Local Rules of Bankruptcy Practices and Procedure of the United States Bankruptcy Court for the District of Delaware. The Parties reserve the right to supplement the Joint Pretrial Memorandum. In support of this Joint Pretrial Memorandum, the Parties respectfully represent as follows:

**I.        STATEMENT OF THE NATURE OF THE ACTION**

1.        Plaintiffs, the debtors in the Bankruptcy Proceeding, were owners and operators of the largest oil refining complex (the "Refining Complex") on the United States Eastern

seaboard.  The Refining Complex sat on an approximately 1,300-acre industrial site roughly 2.5 miles from downtown Philadelphia and was comprised of two interconnected refineries:  Girard Point and Point Breeze.

2.      On June 21, 2019, Plaintiffs suffered a series of large explosions and a fire at the alkylation unit in their Girard Point refining facility (collectively, the "Explosion").  As a result, the Girard Point refinery was rendered inoperable and the operation of the Point Breeze refinery was severely limited.

3.      On July 21, 2019, each of the Plaintiffs filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Plaintiffs' chapter 11 bankruptcy proceeding, captioned *In re PES Holdings, LLC, et. al.* (the "Bankruptcy Proceeding"), Case No. 19-11626 (LSS), is currently pending before Judge Laurie Selber Silverstein in the United States Bankruptcy Court for the District of Delaware.

4.      Each Defendant is an insurer that subscribed to a pro-rata portion of Plaintiffs' $1.25 billion quota share insurance program providing, subject to all of its terms and conditions, property damage and business interruption insurance for the 2018-2019 policy year (the "Insurance Program").

**A.      The Adversary Proceeding**

5.      Plaintiffs initiated this Adversary Proceeding on February 12, 2020, and filed a Complaint (D.I. 1) against Defendants for declaratory judgment, breach of contract, and breach of the implied covenant of good faith and fair dealing.  Plaintiffs' claims all arise out of the Insurance Program which Plaintiffs claim provides coverage for Plaintiffs' property damage (the "PD Claim") and/or business interruption losses (the "BI Claim") allegedly caused by the Explosion.

6.      On March 27, 2020, Defendants filed their Answer (D.I. 20).

7.       On April 6, 2020, ICBC Standard Bank PLC ("ICBCS") filed the Intervenor-Complaint (D.I. 31) in this Adversary Proceeding and asserted claims against Defendants for declaratory judgment and breach of contract.  ICBCS's claims arise out of Defendants' contractual obligations to provide insurance coverage for ICBCS's business interruption losses caused by the Explosion, pursuant to the terms and conditions of Defendants' respective insurance policies (the "ICBCS BI Claim").

8.       On May 6, 2020, Defendants filed their Answer to ICBCS's Intervenor-Complaint (D.I. 54).

9.       On August 9, 2021, the Court entered the Fourth Amended Scheduling Order (the "Scheduling Order") (D.I. 196).

10.      As set out in the Scheduling Order, the Parties completed fact discovery in May 2021 and expert reports were served in June through August 2021.  All expert discovery was completed by October 15, 2021.  The Parties exchanged trial witness lists on October 29, 2021, exchanged Exhibit lists on November 2, 2021, and exchanged affirmative deposition designations on November 8, 2021.

11.      On September 20, 2021, Plaintiffs and Defendants each filed motions for partial summary judgment (D.I. 204; 215).  Briefing for the Parties' motions was completed on November 19, 2021 (D.I. 248), and oral argument was held on December 6, 2020 (D.I. 249). The Court issued a ruling on December 15, 2021.

### B.       The Pending Settlement of the BI Claims

12.      On September 15, 2021, the Liquidating Trust's Business Interruption Committee, a three-member committee with sole and exclusive power and authority over the BI Claim, voted 2-to-1 to accept a proposed settlement of the BI Claim that resulted from a multi-day mediation.

ICBCS's representative and the independent Committee member voted in favor, and the Term

Loan Lender representative voted against.

13.     On September 16, 2021, all parties to this Adversary Proceeding accepted the

proposed settlement of the BI Claim and have finalized a Settlement Agreement documenting the

terms of the partial settlement.

14.     On November 16, 2021, the PES Liquidating Trust filed a Rule 9019 Motion for

Entry Of An Order (I) Approving the Business Interruption Settlement by and among the

Debtors, ICBC Standard Bank PLC, and Certain Insurers and (II) Granting Related Relief (the

"9019 Motion") (D.I. 242) pursuant to *Second Amended and Restated Liquidating Trust*

*Agreement* (as amended, supplemented, restated, or otherwise modified from time to time, the

"LTA").  *See* LTA §§ 2.9; 2.13 (requiring the Liquidating Trust's Business Interruption

Committee to file a Bankruptcy Rule 9019 motion for the court's approval of a settlement that

was approved by a less than unanimous vote).

15.     On December 6, 2021, the Ad Hoc Term Loan Lender Group filed an Objection

to the 9019 Motion (D.I. 260).

16.     On December 16, 2021, the Ad Hoc Term Loan Lender Group and PES agreed in

principle on a resolution to the objection, and the matter has been adjourned until the January 19,

2022 omnibus hearing.  *See* D.I. 282 at 4.

17.     If the Court grants the 9019 Motion, the BI Claim and the ICBCS BI Claim will

be settled and the only remaining claims in this litigation will be the PD Claim and Plaintiffs'

claims for breach of the covenant of good faith and fair dealing claim related to Defendants'

adjustment of the PD Claim.

## II.    BASIS OF JURISDICTION

18.    This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C.

§§ 157, 1334, 2201, and 2202, and Rule 7001 of the Federal Rules of Bankruptcy Procedure

("FRBP").

19.    This Adversary Proceeding is a non-core matter.

20.    Defendants do not consent to the entry of final orders or judgments by this Court.

21.    Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

## III.    STATEMENT OF ADMITTED FACTS THAT REQUIRE NO PROOF

### A.    The Parties

22.    Plaintiff PES Ultimate Holdings is a limited liability company organized under

the laws of the State of Delaware, with its principal place of business in the Commonwealth of

Pennsylvania.

23.    Plaintiffs PES Holdings, LLC, North Yard GP, LLC, North Yard Logistics, L.P.,

PES Administrative Services, LLC, PES Intermediate, LLC, and Philadelphia Energy Solutions

Refining and Marketing LLC are all privately held limited liability companies and limited

partnerships that are parents and subsidiaries of PES Ultimate Holdings.

24.    Plaintiff PES Energy Inc. is a privately held corporation and is the managing

member of PES Ultimate Holdings.

25.    Each of the Plaintiffs (collectively, "PES") is organized under the laws of the

State of Delaware, with a principal place of business in the Commonwealth of Pennsylvania.

26.    Defendants XL Insurance Company SE, XL Catlin, XL Insurance America, Inc.

(collectively, "AXAXL") collectively have $178,125,000.00 in limits under PES's Insurance

Program as follows:

5

a.  XL Insurance Company SE, the successor to AXA Corporate Solutions Assurance, subscribed to Policy No. ENNMG1800253 and, subject to all the terms and conditions of the policy, agreed to cover 4.25% of PES's insurable losses up to a total loss of $1.25 billion;

b.  Syndicate 2003 XLC, for and on behalf of XL Catlin, subscribed to Policy No. ENNMG1800280 and, subject to all the terms and conditions of the policy, agreed to cover 5% of PES's insurable losses up to a total loss of $1.25 billion; and

c.  XL Insurance America, Inc. subscribed to Policy No. US00064117PR18A and, subject to all the terms and conditions of the policy, agreed to cover 5% of PES's insurable losses up to a total loss of $1.25 billion.

27.  Defendant General Security Indemnity Company of Arizona ("SCOR") has $125,000,000 in limits under PES's Insurance Program.  SCOR subscribed to Policy No. 10F152096-2018-1 and, subject to all the terms and conditions of the policy, agreed to cover 10% of PES's insurable losses up to a total loss of $1.25 billion.

28.  Defendant HDI Global Insurance Company ("HDI Global") has $88,750,000 in limits under PES's Insurance Program.  HDI Global subscribed to:

a.  Policy No. OGD1368503 and, subject to all the terms and conditions of the policy, agreed to cover 4% of PES's insurable losses up to a total loss of $1.25 billion;

b.  Policy No. OGD1432102 and, subject to all the terms and conditions of the policy, agreed to cover 1.5% of PES's insurable losses up to a total loss of $1.25 billion; and

c.  Policy No. OGXD1307804 and, subject to all the terms and conditions of the policy, agreed to cover 4% of PES's insurable losses exceeding $750 million up to a total loss of $1.25 billion.

29.  Defendant Great Lakes Insurance SE ("MunichRe") has $75,000,000 in limits under PES's Insurance Program.  MunichRe subscribed to Policy No. ENNMG1800282 and, subject to all the terms and conditions of the policy, agreed to cover 10% of PES's insurable losses up to a total loss of $750 million.

30.     Defendant HDI Global Specialty SE ("HDI Specialty") (formerly International Insurance Company of Hannover SE) has $73,125,000 in limits under PES's Insurance Program. HDI Specialty subscribed to:

      a.     Policy No. ENNMG1800253 and, subject to all the terms and conditions of the policy, agreed to cover 1.25% of PES's insurable losses up to a total loss of $1.25 billion;

      b.     Policy No. ENNMG1800260 and, subject to all the terms and conditions of the policy, agreed to cover 4.250% of PES's insurable losses that exceeded $500 million, up to a total loss of $750 million; and

      c.     Policy No. ENNMG1800261 and, subject to all the terms and conditions of the policy, agreed to cover 10% of PES's insurable losses that exceeded $750 million, up to a total loss of $1.25 billion.

31.     Defendant Ace American Insurance Company ("ACE") has $61,250,000 in limits under PES's Insurance Program.  ACE subscribed to Policy No. EPRN14327186 and, subject to all the terms and conditions of the policy, agreed to cover 4.9% of PES's insurable losses up to a total loss of $1.25 billion.

32.     Defendant Mapfre Group:  Mapfre España, Compañia International De Seguros Y Reaseguros S.A. ("Mapfre") has $50,000,000 in limits under PES's Insurance Program.  Mapfre subscribed to Policy No. ENNMG1800181 and agreed, subject to all the terms and conditions of the policy, to cover 4% of PES's insurable losses up to a total loss of $1.25 billion.

33.     Defendant Zurich American Insurance Company ("Zurich") has $50,000,000 in limits under PES's Insurance Program.  Zurich subscribed to Policy No. OGR 3227382-00 and, subject to all the terms and conditions of the policy, agreed to cover 4% of PES's insurable losses up to a total loss of $1.25 billion.

34.     Defendant Allianz Global Risks US Insurance Company ("Allianz") has $46,875,000 in limits under PES's Insurance Program.  Allianz subscribed to Policy No.

USN00016718 and, subject to all the terms and conditions of the policy, agreed to cover 3.75% of PES's insurable losses up to a total loss $1.25 billion.

35.     Defendant Liberty Mutual Insurance Company ("Liberty") has $46,875,000 in limits under PES's Insurance Program.  Liberty subscribed to Policy No.1000233255-03 and, subject to all the terms and conditions of the policy, agreed to cover 3.75% of PES's insurable losses up to a total loss of $1.25 billion.

36.     Defendant Westport Insurance Corporation ("Westport") has $43,750,000 in limits under PES's Insurance Program.  Westport subscribed to Policy No. OMP 2000020-04 and, subject to all the terms and conditions of the policy, agreed to cover 3.5% of PES's insurable losses up to a total loss of $1.25 billion.

37.     Defendant Validus Specialty Underwriting Services, Inc. ("Talbot") has $34,062,500 in limits under PES's Insurance Program.  Lloyd's Syndicate TAL 1183, for and on behalf of Talbot, subscribed to Policy No. AJK148822G18 and, subject to all the terms and conditions of the policy, agreed to cover 2.725% of PES's insurable losses up to a total loss of $1.25 billion.

38.     Defendant Chaucer Syndicates Ltd. ("Chaucer") has $31,250,000 in limits under PES's Insurance Program.  Lloyd's Underwriter Syndicate No. 1084 CSL, for and on behalf of Chaucer, subscribed to Policy No. ENNMG1800279 and, subject to all the terms and conditions of the policy, agreed to cover 2.5% of PES's insurable losses up to a total loss of $1.25 billion.

39.     Defendant Lancashire Insurance Company (UK) Ltd. ("Lancashire") has $31,250,000 in limits under PES's Insurance Program.  Lancashire subscribed Policy No. ENNMG1800262 and, subject to all the terms and conditions of the policy, agreed to cover 2.5% of PES's insurable losses up to a total loss of $1.25 billion.

8

40.    Defendant PartnerRe Ireland Insurance DAC ("PartnerRe") has $31,250,000 in limits under PES's Insurance Program.  PartnerRe subscribed to Policy No. ENNMG1800181 and, subject to all the terms and conditions of the policy, agreed to cover 2.5% of PES's insurable losses up to a total loss of $1.25 billion.

41.    Defendant Pioneer Underwriting Limited ("Pioneer") has $31,250,000 in limits under PES's insurance program.  Pioneer Natural Resources – Onshore – PNR 9094, for and on behalf of Pioneer, subscribed to Policy No. ENNMG1800181 and, subject to all the terms and conditions of the policy,  agreed to cover 2.5% of PES's insurable losses up to a total loss of $1.25 billion.

42.    Defendant Navigators Management Company, Inc. ("Navigators") has $22,500,000 in limits under PES's Insurance Program.  Navigators Syndicate at Lloyd's 1221, for and on behalf of Navigators, subscribed to Policy No. 18NSRO1797-01 and, subject to all the terms and conditions of the policy,  agreed to cover 3% of PES's insurable losses up to a total loss of  $750 million.

43.    Defendant Argo Managing Agency Ltd. ("Argo") has $22,500,000 in limits under PES's Insurance Program.  Lloyd's Underwriter Syndicate 1200 AMA, for and on behalf of Argo, subscribed to Policy No. ENNMG1800279 and, subject to all the terms and conditions of the policy, agreed to cover 1.8% of PES's insurable losses up to a total loss of $1.25 billion.

44.    Defendant Premia Managing Agency ("Premia") has $21,562,500 in limits under PES's Insurance Program.  Syndicate No. 1884 ("Syndicate 1884"), for and on behalf of Premia, subscribed to Policy No. EN100070-18 and, subject to all the terms and conditions of the policy, agreed to cover 1.125% of PES's insurable losses up to a total loss of $1.25 billion.  Premia is also the successor to Barbican Managing Agency Ltd. ("Barbican").  Lloyd's Underwriter

9

Syndicate 1955 BAR, for and on behalf of Barbican, subscribed to Policy No. ENNMG1800281 and, subject to all the terms and conditions of the policy, agreed to cover 1.5% of PES's insurable losses up to a total loss of $500 million.

45.     Defendant Helvetia Swiss Insurance Company in Liechtenstein Ltd. ("Helvetia") has $18,750,000 in limits under PES's Insurance Program.  Helvetia subscribed to Policy No. ENNMG1800253 and, subject to all the terms and conditions of the policy,  agreed to cover 1.5% of PES's insurable losses up to a total loss of $1.25 billion.

46.     Defendant QBE European Company Operations ("QBE") has $16,250,000 in limits under PES's Insurance Program. Lloyd's Underwriter Syndicate No. 1036 COF, by and on behalf of QBE, subscribed to Policy No. ENNMG1800283 and, subject to all the terms and conditions of the policy,  agreed to cover 3.25% of PES's insurable losses exceeding $750 million up to a total loss of $1.25 billion.

47.     Defendant Ark Syndicate Management 3902 ("Ark") has $5,000,000 in limits under PES's Insurance Program.  Lloyd's Underwriter Syndicate 3902 NOA, for and on behalf of Ark, subscribed to Policy No. ENNMG1800285 and, subject to all the terms and conditions of the policy, agreed to cover 2% of PES's insurable losses exceeding $1 billion up to a total loss of $1.25 billion.

48.     Defendant Renaissance Re Syndicate Management ("RenRe") has $4,687,500 in limits under PES's Insurance Program.  Syndicate No.1458, for and on behalf of RenRe, subscribed to Policy No. EN100070-18 and, subject to all the terms and conditions of the policy, agreed to cover .0375% of PES's insurable losses up to a total loss of $1.25 billion.

DOCS_DE:237478.1 70753/001

49.     Defendants Certain Underwriters at Lloyd's, London participating in the Aon Client Treaty (the "ACT Insurers") collectively have $60,312,500 in limits under PES's Insurance Program.  The ACT Insurers subscribed to:

a.     Policy No. ENNMG1800261 and agreed, subject to all the terms and conditions of the policy, to cover 2.5% of PES's insurable losses that exceeded $750 million, up to a total loss of $1.25 billion;

b.     Policy No. ENNMG1800279 and, subject to all the terms and conditions of the policy, agreed to cover 1.075% of PES's insurable losses up to a total loss of $1.25 billion;

c.     Policy No. ENNMG1800280 and, subject to all the terms and conditions of the policy, agreed to cover 1.25% of PES's insurable losses up to a total loss of $1.25 billion; and

d.     Policy No. ENNMG1800282 and, subject to all the terms and conditions of the policy, agreed to cover 2.5% of PES's insurable loss up to a total loss of $750 million.

**B.     The Insurance Program**

50.     Philadelphia Energy Solutions LLC was formed in June of 2012 as a joint venture between Sunoco Inc. and The Carlyle Group, to acquire Philadelphia's Point Breeze and Girard Point oil refining complex (the "Refinery").

51.     Through Aon, PES purchased a program of property insurance policies for the policy period November 1, 2018 through November 1, 2019 (collectively, the "Policy").

52.     PES paid all premiums required under the terms of the Policy, a total of $6.8 million, $6.3 million of which was paid to Defendants.

53.     For the November 1, 2018 to November 1, 2019 policy period, PES purchased a total limit of $1.25 billion in insurance for the Refinery.

54.     The Plaintiffs in this suit qualify as "Named Insureds" as defined in the Policy.

55.     The Insurance Program is comprised of individual insurance Policies issued by each Defendant Insurer. Each policy includes a common "manuscript" form plus additional

11

terms, conditions, modifications of the form and/or exclusions required by the individual Insurer (if any).

56.    All terms at issue in this action are found in the common manuscript form and are the same for all Defendants unless otherwise noted.

57.    The Policy provides coverage for "'All risks' of direct physical loss or damage including boiler explosion, Mechanical and Electrical Breakdown, Flood, Earthquake, Named Windstorm."

58.    The Policy includes a $10 million deductible for Physical Damage.

59.    The Policy includes a $2.5 million sublimit for Claim Preparation Expense (no coverage for Public Adjusters or Attorneys).

60.    Section I of the Policy relates to Physical Damage coverage.  In the event of covered property damage loss, Paragraph 5 of Section I sets forth how such damage is to be valued for indemnification purposes.  With respect to valuation of real and personal property, the valuation provision provides:

### 5.    VALUATION

At the time of loss, the basis of valuation will be as stated below or herein.

a)    (1)    <u>Real and Personal Property</u>:    The Replacement Cost, except Actual Cash Value if not repaired or replaced[.]

* * *

e)    **Stipulated Loss Value**: where the Insured is contractually obligated to insure specific property for a stipulated loss amount, then in the event of a loss, this Policy will provide for the stipulated loss value regardless of whether such property is replaced. However, in no event shall this amount exceed the Replacement Cost Value of such property (plus in addition the covered cleanup costs). In the event of a loss up to USD 250,000,000, regardless

> whether the affected property is replaced, the loss settlement will be on replacement cost basis. In the event of a loss in excess of USD 250,000,000 and the insured does not replace the affected property, the loss settlement will be on the basis of Actual Cash Value with a minimum of USD 250,000,000[.]

61.    "Actual Cash Value" is defined as "The Replacement Cost less deduction for physical depreciation."

62.    Replacement Cost is defined as:

> The amount it would take to repair or replace the damaged or destroyed property with materials of like kind and quality, without deduction for depreciation or obsolescence and including the Insured's overhead, and normal and customary profit should the Insured participate in the repair or replacement of damaged property, all determined at the time and place of loss, it being understood that subject to the Insurers' limit of liability not exceeding the Replacement Cost:
>
> (1)    the Insured shall have the option to rebuild or replace the insured property by a construction or type superior to or more extensive than its condition when new;
>
> (2)    the Insured shall have the option of replacement with electrical and mechanical equipment having technological advantages and/or representing an improvement in function and/or forming part of a program or system enhancement. The Insurers shall be allowed to dispose of, as salvage, any non-proprietary property deemed unusable by the Insured;
>
> (3)    the Insured may elect to replace the Real Property lost, damaged, or destroyed at an alternative site;
>
> provided that the above provisions shall not serve to increase the liability of the Insurers for loss hereunder.

63.    Section III – Coverage Extensions includes the following provisions:

> 4.    CLAIM PREPARATION EXPENSE
>
> It is understood and agreed that this Policy covers expenses incurred by the Insured's auditors or consultants for producing and certifying particulars or details of the Insured's business required by Insurers in

13

order to arrive at the amount of loss payable under this Policy. Such expenses shall be limited to the sublimit stated in the Declarations, excluding expenses of public adjusters or attorneys.

\*\*\*

6.      DEBRIS REMOVAL

Nothing contained in this Clause shall override any seepage and/or pollution and/or contamination exclusion or any radioactive contamination exclusion or any other exclusion applicable to this Policy. The inclusion of this clause shall in no event increase the limit of liability of Insurers under this Policy or any endorsement applicable to this Policy.

a.      In the event of insured physical loss or damage to property for which Insurers agree to pay hereunder or which, but for the application of a retention or underlying amount they would agree to pay, this Policy also insures, subject to the limitations below and the terms and conditions of the Policy, the expense;

(1)      which is reasonable and necessarily incurred by the Insured in the removal, from the premises of the Insured at which the insured physical loss or damage occurred, of debris which results from such loss or damage to insured property, or debris of property which is not insured hereunder that is windblown, waterborne or otherwise deposited on the Insured's premises, up to the sublimit stated in the Declarations; and

(2)      of which the Insured becomes aware and advises the amount to Insurers hereon within one year of the commencement of such loss or damage;

b)      The maximum amount of expense recoverable hereunder for removal of debris shall be the sublimit stated within the Declarations.

\*\*\*

20.      PROFESSIONAL AND OTHER FEES

This Policy includes, within the repair and/or replacement costs, the expenses of the Insured for architects, surveyors, consulting engineers, legal and other professional fees; contributions or other imposts payable to any government, local government or other statutory authority; and other fees necessarily and reasonably incurred in the reinstatement of the

14

property insured consequent of its loss, destruction or damage by a peril insured against hereunder.

64. The "General Conditions" section of the Policy contains the following provisions:

### 9.   CONTROL OF DAMAGED PROPERTY

It is understood and agreed that the Insured shall have full right to the possession of all property involved in any loss under this Policy, and shall retain control of all damaged property. Exercising reasonable discretion, the Insured shall be the sole judge as to whether the property involved in any loss under this Policy is fit for use and no property deemed by the Insured to be unfit for use shall be sold or otherwise disposed of except by the Insured or with the Insured's consent, but the Insured shall allow the Insurers any salvage obtained by the Insured on any sale or other disposition.

\*\*\*

### 12.   CLAIMS ADJUSTERS

In the event of a loss that may involve this insurance, the Insured may appoint, on behalf of the Insurers, any of the following loss adjusters without seeking the prior approval of the Insurers:

- ▪ John Nelson, Integra Technical Services
- ▪ Charles Klehr; McLarens

or to be mutually agreed by the Insured and Insurers.

It is agreed the adjuster will notify and seek the permission of the Insured prior to retaining other engineers, experts, or consultants to assist in the investigation of the claim.

The adjustment representative will notify the Insurers or their representative of the loss particulars and distribute all loss adjustment reports, updates and correspondence, as appropriate, to the Insurers or their representative, and Philadelphia Energy Solutions and Aon Risk Services.

\*\*\*

65. The Parties agree that disputes arising from the Policy are governed by New York law.

### C.    The Explosion at the PES Refinery and the Adjustment of PES's Claim

66.    On June 21, 2019, a series of explosions occurred in the Refinery's hydrofluoric acid alkylation unit 433 (the "HF Unit") after there was a loss of containment in a section of piping within the unit.

67.    Shortly after the initial explosion, a PES control room operator initiated a forced shutdown of the HF Unit by activating the Rapid Acid Deinventory ("RAD") system, which caused bulk hydrofluoric acid in the system to drain into the RAD drum, isolating it from release.

68.    The fire caused by the loss of containment and subsequent explosions burned throughout the day on June 21, 2019 as PES and the Philadelphia Fire Department worked to extinguish it, and it was extinguished on the morning of June 22, 2019.

69.    Post-event investigation determined that an elbow in an 8" diameter pipe within the HF Unit ruptured, causing the initial fluid/vapor release that ultimately led to the explosions and resultant fire (collectively, the "Explosion").

70.    In the days following the Explosion, numerous federal, state and local governmental agencies initiated investigations into the Explosion.

71.    The Philadelphia Fire Department served as the formal unified incident commander, directing PES and other parties during their involvement in the emergency response to the Explosion.

72.    The Explosion caused damage to equipment, piping and ancillaries at the Refinery and particularly within the HF Unit.

73.    After the Explosion, residual hydrofluoric acid remained in certain equipment and/or piping within the HF Unit.

16

74.    After the hydrofluoric acid was transferred into the RAD drum immediately after the first of the three explosions, PES hired a contractor with expertise in cleaning alkylation units to neutralize the remaining hydrofluoric acid.

75.    The process of neutralizing the bulk hydrofluoric acid lasted from August 7, 2019 to August 27, 2019.

76.    At the time of the Explosion, PES was the largest refinery complex on the East Coast.

77.    PES and previous owners of the Refinery conducted regular maintenance "turnarounds" of the HF Unit in which the unit was temporarily taken out of service for inspections, repairs and replacement of equipment, piping, and other components.

78.    On June 21, 2019, Aon, PES's insurance broker, provided notice to Defendants of the Explosion.

79.    In that Notice, Aon indicated that PES requested Defendants consider Ewan Creswell of Integra Technical Services, supported locally to by Fred Popko and John Nelson as adjuster of record for the loss.

80.    Defendants retained Ewan Cresswell, Fred Popko and John Nelson as the adjusters of record for the loss.

81.    On or about June 24, 2019, Defendants retained Buchanan Clarke Schlader LLP ("BCS") as forensic accountants.

82.    On or about July 22, 2019, PES acknowledged it had no objection to Defendants' retention of BCS.

83.    The Explosion caused direct physical loss or damage to property insured under the Policy.

17

84.    PES's claim does not include a claim for coverage for physical loss or damage to "Property Excluded" under the Policy.

85.    The Explosion was caused by a peril insured under the Policy.

86.    PES's loss was not a result of any "Peril Excluded" under the Policy.

87.    PES has satisfied the Policy's $10,000,000 retention for its physical damage claim.

88.    On June 26, 2019, PES announced that it would shut down the entire Refinery and position it for sale.

89.    On or about July 21, 2019, PES filed for Chapter 11 bankruptcy protection, entering into a debtor-in-possession financing agreement.

90.    On or about July 23, 2019, Integra sought permission from PES to retain Jensen Hughes ("JH") as cause and origin investigator, SEA LTD ("SEA") for drone investigation, Failure Analysis and Prevention ("FAP") for damage assessment, heat mapping and metallurgical engineering.

91.    PES agreed to Insurers retaining SEA on July 23, 2019, and JH and FAP on July 25, 2019.

92.    FAP and/or Pivot visited the site numerous times from July 2019 to June 2020 for on-site inspections.

93.    On or about January 17, 2020, PES reached an agreement to sell the Refinery to an affiliate of Hilco Redevelopment Partners ("Hilco").

94.    On or about June 26, 2020, the sale of the Refinery to Hilco closed.

95.    Despite the sale of the Refinery to Hilco, PES's insurance claim at issue in this litigation remains an asset of the bankruptcy estate.

18

96.     After the sale, Hilco confirmed that the Refinery would not be rebuilt.

97.     After the Explosion, PES retained the Fluor Corporation ("Fluor") to perform an initial estimate of the cost to replace the damaged HF Unit based in part on information provided by PES regarding the scope of damage.

98.     Fluor's initial Class 4 equipment-factored replacement cost estimate, issued via a revised report dated January 29, 2020, was $361,501,400.

99.     On July 31, 2019, Integra requested permission for Defendants to retain KBR to prepare a replacement cost estimate for damages caused by the Incident.

100.    On September 16, 2019, Integra sent its First Report to Aon for distribution to PES.

101.    On September 17, 2019, Integra recommended to Defendants, and Defendants subsequently paid, a $50,000,000 unallocated partial payment to PES.

102.    On October 3, 2019, PES informed Defendants that the Replacement Cost of the Explosion-damaged property exceeded $250 million and demanded that Defendants pay a minimum of $250 million for PES's property damage losses pursuant to the terms of the Policy's Stipulated Loss Value clause.

103.    On December 10, 2019, Integra recommended to Defendants, and Defendants subsequently paid, an additional $15,000,000 unallocated partial payment to PES.

104.    The $15,000,000 unallocated partial payment recommended by Integra on December 10, 2019 represented Integra's estimated Actual Cash Value of the HF Unit of $65,000,000 and $10,000,000 of vetted loss-related costs incurred by PES, less prior payments and the Policy's $10,000,000 deductible.

105.    On December 11, 2019, Integra provided its Second Report to Aon for issuance to PES.

106.    On February 11, 2020, Integra recommended to Defendants, and Defendants subsequently paid, an additional $5,500,000 for vetted loss-related costs incurred by PES.

107.    On February 21, 2020, PES submitted a claim to Defendants which included a claim of $250 million for the damage to the HF Unit based on the application of the Stipulated Loss Value Clause.

108.    On March 10, 2020, Integra recommended to Defendants, and Defendants subsequently paid, a $30,000,000 time element partial payment to PES.

109.    On May 20, 2020, Integra recommended to Defendants, and Defendants subsequently paid, an additional $5,346,532 for vetted loss-related costs incurred by PES.

110.    On June 6, 2020, Integra provided PES with reports from FAP and Pivot Engineers (who had been retained by FAP to inspect concrete) related to the damage assessment.

111.    On June 19, 2020, Integra provided PES with KBR's May 29, 2020 HF Alkylation Unit Reinstatement Cost Estimate Basis.

112.    On August 21, 2020, Integra provided PES with KBR's August 20, 2020 Evaluation of the Actual Cash Value Estimate for the Reinstatement of the Hydrofluoric Acid Alkylation Unit at the Girard Point Refinery and Integra's Actual Cash Value with 50% Maximum Depreciation spreadsheet.

113.    The Parties agree that a 50% maximum depreciation deduction for operational equipment applies to any calculation of the Actual Cash Value.

114.    On February 8, 2021, Integra recommended to Defendants, and Defendants subsequently paid, an additional $10,956,327.34 payment to PES, reflecting additional vetted

20

loss-related costs incurred by PES and reflecting an increase in Defendants' prior calculation of the Actual Cash Value of the HF Unit.

115.    On June 7, 2021, PES provided Defendants with an Actual Cash Value measure of its claimed damages arising from the incident, in accordance with the deadline for production of initial expert reports in this litigation.

116.    On July 12, 2021, Integra provided its Third Report dated June 12, 2021 to PES and Aon.

117.    On or about September 16, 2021, PES, Defendants, and ICBCS agreed in principle to settle PES's BI Claim and ICBCS's Claim for a total of $270,000,000: $200,000,000 paid to PES and $70,000,000 paid to ICBCS.

118.    On September 28, 2021, Integra advised PES that there was an outstanding balance of $28,637 due to PES from Defendants based on prior authorized payments, and suggested that it be paid in conjunction with the settlement of the BI Claim.

119.    In total, independent of Defendants' mediated resolution of PES's BI Claim and the ICBCS BI Claim, Integra's payment recommendations indicate that Insurers have paid PES $86,802,859.34 in covered property damage-related costs and other costs and acknowledged an additional $28,637 in covered property damage-related costs.

120.    The $86,802,859.34, as calculated using Integra's payment recommendations, represents the sum of what Defendants contend is the Actual Cash Value of the HF Unit and the vetted property damage-related costs and other costs incurred by PES, less the Policy's $10,000,000 deductible.

**IV.      STATEMENT OF FACTS IN DISPUTE AND LEGAL ISSUES PRESENTED**

**A.      Issues of Fact that Remain to Be Litigated**

121.    The Replacement Cost, as that term is defined in the Policy, including but not limited to the following sub-issues:

a.      The correct allowance for "contingency" (or any other allowance for unknown costs that might have occurred during the execution of the known project scope, had the Unit been rebuilt);

b.      Whether there should be any, and if so the correct amount of, allowance for "discovery" (or any other allowance for unknown costs that might have occurred based on the discovery of previously unknown damage during the execution of the known project scope, had the Unit been rebuilt);

c.      Whether there should be any, and if so the correct amount of, allowance for "owner's cost" (or any other allowance for costs that might have been incurred by PES or third parties contracted by PES had the Unit been rebuilt);

d.      Whether there should be any, and if so the correct amount of, allowance for demolition costs that would have been incurred in order for PES to rebuild the Unit had it been rebuilt;

e.      The property within Unit 433 and elsewhere in the Refinery that would have needed to be replaced due to the explosions on June 21, 2019 and/or the resulting fire;

f.      The property within Unit 433 and elsewhere in the Refinery that would have needed to be repaired due to the explosions on June 21, 2019 and/or the resulting fire;

g.      The property, if any, within Unit 433 that needed repair or replacement because of its pre-explosion condition unrelated to the fire or explosion; and

h.      The correct division between materials-related costs and labor-related costs included in the Replacement Cost.

122.    The Actual Cash Value, as that term is defined in the Policy.

123.     Whether Defendants' conduct during the adjustment of PES's claim constituted a breach of Defendants' covenant of good faith and fair dealing under the Policy and New York law.

**B.     Issues of Law that Remain to Be Litigated and Citation of Authorities Relied Upon**

124.     Issue of Law No. 1: Whether Defendants' conduct during the adjustment of PES's claim constituted a breach of Defendants' covenant of good faith and fair dealing under the Policy and New York law.

125.     Issue of Law No. 2: Whether "owner's cost" (or any other allowance for costs that might have been incurred by PES or third parties contracted by PES during the rebuild of Unit 433) claimed by PES had to have been incurred to be recoverable under the Policies; and

126.     Issue of Law No. 3:  Whether the demolition costs claimed by PES have to have been incurred by PES to be recoverable under the Policies.

127.     With respect to Issue of Law No. 1, the Parties rely upon New York cases setting forth the legal standards concerning claims for breach of the common law implied covenant of good faith and fair dealing, including but not limited to the following primary authorities:  *Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 10 N.Y.3d 187 (2008); *Panasia Estates, Inc. v. Hudson Co.*, 10 N.Y.3d 200 (2008); *New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308 (N.Y. 1995); *Sukup v. State*, 19 N.Y.2d 519 (1967); *Certain Underwriters at Lloyd's v. BioEnergy Development Group, LLC*, 178 A.D.3d 463 (N.Y. App. Div. 2019).

128.     With respect to all Issues of Law, the Parties also respectfully refer the Court to the legal authorities set forth in their motions for partial summary judgment.  D.I. 205 (Insurers' Memorandum of Law in Support of Motion for Partial Summary Judgment on Plaintiffs' Property Damage Claims) at 23-29; D.I. 224 (PES's Opposition to Defendants' Motion for

23

Partial Summary Judgment) at 26-30; D.I. 236 (Reply Memorandum of Law in Support of

Insurers' Motion for Summary Judgment) at 8-12.

## V.      RELIEF SOUGHT

### A.      Relief Sought by Plaintiffs

**1.      PES seeks an award of no less than $215,212,253 against Defendants for their breach of their obligations under the Policy, plus prejudgment interest on that amount, and any other relief this Court deems just and proper.**

PES seeks an award of no less than $215,212,253 against Defendants, such amount being

equal to the sum of 1) the unpaid balance of the Actual Cash Value of PES's Explosion-damaged

property ($208,591,059); and 2) the unpaid balance of certain additional property damage losses

and other incurred costs which PES is entitled to coverage under Section 3 of the Policy

($6,621,194).

The Court has determined that the Stipulated Loss Value clause is applicable to PES's PD

Claim and therefore that PES is entitled to the greater of either 1) the Replacement Cost up to

$250 million; or 2) the Actual Cash Value.  *See* December 15, 2021 Opinion (D.I. 280) (the

"December Opinion").  At trial, PES will demonstrate that the Replacement Cost is

$301,669,147 and that the Actual Cash Value is $281,767,417.  Because the Actual Cash Value

is greater than $250,000,000, PES is entitled to the full $281,767,417 of Actual Cash Value, less

the $73,176,358 that Defendants have already paid toward this amount.[1]  Additionally, PES will

demonstrate that, as of December 22, 2021, PES has incurred at least $30,276,333 in losses and

costs covered under Section 3 of the Policy.  These losses continue to accrue, and as of

December 22, 2021, Defendants have only paid $23,655,139 towards this amount.

---

[1] Alternatively, should the Court find the Actual Cash Value to be less than $250,000,000, PES will seek an award of $176,823,642, such amount being equal to the Replacement Cost as capped at $250,000,000, less the $73,176,358 that Insurers have already paid.

24

      **2.**      **PES seeks an award of those attorneys' fees that PES incurred as consequential damages of Defendants' breach of the implied covenant of good faith and fair dealing in an amount to be determined after trial.**

Pursuant to this Court's December Opinion, the upcoming trial has been bifurcated with respect to PES's cause of action against Insurers for breach of the implied covenant of good faith and fair dealing.  *See* Dec. Op. 27-29.  If and when the Court determines that Insurers' are liable to PES for their breach of the implied covenant of good faith and fair dealing, PES will present evidence of those attorneys' fees PES incurred as consequential damages at the subsequent damages trial in accordance with the Court's December Opinion.

      **B.**      **Relief Sought by Defendants**

      1.      Defendants seek a finding that the appropriate Replacement Cost as defined under the Policy for the property damages suffered by PES are $166,832,000.

      2.      Defendants seek a finding that the appropriate Actual Cash Value (without depreciation for labor) is $134,100,500.

      2.      Defendants seek a ruling that of the $30,276,333 in losses and costs PES is claiming are covered under Section 3 of the Policy, PES has only provided support for covered losses and costs totaling $23,655,139.

      3. Defendants seek a ruling that they did not breach the covenant of good faith and fair dealing in handling PES's claim.

      4,      Defendants seek a ruling that PES did not suffer consequential damages from any breach of the covenant of good faith and fair dealing.

      5.      Defendants seek a ruling that PES is not entitled to recover demolition costs that it did not incur, and that demolition costs not incurred are not a component of Replacement Cost or Actual Cash Value.

6.      Defendants seek a ruling that PES is not entitled to recover Owners Costs that it did not incur, and that Owners Costs not incurred are not a component of Replacement Cost or Actual Cash Value.

7.      Defendants seek a ruling that PES is not entitled to recover Discovery Costs that it did not incur and that Discovery Costs not incurred are not a component of Replacement Cost or Actual Cash Value.

## VI.    WITNESSES

### A.    Plaintiffs' Witnesses

1.      **Mark Smith**

2.      **John Sitler**

3.      **Mike Leonardo**

4.      **Mark O'Rear**

5.      **Tom Brindley**

6.      **Olie Jolstad**

7.      **Fred Popko**

8.      **Perry Bowen (by designation)**

9.      **Geoffrey Brodhead (by designation)**

10.     **Andrew Butcher (by designation)**

11.     **Paul Crockford (by designation)**

12.     **Christopher Dye (by designation)**

13.     **Robert Erb (by designation)**

14.     **Daniel Flint (by designation)**

15.     **Rob Gallie (by designation)**

16.     **Dennis Griffith (by designation)**

17.     **Roman Guaita (by designation)**

18.    **Mark Hatchett (by designation)**

19.    **Patrick Hauser (by designation)**

20.    **Frazer Higgins (by designation)**

21.    **Stephen Hill (by designation)**

22.    **Jim Jezewski (by designation)**

23.    **Joseph Kelly (by designation)**

24.    **Matthias Leber (by designation)**

25.    **Kathrin Lesser (by designation)**

26.    **Carol Martin (by designation)**

27.    **Jonathan McCoy (by designation)**

28.    **Kevin McCoy (by designation)**

29.    **Andrew Mendrys (by designation)**

30.    **Oliver Newick (by designation)**

31.    **Roland Oppliger (by designation)**

32.    **Kudret Oztap (by designation)**

33.    **Georgie Panter (by designation)**

34.    **Ed Ryan (by designation)**

35.    **Patrick Spagnuolo (by designation)**

36.    **John Swanson (by designation)**

37.    **Matthew Town (by designation)**

38.    **George Tsagaris (by designation)**

39.    **Jon Ward (by designation)**

40.    **Dean Watson (by designation)**

41.    **Adam Williams (by designation)**

42.    **Tayo Williams (by designation)**

DOCS_DE:237478.1 70753/001

**43.**    **Kieran Wilson (by designation)**

**B.**    **Defendants' Witnesses**

**1.**    **Fred Popko**

**2.**    **Scott Dalton**

**3.**    **Reggie Dent**

**4.**    **Kevin McCoy**

**5.**    **Steve Guggenheim**

**6.**    **Michael Casey**

**7.**    **Michael Wilson**

**8.**    **Dylan Freytag**

**9.**    **John Swanson**[2]

**10.**    **Reza Nikain**

**11.**    **Jonathon Held**

**12.**    **Dale Frediani**

**13.**    **Aram Asdourian (by designation)**

**14.**    **Rachel Celiberti (by designation)**

**15.**    **Brett Flande (by designation)**

**16.**    **Jake Newman (by designation)**

**17.**    **Franklin Parks (by designation)**

**18.**    **Gary Rundgrun (by designation)**

**19.**    **Daniel Statile (by designation)**

---

[2] The Parties have tentatively reached an agreement to enter into a stipulation that will eliminate the necessity of this witness.

DOCS_DE:237478.1 70753/001

VII.   **LIST OF DISCOVERY ITEMS PROPOSED BY PARTIES TO BE ENTERED INTO TRIAL**

A.      **Plaintiffs' Deposition Designations**

The Plaintiffs' Deposition Designations, along with Defendants' Counter Designations and Objections are appended to this Memorandum at Appendix 1.  The Parties are continuing to update the designations and objections listed in Appendix 1 to account for the Court's December Order.

B.      **Defendants' Deposition Designations**

The Defendants' Deposition Designations, along with Plaintiffs' Counter Designations and Objections are appended to this Memorandum at Appendix 2.  The Parties are continuing to update the designations and objections listed in Appendix 2 to account for the Court's December Order.

VIII.  **JOINT LIST OF EXHIBITS**

The Parties' Joint List of Exhibits is appended to this Pretrial Order at Appendix 3.  The Parties are continuing to update the exhibit list and objections listed in Appendix 3 to account for the Court's December Order.

DOCS_DE:237478.1 70753/001

Dated:  December 22, 2021

_/s/ Peter J. Keane_
Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Peter J. Keane (DE Bar No. 5503)
**PACHULSKI STANG ZIEHL & JONES
LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier
19801)
Telephone:     (302) 652-4100
Facsimile:     (302) 652-4400
Email:          ljones@pszjlaw.com
                   joneill@pszjlaw.com
                   pkeane@pszjlaw.com

- and -

Edward O. Sassower, P.C.
Steven N. Serajeddini (admitted _pro hac vice_)
Matthew C. Fagen (admitted _pro hac vice_)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL
LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          edward.sassower@kirkland.com
                   steven.serajeddini@kirkland.com
                   matthew.fagen@kirkland.com

- and -

Andrew A. Kassof, P.C. (admitted _pro hac vice_)
Nader R. Boulos, P.C. (admitted _pro hac vice_)
Michael B. Slade (admitted _pro hac vice_)
William T. Pruitt (admitted _pro hac vice_)
Whitney L. Becker (admitted _pro hac vice_)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL
LLP**
300 N. LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          andrew.kassof@kirkland.com

DOCS_DE:237478.1 70753/001

nader.boulos@kirkland.com
michael.slade@kirkland.com
william.pruitt@kirkland.com
whitney.becker@kirkland.com

- and -

Kenneth H. Frenchman (admitted *pro hac vice*)
Robin L. Cohen (admitted *pro hac vice*)
Marc T. Ladd (admitted *pro hac vice*)
Alexander M. Sugzda (admitted *pro hac vice*)
Nicholas R. Maxwell (admitted *pro hac vice*)
Chelsea L. Ireland (admitted *pro hac vice*)
**COHEN ZIFFER FRENCHMAN &**
**MCKENNA LLP**
1350 Avenue of the Americas, 25th Floor
New York, New York 10019
Phone:        (212) 584-1890
Email:        kfrenchman@cohenziffer.com
              rcohen@cohenziffer.com
              mladd@cohenziffer.com
              asugzda@cohenziffer.com
              nmaxwell@cohenziffer.com
              cireland@cohenziffer.com


*Counsel for Plaintiffs PES Energy, Inc., PES
Holdings LLC, PES Administrative Services,
LLC, PES Intermediate, LLC, PES Ultimate
Holdings, LLC, and Philadelphia Energy
Solutions Refining and Marketing LLC*


**HOGAN MCDANIEL**

*/s/ Garvan F. McDaniel*
Garvan F. McDaniel [Del. Bar No. 4167]
1311 Delaware Avenue
Wilmington, Delaware 19806
Telephone 302-656-7540
gmcdaniel@dkhogan.com

-and-

**WILMER CUTLER PICKERING HALE**
**AND DORR LLP**
Philip D. Anker
7 World Trade Center

31

250 Greenwich Street
New York, NY 10007
Telephone: 212-230-8890
philip.anker@wilmerhale.com

Benjamin W. Loveland
60 State Street
Boston, MA 02109
Telephone: 617-526-6000
benjamin.loveland@wilmerhale.com

*Counsel for Defendant Insurers*

-and-

**ZELLE LLP**
Jonathan R. MacBride
1635 Market Street, Suite 1600
Philadelphia, PA 19103
Telephone: 484-532-5330
jmacbride@zelle.com

Matthew Gonzalez
45 Broadway, Suite 920
New York, NY 10006
Telephone 646-876-4410
mgonzalez@zelle.com

Elizabeth V. Kniffen
Lindsey A. Davis
500 Washington Avenue South, Suite 4000
Minneapolis, MN 55415
Telephone: 612-339-2020
ekniffen@zelle.com
ldavis@zelle.com

*Co-Counsel for Defendant Insurers*

DOCS_DE:237478.1 70753/001